22-16162

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**TODD ASHKER,**

Plaintiff-Appellant,

**v.**

**S. KERNAN, et al.,**

Defendants-Appellees.

On Appeal from the United States District Court
for the Northern District of California

No. 3:18-cv-06350-WHA
The Honorable William Alsup, Judge

**DEFENDANTS-APPELLANTS'
SUPPLEMENTAL EXCERPTS OF RECORD
(VOLUME 6 OF 7)**

ROB BONTA
Attorney General of California
MONICA N. ANDERSON
Senior Assistant Attorney General
NEAH HUYNH
Supervising Deputy Attorney General
CASSANDRA J. SHRYOCK
Deputy Attorney General
State Bar No. 300360
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone: (415) 510-3622
  Fax: (415) 703-5843
  Email:  Cassandra.Shryock@doj.ca.gov
*Attorneys for Defendants-Appellees*
*Beard, Kernan, Ducart, Giurbino,*
*Hubbard, Rothchild, Ruff, Robertson,*
*Harrington, McLaughlin, Russell, Vargas,*
*Fallis, and Black*

# EXHIBIT 8

**TO DEFENDANTS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**AGO 001061**

Todd Ashker, C58191

Danny Troxell, B76578

P.O. Box 7500/D1-SHU

Crescent City, Cal. 95532

Plaintiffs, In pro-se +

FILED

MAY 21 2010

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

The United States District Court

For The Northern District Of California

Oakland-Division

Todd Ashker and Danny Troxell,

Plaintiffs,

vs.

Arnold Schwarzenegger, Mathew Cate,
Roderick Q. Hickman, Jeanne Woodford,
Joe McGrath, Richard Kirkland,
Robert Horel, Francisco Jacquez, Derral
Adams, William Barlow, R.L. Johnson, D.W.
Bradbury, J. Mckinney, Robert Marquez,
R. Rice, John Harrison, B. Thornton, G.H. Wise,
A. Hernandez, Robert Doyle, Susan Fisher,
Robert Harmon, Hollis Gillingham,
D. Smith, and S. Tucker, inclusive,
Defendants.

Case No. C09-5796 C.W.

First Amended Complaint
For Damages and Injunctive-
Relief [42 USC §1983]
And Demand For Jury Trial

AGO 001062

## I. Jurisdiction & Venue

1) This action is brought pursuant to 42 USC §1983 to redress the deprivations under color of state law, of rights secured by the Constition of the United States. Jurisdiction is pursuant to 28 USC §§ 1331 & 1343. Plaintiffs seek damages, as well as declaratory relief [per. 28 USC §§ 2201 & 2202]

2) Venue is proper pursuant to 28 USC § 1391(b)(2) because the alleged unlawful acts and ommisions occurred primarily within the Northern District Of California, in the County of Del Norte. Plaintiffs request a trial by jury on all claims.

## II. Parties

3) Plaintiffs Todd Ashker and, Danny Troxell, are both serving term-to-life sentences in the custody of the Calif. Dept. of Corrections & Rehabilitation [C.D.C.R.]. They have been, and were, at all times mentioned herein, confined in Pelican Bay State Prison's S.H.U. unit.

4) Defendant Arnold Schwarzenegger, is Governor and Chief Executive of the state of California. At all times mentioned herein, he has been legally responsible for the policies, customs, and practices, adhered to by the C.D.C.R. [i.e., he is personally aware of, and condons, state sanctioned torture as a way of coercing P.B.S.P.-SHU inmates into providing information & confessions]; as well as, The Board of Prison Hearings [BPH] re: term-to-life inmates parole criteria [i.e., he created, and/or, allowed the continuance of, the policy, or custom under which unconstitutional practices occur; e.g., reviewing [BPH] parole grants, per. article 5, sect. 8(b) of the Calif. Const., and rescinding the parole grants given to inmates with many years of inactive gang-status, until said inmates "debrief" [See below paras #26-27, 40, re: "debriefing"]

5) Defendant Matthew Cate, is the Secretary of [CDCR]; per. Cal. Penal Code §5054, Secretary Cate, is the head of [CDCR], responsible for the supervision, managent and control of the state prisons, and for the care, custody, treatment, ... of all persons confined therein. Sec. Cate, is responsible for promulgating and rescinding the rules and regulations for the administration of the prisons [per. Cal. Pen. Code §5058]

⟨1⟩

AGO 001063

Defendant Cate, has personally created, and/or allowed the continuation of, the policies and customs under which the unconstitutional policies, customs & practices occurred

6) Defendants Roderick Q. Hickman, and Jeanne Woodford, are former Secretary's [Directors] of [C.D.C.R]. At all times mentioned herein, they both had the same duties and responsibilities as Defendant Cate; each of them were personally responsible for creating, and/or allowed the continuance of, the policies and customs under which the unconstitutional policies, customs, and practices occurred.

7) Defendants Joe McGrath, Richard Kirkland, Robert Horel, and Francisco Jacquez, are each former Wardens/acting Wardens and Administrators at P.B.S.P.; Def. Darral Adams, is current PBSP - acting Warden, At all times mentioned herein, each of them was legally responsible for implementing and adhering to the Secretary/Directors rules and regulations, and for the operation of P.B.S.P, and the welfare of all inmates therein. Each of them was personally responsible for creating, and/or allowing the continuance of, the policies and customs under which the unconstitutional policies, customs, and practices occurred. [each were directly, and personally involved in the violations too]

8) Defendants William Barlow [PBSP-Litigation Coordinator], R.L. Johnson [PBSP-SHU Captain], and D.W. Bradbury [PBSP-SHU, Associate Warden], at all times mentioned herein, were each legally responsible for carrying out their duties [per assigned posts]; including, following applicable law, rules and regulations. Each of them was personally put on notice of the unconstitutional policies, customs, and practices described in the complaint, and each had the power, and duty, to take remedial action. Instead, each of them, via their acts and omissions, exacerbated the problems by condoning them, and thereby ensuring the continuance of the violations indefinitely.

9) Defendants J. McKinney, Robert Marquez, R. Rice, G.H. Wise, John Harrison, and B. Thornton, are each current and former [CDCR-PBSP] gang-investigators. At all times mentioned herein, each of them were legally responsible for carrying out their assigned duties, and adhering to all applicable laws, rules and regulations. Each of them claimed they personally investigated Plaintiffs gang-affiliation, and status, issues, and each

⟨2⟩

AGO 001064

of these Defendants have personally violated Plaintiffs U.S. Constitutional rights via their failure to follow CDCR- policies; and/or, the policies, customs, and practices they did follow are unconstitutional, as specified in the complaint below.

10) Defendant A. Hernandez, is a former CDCR- correctional officer, who was assigned to P.B.S.P.- SHU, D1- Block. At all times mentioned herein, part of her duty(s) included the processing/reviewing of PBSP-SHU inmates, approved inmate to inmate legal correspondence. As detailed in the complaint, Def. Hernandez, personally violated Plaintiffs' U.S. Const. rights via her acts and omissions re: approved legal correspondence violations.

11) Defendant Robert Doyle, is current [BPH] chairman; Defendants Susan Fisher, Robert Harmon, Hollis Gillingham, Dennis Smith, and Steven Tucker, are each current and former [BPH] commissioners. At all times mentioned herein, each of them were legally responsible for conducting term-to-life inmates, parole suitability hearings pursuant to applicable laws, rules and regulations. Each of them personally created, and/or, allowed the continuance of, the unconstitutional policies, and customs under which the unconstitutional practices occurred. Defendants each personally applied the arbitrary, status-based, no parole and multi-year deferrals practice, applied to lifers in [SHU] for administrative reasons; including the Plaintiffs, as specified below.

12) Defendants Schwarzenegger, Cate, Hickman, Woodford, McGrath, Kirkland, Horel, Jacquez, Barlow, Johnson, Bradbury, McKinney, Marquez, Rice, Harrison, Thornton, Wise, and Hernandez, are each sued individually and in their official capacity [for damages and injunctive relief].

13) Defendants Doyle, Fisher, Harmon, Gillingham, Smith, Tucker, and Adams, are each sued in their official capacity [for declaratory and injunctive relief].

14) Each of the Defendants have acted, and those still employed continue to act, under color of state law at all times relevant to this complaint. Plaintiffs are informed and believe that each of the kinds of conduct complained of herein, are the subject of numerous prisoner complaints, which are reviewed by the Governor, Secretary/Directors, Wardens, and [BPH] staff. Additionally, this conduct has been

<3>

AGO 001065

the subject of numerous individual suits and writs by inmates [including the Plaintiffs many complaints, memos, and suits]. Defendants have been on notice of the constitutional violations and refuse to correct the problems, and in fact condone these continuing violations.

### III. INTRODUCTION

15) This is a claim for damages and injunctive relief brought under 42 USC §1983, against the Governor, CDCR, and BPH officials, for violations of Plaintiffs rights to: free speech and association; freedom from incriminating themselves and others; freedom from torture and other cruel and unusual punishment; right to due process [both procedural and substantive], equal protection, and ex post facto protection; as protected by the 1st, 5th, 8th, and 14th Amendments to the U.S. Constitution [and United Nations 1984 Convention Against Torture and other cruel, inhuman or degrading treatment].

16) This action arises from Defendants policies, customs, practices, and/or, acts and omissions re: Plaintiffs [23-24+] years of SHU-confinement and related harm therefrom, including multi-year parole deferrals. Defendants have arbitrarily and wrongly retained them in SHU, and issued multi-year parole denials, on the basis of status [a CDCR-gang label]: (a) Without due process of law; (b) When they deny membership, and have never been found guilty of committing an illegal, gang-related act; (c) On the basis of innocent association; (d) On the basis of coerced, erroneous, false, and unreliable information; (e) As part of Defendants informant procurement custom, via the use of torture and cruel, unusual, and dehumanizing treatment; (f) For more than (23-24) years, in conditions that seriously impact Plaintiffs physical and mental health; (g) And predicating their release from (SHU), and parole, upon their agreement to become known informants, and thereby subject themselves [and family] to serious risk of retaliatory danger.

17) This action also includes claims arising from Defendants acts, omissions, customs, policies, and practices, re: U.S. Constitutional First Amendment

⟨4⟩

AGO 001066

Violations of Plaintiffs protected rights to: free speech, access to courts, and reading material.

## IV FACTS

### FACTS PERTAINING TO PLAINTIFFS ARBITRARY, ILLEGAL, AND INDEFINITE RETENTION IN THE P.B.S.P.-S.H.U.

### (a) General Facts re: Violations of Applicable Law, Rules, and Regulations

18) As detailed below, Plaintiffs have been arbitrarily, and illegally, confined in [SHU] for more than [23-24] years; such indefinite SHU-confinement is a continuing violation of their protected U.S. Constitutional rights, as follows.

19) The CDCR classified Ashker as an A.B. member in 1988, based on unreliable, unsubstantiated allegations made by confidential inmate informants -to prison staff. This initial classification came about without prior notice that (a) a gang classification was cause for sanctions; and (b) he was even being investigated. He received no notice re: allegations being made about him, nor any opportunity to respond. He has always maintained he is not a gang affiliate, nor is he party to any illegal, gang-activity.

20) Ashker's been in [SHU] since 1986, and been on indefinite [SHU] status at PBSP-since January 1992, based on CDCR's arbitrary application of policy(s) re: SHU due to gang-label. Defendants have repeatedly told him his only way out of [SHU] is to parole, die, or debrief; and Defendants Schwarzenegger, and [BPH] commissioners, expect him to debrief his way out of [SHU], prior to a chance to parole [see details, paras" 42-91, and 141-149]

21) The CDCR classified Troxell as an A.B. member in 1989, based on unreliable, unsubstantiated allegations made by confidential inmate informants - to prison staff. This initial classification came about without any prior notice that (a) a gang classification was cause for sanctions; and (b) that he was even being investigated. He received no notice about allegations being made about him, nor any opportunity to respond.

⟨5⟩

AGO 001067

He has always maintained he is not gang affiliated, nor party to any illegal, gang-activity.

22) Troxell has been subject to (SHU) since 1985, and indefinite PBSP-SHU confinement since December 1989, based on CDCR's arbitrary application of policies re: SHU due to gang-label. Defendants have repeatedly told him his only way out of (SHU) is parole, die, or debrief; and Defendants Schwarzenegger and (BPH) commissioners, expect him to debrief his way out of (SHU), prior to a chance to parole [see details, paras* 92-137, 141-143, and 150-161]

23) Plaintiffs received subsequent reviews of their gang-status in 1995, 2001, 2002, 2003, and 2007. The 1995-2003, reviews were conducted without prior notice or opportunity to be heard. They were given prior notice, and opportunity to be heard for their 2007 reviews, whereupon Defendants re-validated them again; However, Plaintiffs are informed and thereby allege, that none of their subsequent reviews [1995-2007], were inclusive of subjective investigation(s) [per Defendant McGrath's testimony, and Court findings of Fact in Lira v. Cate, USDC-N.D. Cal* C00-0905SI, Order of Sept. 30, 2009] [Order, at pp. 40-42]

24) Plaintiffs challenged the gang-validations via several CDCR-602 Appeals; all of which Defendants, or their agents, denied, based on their unconstitutional policies, and customs at issue. Plaintiffs are informed and thereby allege, that none of their 602's, received subjective investigatory reviews [Id, per McGrath's testimony ref'd in Lira Order, pp. 40-42; as detailed in below paras* 46-87, and *97-133]

25) Between 1985 and 2010, Defendants, and their agents, were mandated to provide meaningful reviews of Plaintiffs (SHU) status every 120/180 days [per. Toussaint/Madrid rulings]. This is because Plaintiffs have a liberty interest in not being held in (SHU) beyond (11) months, absent specific exceptions. Plaintiffs are informed and thereby allege that their 120/180 day reviews were without subjective due process, and thus, meaningless [Id., Lira Order, at p. 42:8-25].

26) As stated above [see paras* 20-22, and para's ref'd]; and more fully detailed below, Plaintiffs only avenue for release from SHU [and to be found suitable for parole] is by

⟨6⟩

AGO 001068

successfully "debriefing". Pursuant to Defendants policy and custom, successful debriefing requires the inmate to provide staff with "sufficient verifiable information about other gang-affiliates, that causes them harm, so they will never accept him back".

27) Defendants "debriefing" policy and custom, described above, is unconstitutional; it requires the inmate to become a known informant; known by other inmates to have harmed them. This puts the debriefer [and his family], at substantial risk of serious harm due to known informant status; and, Defendants are not able to protect inmate informants [or their families], and don't bother to tally the one's who have been hurt.

28) CDCR-Defendants have subjected Plaintiffs, and similarly situated inmates [i.e., arbitrary, indefinite SHU-confinement, for alleged administrative reasons], to progressively more punitive-restrictive conditions in PBSP-SHU [as detailed in below para's "138-140], in order to coerce them into providing staff with damaging information about themselves, and others [Defendants Schwarzenegger, and (BPH), use their power over parole for the same coercive purpose]

29) Between October 1985 and June 1999, CDCR did not have any legally promulgated rules or regulations re: indefinite SHU-confinement, or criteria for release therefrom. On June 25, 1999, A Sacramento Superior Court, ruled that CDCR's-gang-validation, and related SHU-placement, retention, and avenue for release, were not legally promulgated [per. Administrative Proc. Act [A.P.A.]], and were not enforceable.

30) In response, CDCR-Defendants have incorporated several rules into the Calif. Code of Regs, Title 15 [per. A.P.A. requirements], that became effective between Aug. 19, 1999 and the present. Such rules are vague, contradictory, and arbitrarily applied. Other rules, and related policies, customs and practices [summarized in above para's "18-29], promulgated, or allowed to continue, and applied, by Defendants [to Plaintiffs], are unconstitional violations of Plaintiffs rights, as presented below,

31) Defendants Schwarzenegger, Cate, Hickman, Woodford, McGrath, Kirkland, Horel, Jacquez, Adams, Johnson, Bradbury, McKinney, Marquez, Rice, Harrison, Thornton, and

〈7〉

AGO 001069

Wise, at all times mentioned herein, created and/or approved, and allowed the continua-nce of [and personally applied] the policies, or customs under which the unconstit-utional practices, policies, and customs have occurred and caused damage and harm to Plaintiffs [as summarized below, and supported in paras # 42-140]

32) At all times specified here, the above named Defendants knew at the time, or should have known in the proper performance of their official duties:

(a) Plaintiffs had a right to prior notice that a CDCR - gang label was cause for punitive sanctions [i.e., indefinite SHU-status, and denial of parole- until you become a successful informant, known for harming other inmates to get out] prior to being sanctioned.

(b) Plaintiffs have a liberty interest in remaining in General Prison Population, and to a parole date; because, in part, the SHU- is punitive and restrictive, with potential for causing serious mental illness and exacerbating phys. health problems, and no parole.

(c) Based on this liberty interest and harm caused by decades of indefinite SHU-status, the U.S. Constitution requires due process protection against arbitrary actions, including, procedural due process [i.e., prior notice and opportunity to respond to allegations re: gang issues, before being sanctioned]; and, substantive due process [i.e., legitimate, thorough investigations re: sources of information and Plaintiffs rebuttals; by the gang-investigators, the 180 day committee reviewers, and the 602 Appeals process]

(d) That Plaintiffs have been in [SHU] for [23-24+] years now, without being provided the required due process, since day one. [per details in paras # 18-25, and paras referenced]

(e) That inmate informants are at serious risk of harm in CDCR- prisons; and this risk is greater when the informant is known by gang-affiliates to have told on and harmed them [this may also result in retaliatory harm to the informants family, whom Defendants are not able to adequately protect from such harm].

(f) That their policy, custom, and practice of requiring Plaintiffs to become notor-ious informants in order to successfully debrief their way out of SHU [and have

〈8〉

AGO 001070

a chance to parole], and thereby be at serious risk of harm to themselves [and their family], violates the Eighth Amendment of the U.S. Constitution [and U.N. Convention Against Torture] [as detailed and supported by paras'# 26-27, and # 36-161].

(q) That their policy, custom, and practice of making PBSP-SHU, progressively more punitive-restrictive, for purpose of coercing Plaintiffs, and others, into providing staff with damaging information about themselves, and others [including this requirement to get a parole date], violates the 1st, 5th, and 8th Amends, of the U.S. Constitution [and, U.N.C.A.T.] [as described in paras' # 138-140].

33) At all times specified herein, Defendants Doyle, Fisher, Harmon, Gillingham, Smith, and Tucker, also personally applied the unconstitutional policy(s), customs, and practices described in above [para # 32(a-q)], when they denied parole, with multi-year deferrals, based on status, as detailed in [paras' # 141 to 161]

34) At all times specified herein, the Defendants named above [in para 31], also created and/or approved, and allowed the continuance of [and personally applied] the below policies, customs under which the unconstitutional policies, customs, and practices occurred, and harmed Plaintiffs [as detailed in paras # 35 to 161; this applies to Defendants named in para # 33 too, as stated below]

35) At all times specified herein, the above referenced Defendants knew at the time, or should have known in the proper performance of their official duties, that the following policies, customs, and practices, are vague, arbitrary, and contradictory; and, violate the U.S. Const. as applied to Plaintiffs, and similarly situated inmates. All of which have been the subject of numerous complaints, and formal grievances, to Defendants – to no avail, as Defendants not only refuse to take corrective action, they have condoned, and enabled the violations to continue [as detailed in paras # 35 - 161], as follows:

(a) CCR-Title 15 §§ 3000 [defining "Gang"], and 3023 [defining "Gang Activity"], when taken together in context, define "Gang-Activity" as, "...when one knowingly commits acts of misconduct classified 'serious' per Title 15 § 3315 [unlawful acts], on behalf of a gang". This interpretation is supported by the fact that these (2) Title 15 sections, are pursuant to Cal. Pen. Code § 186.22 [which the California

⟨9⟩

AGO 001071

Supreme Court has repeatedly interpreted to mean that "sanctionable gang-activity" requires "a conviction for felonious, gang-related acts; not for innocuous-associational activity," [e.g. People v. Castaneda (2000) 23 Cal. 4th 743, 749]

(b) Plaintiffs are informed and thereby allege, Defendants Hickman or Woodford, stipulated to the above referenced interpretation of Title 15 §§ 3000, and 3023, re: definition of "gang-activity," when they settled Castillo v. Almeida, USDC-N.D. C94-2847 [in 2004]. However, Defendants have continued to use "innocuous activity," to keep Plaintiffs in SHU-indefinitely [see below paras# 42-137].

(c) Defendants also claim, reliable confidential "inmate" informants have provided information of Plaintiffs' involvement in felonious gang-activity," on numerous occasions, over the course of the past [20+] years; and used these allegations to keep them in SHU-indefinitely [thus, making them ineligible for parole. see paras# 141-161], without ever issuing a single CDCR-rule violation rpt, [R.V.R.], in violation of CCR-Title 15 §§ 3312(A)(3), and 3315(A)(2), which mandate that any serious misconduct constituting a violation of CDCR-rules, or law, that is supported by credible evidence,"... shall be reported on a CDC-115 [R.V.R.]". Which in turn, requires specific due process [e.g., notice of charge(s), right to investigative employee, right to call witnesses, and a hearing that relies on the "preponderance of evidence" standard of proof]; Defendants intentional, repeat circumvention of these rules violates due process [alternatively, it means the informants were not credible; thus, relying on them also violates due process. As detailed and supported in paras# 42-137] [BPH-Defendants reliance on the info. is a violation too. paras# 141-161]

(d) Defendants claim a CDCR-classification, stating an inmate is a validated prison gang assoc., or member, mandates indefinite SHU-status, because this automatically means the inmate "is deemed to be a severe threat to the safety of others, or security of institutions." per CCR-Tit.15 § 3341.5(c)(2)(A) 2. However, this mandate includes an exception, referring to Title 15 § 3378(d), which states,"a gang member/assoc. in "general population" may be considered for review for "inactive status", with (2) years of no documented gang-activity." These (2) Title 15 sects., were legally promulgated [per. A.P.A.], in August 1999, in response to a court ruling [see above, paras# 29-30]. Indefinite SHU-status, has always been applied arbitrarily, and presently there are

〈10〉

tens of thousands of gang members/assocs, in CDCR-general population prisons; while a few hundred have been in SHU-more than (20) years, without ever being found guilty of committing an illegal, gang-related act [including Plaintiffs, See paras # 42-137]

(e) The above referenced policy(s) are also contradictory and vague; per. 3341.5(c)(2)(A)2, a CDCR-gang label mandates indefinite SHU [but] there's an exception to this mandate, per. 3378(c) [but] there is no reference re: exception criteria.

(f) The above referenced policy [§3378(d)], is also arbitrary because it allows gang affiliates in general population to be eligible for "inactive review", with (2) years of no documented gang-activity; compared to Plaintiffs, who are eligible for "inactive review", in (6) years [per. § 3378(e)]

(g) CCR-Title 15 § 3341.5(c)(2)(I) specifies, an inmate on indeterminate SHU-term shall be reviewed by a classification committee at least every [180] days for consideration of release to a general inmate population; and, Title 15 § 3341.5(c)(3) specifies, an inmate cannot be retained in SHU-beyond (11) months, unless a classification committee determines retention beyond this time period is required for one of the following reasons"... (B) Release would severely endanger the lives of staff, inmates, or security." The problems with these policies are:

1) CCR-Tit 15 § 3341.5(c)(2)(A)2, mandates indefinite SHU-terms for validated gang-affiliates [but] includes reference to an exception [without] reference to exception criteria [thus, it is vague, arbitrary, and contradictory. See above paras # 35 (d)(e)]

2) The Court Mandated (180) day committee reviews are not meaningful, since they provide no substantive due process; and, the outcome is predetermined, because the committees have no authority to change Plaintiffs SHU-status, unless they have previously debriefed. Such (180) day reviews are shams [Id, Lira Order, p.# 42]

(h) CCR-Tit 15 §§ 3341.5(c)(5)(6), and 3378(c)(5), were legally promulgated [per. A.P.A.] in August 1999; these allegedly provide inmates on indefinite SHU-terms, with an alternative to "debriefing" out of SHU, called "inactive" status. This requires (6) years of zero document-ed gang-activity, and an LEIU-recommendation to committee, to release the inmate from SHU. The problems with this are:

⟨11⟩

1) Defendants continue to abuse the definition of "gang-activity," in order to deny Plaintiffs inactive status [per, (6) year reviews], by relying on innocuous association with members of their race, and use of common symbols in art, and inmates claiming they are gang-members [without ref. to activity]; and, unreliable, unsubstantiated, allegations of illegal activity, provided by confidential inmate informants [see para's # 36-137]

2) "Inactive status" is vague, arbitrary, and contradictory [See above para's # 35(f)]

3) "Inactive status" avenue for SHU-release is a sham, used by Defendants in their efforts to coerce inmates to become CDCR-informants [e.g., periodically releasing a few long term SHU-inmates to general population for a brief time, then telling them, "Your name's come up again, re; gang-activity, you can debrief now and stay in g.p., or go back to SHU for at least (6) more years." See para # 64]. Noteably, Defendants Woodford, and McGrath, told Plaintiffs in 2004, that their only way out of SHU, is informant status [para 64]

[b] General Facts Re: Defendants Violations Of Plaintiffs U.S. Constitutional Rights
[via policies, customs and practices re: use of inmate informants]

36) Plaintiffs gang validations are based on statements about them from confidential inmate informant-debriefers.

37) Plaintiffs incorporate above [para's # 31 & 33] here, and state the same Defendants, at all times specified herein, knew at the time, or should have known in the proper performance of their official duties, that the following are violations.

38) Defendants claim they have to keep the identities, and details of statements from inmate informant-debriefers, a secret because regardless of how many years have passed, divulging this information will place the informant, and his family members at risk of retaliation [see e.g., Lira, supra, Order, p. 33, fn. 27]

39) Defendants refuse to formally disclose the identities, and statements, of conf. inmate informant-debriefers, claiming safety issues [see above para.]; however,

〈12〉

AGO 001074

they also require the debriefer to become a known informant against other gang-affiliates [they have to know the debriefer told staff harmful information about them, so that they will never accept the debriefer back],

40) Thus, Defendants are committing at least (2) constitutional violations via their policies, and custom referenced above [para's # 38-39], as follows:

(a) To get out of SHU [and have a chance to parole], they require the debriefer to become a known informant against other gang-affiliates, knowing this puts the inmate, and his family, in serious danger-potentially for life [knowing they aren't able to protect informants, or their families; and Def. McGrath admitted that CDCR doesn't track the number of debriefers, and their families, retaliated against-due to the burden" this would impose [McGrath's Admits, USDC # C05-3286CW]

(b) While at the same time, refusing to formally disclose the informants identity, and specific allegations made by him, due to professed safety concerns; thereby, causing serious prejudice to Plaintiffs ability to defend themselves [on top of which, Defendants conduct no subjective investigations. See para's # 23-24]

41) At all times specified herein, the same Defendants knew at the time, or should have known in the proper performance of their official duties, about the additional const-itutional violations re: use of inmate informants to justify Plaintiffs, and those similarly situated, to indefinite SHU-status, as shown by:

(a) Defendants policy, custom, and practice of making SHU-conditions progressively more harsh and restrictive for the purpose of coercing inmates to implicate themselves, and others, in gang-activity, violates the 1st, 5th, and 8th Amendment [and U.N.C.A.T.], as summarized in para's # 138-140.

(b) Defendants are aware that the severity of the overall SHU-conditions, has been the cause for many inmates to: go insane; die or have worse health; and, to become so desperate, they will, and have, agreed to become known informants [via debriefing], will-ing to say anything, about anyone, so they can leave SHU, and have a chance to parole

<13>

inspite of the risks; and whose debriefings are "coached-along" by gang unit staff, and whose stories are largely based on: rumors, innuendo, and imaginative elaborations on information spread by staff, other inmates gossip, published legal cases, news papers, magazine articles, and T.V. programs [e.g., Oct./Nov. 2002, news story, with Plaintiffs photos and alleged conspiracies [based on review of rpts.; and SHU-isolation]

(c) Subjecting Plaintiffs to [23-24½] years of indefinite SHU, based on stories from confidential inmate informants - without reliable corroboration [supported by fact that not a single CDC-115 R.V.R. has been issued to them re: illegal gang-acts. See para's [#]35(a-c), and [#]42-137], inspite of the fact that such informants are notoriously unreliable, manipulators and opportunists [based on: common knowledge, e.g., published legal cases, numerous studies, and the 1988 [60] Minutes news program, demonstration by notorious L.A. Jail informant, Leslie White], worsened by fact Defendants fail ~~re~~ to review said informants stories, substantively.

(d) Defendants, and their agents, assist inmate informant [debriefers], who have personal knowledge - credibility problems [due to isolation of PBSP-SHU], by way of: strategical placement near inmate targets [e.g.: those up for their (6) year, inactive review]. Such placement(s) may be: in adjacent holding cells at med. clinics; on clinic bus; law library; visit area; or, shifting them to different cell-blocks [this provides the informant with corroboration for his claim that, "so and so, personally told him about conspiracies", via review of movement and housing records [based on, personally witnessing such antics many times in last (20) years]]

(e) Defendants, and their agents, routinely claim that confidential informant-debriefers, meet "reliability" criteria [per. CCR-Tit.15 § 3321], when in fact they did not, as illustrated by:

1) Their reliability re: specific claims, about a [specific inmates activity] is not even tested [based on Plaintiffs own experience in last (20) years; and noted in Lira Order, pp 46-48]

2) Claim they're "reliable" because, "the debriefing inmate incriminated himself" when the reality is, debriefing involves no risk of self-incrimination [Id., Lira, p.[#]46:18-22]

(f) Defendants, and their agents, give no credence to Plaintiffs points, denying and

⟨14⟩

AGO 001076

disputes, of the informant allegations [limited since no specifics are provided]; nor do they substantively investigate the informant's claims, in response to Plaintiffs points, disputing the generalized-scanty allegations provided [Based on personal experience, see below para's #42-137; and Def. McGrath's testimony, ref'd in Lira Order, pp. 40-41]

## U.S Constitutional Violations Re: Ashker's Initial Gang Validation

42) Plaintiff Ashker was originally validated as a member of the Aryan Brotherhood (A.B) prison gang on May 23, 1988. This was based on the submission of (12) confidential memos from C.S.P.-S.C.[New Folsom] gang investigator Rosario, to the CDCR-SSU [on March 22, 1988, the same month he was arraigned on the Murphy case, summarized below.].

43) This initial validation was done without giving Ashker any notice of allegations made against him; nor was he interviewed, or given the opportunity to respond/dispute-allegations.

44) Ashker was not even notified that he had been validated, until months later [late 1988 or early 1989], which is when he received a chrono, stating he was an A.B. member, with-out reference to evidentiary basis. Begining in 1989, he challenged/denied being an A.B. affiliate - via 602 appeal [in several more 602's since then], all were denied [not a surprize, as per. Def. McGrath's trial testimony, and findings of fact, in Lira, supra, Order, pp40-42...". Once an inmate is validated as a prison gang affiliate, it is virtually impossible to undo a wrongful validation. This is because subsequent institutional classification committee [I.C.C.] reviews, and the CDCR-602 Appeals process, are both perfunctory-procedural reviews; no type of substantive review is done."

45) Ashker denies A.B. affiliation to this day, and his possition is that the initial validation was totally lacking in procedural and substantive due process, and was wrong. On May 22, 1987, Ashker attended the classification committee, at C.S.P.-S.C. [New Folsom Prison], which was documented, and noted that he had no gang-affiliation at all.

⟨15⟩

AGO 001077

Ashker's possition is that the original validation was created by C.S.P.-S.C., gang-investigators, with the assistance of fabricated stories from unreliable inmate informants; and the purpose was so CSP-S.C. staff would be able to support their theory that the Murphy case was an A.B. gang-hit, and thus, the original validation came about as follows:

(A) On May 28, 1987, CSP-S.C. prison staff charged Ashker with the murder of inmate Murphy. CDCR-had inmate Murphy classified as a member of the A.B. prison gang; and rumors began spreading that Murphy's death was the result of an A.B. gang-hit.

(B) On August 6, 1987, C.S.P.-S.C., B-Facility (SHU) opened the remodeled B1-A-Section [called Bedrock]; wherein, all metal had been removed from the (24) cells – the bunks, replaced with cement slabs. Inmates there were only allowed a small amount of legal material, and (1) book-no other property, or canteen was allowed. Ashker was housed there that day, because of the Murphy incident. There were (15) other white inmates housed there that day too, most of those were based on A.B. classification.

(C) In March 1988, Ashker was arraigned in Sacramento Co. Municipal Court, on the Murphy case [the same mo. Rosario submits gang pkg. See para.#42]. He proceeded pro-per, to the point of the March 1990 trial. It was during discovery that he learned [CDCR's theory] was that A.B. leader Norris, had ordered Ashker to kill Murphy, based on his belief Murphy had turned informant. This theory was based on story's from confidential inmate informants stating this [Steve Larson, in June of 1987, and Robert Rowland, in November of 1987, ... both of whom were seeking a way out of C.S.P.-S.C. [New Folsom] SHU; and in Rowland's

⟨16⟩

AGO 001078

case, out of Bedrock and prison, via protective custody – which requires informant status]

Ⓓ The (2) informants claimed Ashker and Tanner killed Murphy per. order from Norris [an A.B. hit]. This was the only information given to Ashker [re: A.B. affiliation link, between 1987 – 1994 [95]].

Ⓔ The trial began in March 1990; the prosecutor declared that the only evidence to support [CDCR - A.B. hit theory] were inmate informants – who he was not using because he did not find them credible. And he never argued, or put on any affirmative evidence, of an "A.B. hit" [informing the court, and jury, he didn't know what the motive was]. Norris testified to begining the "debriefing" process in Jan. 1990, and passing a lie detector test – including questions re: Murphy case [i.e. he gave no order, and had no ill will against Murphy] and that he sent Murphy the knife, he requested to use on Ashker, over a personal dispute.

Ⓕ Ashker's (SHU) term for rule violations was set to expire in (1992), and in January 1992, PBSP- Committee, placed him on "indefinite (SHU) status", based on the A.B. label [the basis of which was not disclosed] Ashker did a 602 Appeal, denying gang-affiliation, and requested release to a G.P. to be able to program. This was denied at all levels of review,

Ⓖ In response to Madrid, the gang-validations of all (PBSP-SHU) inmates were reviewed in 1995. In 1994-1995, Ashker received copies of the 1030- confidential disclosure forms [re: 1988 validation], a few of which were specific enough to challenge via 602 Appeals, to no

⟨17⟩

AGO 001079

avail [not surprising, considering such receive no "substantive" type of review, per Lira Order, supra] And the SSU's review resulted in rejection of (4) of the (12) 1988 documents [per Madrid Court directive i.e. cumulative] and "re-validated" Ashker, again, without opportunity to be heard.

46.) Ashker has rarely attended any of the 180 day committee reviews of his indefinite (SHU) status, because they have no authority to change his status to G.P., absent his successful debriefing [beforehand]; per what administrators told him when he arrived at PBSP-SHU in 1990 [the only way you'll leave is to "parole, die, or debrief"] and the Title 15 § 3341.5; and comm. chronos [pre-printed forms, that all state the same thing]

47.) The committees, C.S.R.'s reviews, and 602 Appeals process, do not provide any substantive due process re: gang-validation challenges, per Lira Court trial testimonies of Defendant McGrath, and others, supra, and exemplified by the following:

(A) In 1999 Ashker received a chrono by CSR Morton, upholding the (ICC) recommendation for continued indefinite (SHU) status, based on 1995 re-validation [per (8) documents from 1988], on the basis of . . . "continuing association and participation in criminal conspiracies that threaten safety-security."

(B) Ashker filed a detailed 602 Appeal, challenging this determination, and asking that evidence of his personal involvement in any criminal conspiracies be produced [pointing out he'd received no 115 RVR's for any conspiracies], and disputing the items used in 1988, wherein conf. inmate informants claimed he had committed an illegal act, of

⟨18⟩

AGO 001080

which there were the following [with 602 Appeal response to each]

1. Claimed Ashker stabbed inmate in early 1986, on Folsom G.P. ["to make bones for A.B"]; informant made claim around April 1986 - Yet, Ashker was on G.P. until August 1986, and has never been charged [this was not even disclosed to him until 1994 or '95] [Ashker's points ignored]

2. [Claims] Ashker killed Murphy for A.B.; Ashker submitted some of the trial transcripts, wherein the prosecutor stated he was not using them due to credibility problems [response: "CDCR criteria is different than prosecutor's]

3. Claimed Ashker assigned to hit inmate Estem; however, he never touched Estem [Ashker's points ignored]

4. Ashker requested each source to be investigated re: credibility issue(s) [this was denied]

each level denied this appeal, without any substantive review[per. Lira, supra; and responses denying Ashker's request for such review]

U.S. Constitutional Violations RE:
<u>Ashker's Re-Validations ÷ Denial of "Inactive Status"</u>

48.) On August 30, 1999 the CDCR Legally promulgated the alternate avenue for validated gang affiliates to gain their release from (SHU), refered to as "inactive status" [see above para's 35[d-h] describing this change in policy, how it works, and allegations that it is applied arbitrarily, and is a SHAM]

49.) As of 1999, Ashker had well over the required (6) years in, without documented allegations of gang-activity (the last ones being the 1988-submissions referenced above]; however, he was not reviewed until 2001,

<19.>

50.) Ashker first became aware of the "inactive status" policy in (2001), and when his counselor informed him he was scheduled For (ICC) committee review in July 2001, he submitted a written request to be put up for "inactive status" [while clarifying he was never "active" because he was never affiliated in the first place.]

51.) An "investigation" into Ashker's alleged gang-status was conducted by Defendant G.H. Wise on Aug. 1, 2001.

52.) On Aug. 2, 2001, Wise issued a CDC-128 B chrono, stating Ashker did not meet inactive criteria based on (4) confidential memorandum indicating "gang activity" in February and June 2001; and Ashker could request another review in June 2007.

53.) Ashker received Wise's [8-2-01] chrono on Aug. 24, 2001, at the same time, his counselor gave him copies of the CDC-1030 confidential-Disclosure Forms, referenced in Wise's chrono. This was the first time Ashker was aware of the (4) 2001 allegations.

54.) Ashker was not notified, nor given opportunity to respond to the (4) [2001] allegations prior to Wise's decision; nor did Wise conduct any sort of substantive investigation into the allegations [how could he, without giving Ashker a chance to respond]

55.) The confidential memos dated Feb. 22, 2001, and June 29, 2001, alleged that "an inmate proven reliable" had claimed "Ashker sent several coded messages to the mainline ... for non-validated associates of the A.B., to continue to kill blacks; and Ashker and other AB members in (SHU) were regularly referred to as leaders in the war with the Blacks" [2.22.01]. And, "Ashker and other AB affiliates were conspiring to set up a white inmate to be killed in Feb. 2000" [6.29.01]

56.) Based on information and belief, the above referenced inmate

⟨20⟩

**AGO 001082**

1   informants' "murder conspiracy" claims, are merely unsupported-
2   allegations by inmates seeking transfers out of (PBSP); if there was
3   any reliable evidence to support these allegations, *CCR Title 15 §§*
4   *3312 & 3315, mandate issuance of CDC-115 Rule Violations, and referal to*
5   the District Attorney, neither of which occurred [notably, if there was
6   reliable evidence supporting such allegations - the failure to issue
7   the mandated (115 RVR's) is a <u>due process violation too</u>]

8   57.) On Sept. 3, 2001, Ashker submitted 602 Appeal #C01-02335, *wherein*
9   *he specifically addressed, and pointed out easy-to-verify facts to*
10  support his denial(s). He also pointed out the fact that he was never
11  issued any CDC-115 R.V.R's, *charging him with anything - which is manda-*
12  *tory, if there was any reliable evidence to support such serious allegations*

13  58.) On Sept. 26, 2001, Def. McGrath, denied the Appeal at Warden's
14  Level, merely rubber stamping Wise's (8-2-01) decision, without any
15  sort of substantive investigation being conducted, based on Ashker's
16  response, and points disputing the allegations [based on info. and
17  belief, i.e., McGrath's testimony admitting that none of the 602 Appeals of
18  validation issues receive substantive review - investigation(s), during
19  Lira trial. per. *Lira, supra,* Order p 40-42]

20  59.) Ashker received the Warden's denial on or about Oct. 2, 2001, and sent
21  it to Director Level on Oct. 14, 2001. Director Level *denied the appeal on*
22  Feb. 21, 2002, *without any substantive type review - investigation [Id.*
23  Lira, supra, Order]

24  60.) During litigation of Ashker, Troxell v. Schwarzenegger, et al #C05-3286 CW,
25  Defendants submitted another CDC-128 B Chrono, Authored by Wise,
26  dated Dec. 31, 2001, claiming Wise conducted an investigation into
27  Ashker's gang-status on Dec. 28, 2001, and located (6) conf. memos

<21>

AGO 001083

1  dated June – August 2001, indicating continued gang-activity.

2  61.) Defendant Wise' (12-31-01) chrono does not state what prompted the

3  alleged (12-28-01) "investigation" after conducting the [8-1-01] review –

4  investigation [wherein Wise states, 'Ashker's next review would not be

5  until 2007]; Wise also claims 'Ashker refused to participate in an

6  interview' on 12-28-01.

7

8  62.) Ashker has no recollection, and therefore _denies_, ever being asked

9  if he would go for a gang status interview on 12-28-01; he _denies_ ever

10  receiving the (12-31-01) CDC-128B Chrono [until reciept of def's 2008 msj]

11  And Ashker did not receive the 1030 - Conf. Disclosures ref'd in Wise'

12  12-31-01 Chrono until [3-21-02], At which point he challenged them

13  via 602 Appeal(s), which were denied without substantive review

14  [based on Lira, supra, order]

15  63.) On July 8, 2002, the CDCR – LEIU Defendants re-validated Ashker

16  as an active AB member, based on the 1988, 1995, and 2001, reviews. This

17  was done _without notice_, or _opportunity to be heard_; and was not based

18  on any substantive investigative process [_Id_., based on Lira, supra; and

19  lack of opportunity to respond – no notice]

20

21  64.) Ashker believes the "inactive status" avenue for release from (SHU) is

22  a SHAM [as alleged in above para 35(H) and based on examples of what has

23  happened to PBSP-SHU inmates Paul Redd, Robert Tanner, and Brad Hart];

24  and that his only avenue for (SHU) release [and eventual parole] is via

25  informant status, as supported by:

26  ⒶOn Feb. 23, 2004, he submitted a Group Appeal, #C04-00566, on behalf

27  of himself, and Troxell, [per. CCR Tit 15 § 3084.2[F]], requesting program-

28  rehabilitation opportunities in (SHU), in order to comply with (BPH)

   parole board recommendations.

   〈22〉

**AGO 001084**

Ⓑ On April 27, 2004, Def. McGrath denied the appeal at Warden's Level, stating, ...'you are considered a member of a terrorist organization, and until you fully cooperate with the authorities to help bring down the gang - you will remain in SHU without opportunities to program; and, should never be paroled either.' [There was no mention of "inactive status" alternative]

Ⓒ On July 22, 2004, Def. Woodford denied the appeal at Director's Level, stating, ...'the Warden's response, represents the CDCR-position.' All of Ashker, Troxell's points of dispute were ignored.

65.) On Sept. 15, 2004, Ashker submitted 602 Appeal # C04-02600, wherein he challenged CDCR-Defendants' "inactive gang" status criteria; pointing out that the defendants were denying "inactive status" based on hearsay allegations from questionable sources and innocuous activity. And he had not been found guilty of ever committing an illegal gang-related act - and the CDCR CCR Title 15 §§ 3000 [Gang] and 3023 [Gang Activity] meant illegal activity - that mandates issuance of CDC-115 RVR. [This 602 challenge was in response to ICC-committee SHAM reviews, and continued indefinite SHU-status, held 8-4-04, the chrono wasn't received by Ashker until 9-7-04]

66.) On Dec. 17, 2004, Def. Kirkland, denied the appeal at Warden's level, without addressing the issues, and without any substantive review; he just upheld Ashker's indefinite SHU status, based on CDC-128B of 7.8.03.

67.) On March 4, 2005, Def. Woodford rejected the appeal as untimely based on view the appeal challenged the (7-8-03) action. This was clear error, as the appeal challenged policies and practices - as applied by the ICC-Comm. on Aug 4, 2004.

⟨23⟩

AGO 001085

68.) On June 6, 2005, Ashker submitted another 602 Appeal, # C05-01551, specifying that he was "challenging CDCR policy's of subjecting him to indefinite (SHU) status, for over (13) years [at the time], based on their gang label." He pointed out that "he had never received a CDC-115 rule violation for committing an illegal act on behalf of a gang, the gang label was based on hearsay from undisclosed inmate informants; and, the continued (SHU) status was used by the (BPH) to justify (5) year parole deferral in (2003), and his only avenue for (SHU) release is via debriefing, or inactive status."

69.) The above referenced appeal pointed out that the policies and practices at issue violated U.S. Constitutional 1st, 5th, 8th and 14th Amendments as follows:

Ⓐ Sanctions for mere association, without guilt for illegal activity, is a 1st Amendment violation [per. NAACP v. Claiborne Hardware Co. (1982) 485 US 866, 925; American Arab Anti-Discrimination v. Reno, 70 F.3d 1045, 1063 [9th Cir 1995]; Cal. Penal Code §§ 186.21-186.22 [e.g., People v. Castaneda, [2000] 23 Cal. 4th 743, 749]

Ⓑ Requiring inmates to become informants to gain release from (SHU) — thereby putting the inmate, and family, in danger of retributive harm, is a 8th Amendment violation.

Ⓒ Promising release from (SHU) upon the inmate becoming an informant via debriefing [implicating ones self and others in gang related acts], which can be used to prosecute the debriefer, and others (and to keep others in SHU), is a violation of 5th and 14th Amendments.

⟨24⟩

AGO 001086

Ⓓ The (SHU) status has seriously had an adverse impact on his chance for parole, the status has been illegal and completely lacking in adequate due process, in violation of 14th Amendment.

Ⓔ The policy(s) re: "inactive status" is a SHAM, and the (6) year review violate requirement that (SHU) confinement cannot be arbitrary, or a pretext for indefinite segregation and thus periodic - meaningful reviews are mandatory [per. Toussaint v. McCarthy, 801 F2d 1080, 1101; Madrid v. Gomez, at 1277-78, citing Hewitt v. Helms, 459 US 460, 477 n.9] and the ICC-Committee reviews deny meaningful review because they have no authority to release the (SHU) inmate unless he has debriefed, or deemed inactive during one of the (6) year reviews by LEIU, "

70.) Defendant Kirkland, denied the appeal at Warden's level of review, on Aug. 22, 2005. He acknowledged Ashker's 8th Amendment issue re: "debriefing places inmate in danger," then ignores it [demonstrating deliberate indifference]; and he acknowledges and admits Ashker has received no disciplinaries for participating in illegal gang activities. He ignores the other points.

71.) On Dec. 13, 2005, Defendant(s) [Hickman or Woodford] denied the appeal at the Director level, merely rubber stamping the Wardens level denial.

72.) On Aug. 7, 2005, Ashker sent Defendant Hickman a (5) page memo signed by Ashker and Troxell, pointing out that the CDCR use of innocuous - activity, and allegations from confidential inmate informants, to keep them in (SHU) indefinitely unless they debrief, violated clearly established law. The response was, ... the issues presented could not be addressed because they were being litigated in court.

⟨257

73.) On October 25, 2007, *PBSP - Institutional Gang Investigations [IGI]* Unit [Defendants Thornton, and Rice] allegedly initiated an investigation regarding Ashker's current gang activity [per CCR-Title 15 § 3378(e), six year review re: inactive status]

74.) This alleged "investigation" into Ashker's current gang activity, was a SHAM - it was not meaningful, because it lacked any semblance of substantive due process [no actual investigation took place] as shown by the following:

Ⓐ On Nov. 26, 2007, *Defendants Thornton, and Rice signed a CDC-128B chrono*, recommending that Ashker's *gang status remain "active"* based on their alleged "investigation" *consisting of:*

1) Review of Ashker's Central File [revealing current gang activity, via (5) confidential memos]

2) Property Search [revealing (3) photocopies of artwork]

3) Nov. 26, 2007 "interview" of Ashker [consisting of Ashker giving Def. Thornton (2) pages, *denying each item used against him*]

Ⓑ The (5) confidential memos, and Ashker's responsive denials, were as follows:

1) March 14, 2007, Chrono documenting a greeting card with numerous shamrocks. The shamrock is used by members of AB to show alliance/membership *in gang*! [*Response: this is clearly a "St. Patrick's Day" card, dated '98. I kept it to use as a pattern for my own St. Pat's Day card creations & no "sources" ever claimed I've shown them "gang symbols"*].

2) Memo dated Sept. 18, 2006, documenting an informant's claim that 'kites were passed between validated *Nazi Lowrider [NLR] members*,

<26>

1  containing the housing assignment of Ashker as well as other AB

2  members [the AB were recruiting the NLR for membership in AB at

3  this time] . . . Also identified was the fact Ashker had ordered the

4  murder of attorney Franck, who owed Ashker money [Response:

5  #1. I have no control over who passes my # cell on lists or kites; nor

6  do I have any knowledge about "recruitment," # it doesn't specify

7  that I was recruiting anybody. #2. The claim re: putting "hit" on

8  atty Franck is a lie! This atty. has helped me on legal issues for 17 yrs. -

9  the money he owed has been paid for most part, # it source was reliable,

10  a 115 RVR is mandatory # I've rec'd Ø! Last of all re: alleged "hit" there's

11  zero demonstrating this is a "gang" issue. My relationship with atty is

12  is strictly professional # personal # you have no "evidence" proving otherwise]

13

14  3) Memo dated July 7, 2006, staff claimed 'Ashker attempted to relay

15  messages thru (NLR) member to AB associate Brown, to have his

16  girlfriend sponsor Ashker's girlfriend for U.S. citizenship. Ashker's

17  request shows good standing in gang [Resp. Brown is a personal

18  friend since [1985]. My wife # his are friends # the subject has nothing

19  to do with "gang" activity period]

20

21  4) Memo dated April 4, 2006, informant claimed Ashker is one of the

22  top ranking AB members in PBSP' [Resp. I deny membership/issue

23  or involvement in any type of illegal gang activity]

24

25  5) Memo dated March 29, 2006, Debriefer claimed, 'Ashker one of the A.B.

26  members who ordered murder of AB member Michael Hicks in 2003.'

27  [Resp. Your alleged reliable debriefer is a liar! I do not know anyone by

28                                    <27>

AGO 001089

this name — have never met or been around this person at all-period!
And if there was evidence of my involvement - CDC rules mandate a
115 RVR be issued — I've rec'd none for this — I don't know anything about
this subject, or this person.]

© The property search [re: three drawings] resulted in (2) Chronos, and
Ashker's responses — denials were as follows:
   1) Oct. 30, 2007, Chrono documenting photocopied drawing with a
   shamrock in axe blade [Resp. The art is from (1995) and I knew I'd
   inked over the shamrock 7-8 yrs ago when I heard staff were making
   issue out of art work! The symbol means "Irish Pride" to me ...]

   2) Oct. 29, 2007, Chrono documenting photocopied drawings by A.B.
   assoc. Evans and AB member Bretches. And by possession, shows Ashker's
   continued allegiance to gang and its members.[Resp. As for Evan's
   art copies - so what, there's of demonstrating anything illegal! And gang unit
   claims re: "indications" sounds juvenile & cartoonish.
   As for Bretches' art — I want that back! That was sent to me as part of an
   exhibit to declaration he did for me last year — per approved legal corresp.
   & was reviewed by I.G.I. — as part of my civil case]

75.) Defendant's Thornton, and Rice, received my above referrenced
responses, disputing all of the information alleging gang-activity, on
Nov. 26, 2007. The fact that they did not investigate the possible validity of
any of Ashker's points, is supported by the fact that Nov. 26, 2007, is
the same day they received Ashker's responses, and authored their 128B -
Chrono, referring case to Office of Correctional Safety [OCS] with recommendation
<28>

Ashker's gang status remain unchanged; and, he can request review again in October 2013".

76.) On April 22, 2008, Ashker received Defendant Harrison's, CDC-128 B-2 Chrono dated Jan.16, 2008 — revalidating him as an active AB gang member based on the (4) confidential memos, submitted by Thornton, and Rice.

77.) Defendant Harrison did not independently investigate any of the confidential memos at issue [and, in lieu of Ashker's responsive denials]. He just rubber stamped Thornton and Rice's recommendations. [Based on info. and belief, i.e., CDCR-testimony(s) in Lira trial, supra, Order, admitting no substantive review, or independent investigations, are done]

78.) On April 24, 2008, Ashker submitted 602 Appeal # D08-01173, wherein he challenges [CDCR] Rules & Regs [CCR Tit.15 §§ 3341.5 & 3378(c)], and the policies-practices related thereto, on the basis that my [22+] years of indefinite [SHU] confinement [based on "status", i.e., a label], violates clearly established state & federal law, as more fully-specifically detailed below".

79.) The appeal continues,"... I've been on continuous 'indefinite [SHU]' status since [1992], based on [CDCR] classifying me an assoc/member of the A.B. The basis for this classification is confidential inmate informant-claims. Yet, I've never been issued a R.V.R [CDC-115] claiming evidence establish'd my personal involvement in any illegal, gang-related activity."

80.) The appeal continues,".. In (2001) I was denied 'inactive status' based on alleged inmate-informant & staff-claims - Yet, I was never charged, nor issued any RVR [CDC-115]. Recently, on [11.19.07] I was given [3] 128-B's and (4) 1030's, containing claims that such represents evidence that I remain "active". On [11.26.07] I gave I.G.I. my written response to these 128 B's/ 1030's wherein I dispute each of them [see attached copies...]."

<29>

AGO 001091

81.) The appeal continues, ... On [4·22·08], I received my copy of the
ssu-Review, finding me ineligible for "inactive" status; and notifying me
my next "review" will be [10·29·13] [see copy of CDC-128B-2 ...] This means,
between now & [10·29·13] my only way out of [SHU] is to die, parole, or become
an informant. ... Such policy(s) & practices violate clearly established law, as
briefly stated below [note: these issues will be pursued in Court]

    1.) Punishment based on "status" [association-label], without ever
    being found guilty of a single gang related-illegal act, is a _pretext_
    for "indefinite [SHU] status," which violates the 1st and 14th Amends, of
    U.S. Const, & State Statutory Law [_see_: Hewitt v. Helms [1983] 459 US 460,
    477 n.9; NAACP v. Claiborne Hardware Co. [1982] 485 U.S. 866, 925;
    Amer. Arab Anti-Discrimination v. Reno, 70 F3d 1045, 1063 [9th Cir 1995];
    Cal. Penal Code §186.21 & 186.22; People v. Castaneda, 23 Cal. 4th 743, 749 [00]]

    2.) Providing "meaningful" review of indefinite [SHU] status, once every (6)
    yrs., violates the 14th Amend., US Const, Procedural & Substantive Due
    Process [see: Wilkinson v. Austin [2005] 125 S.Ct. 2384; Hewitt v. Helms, supra;
    McClary v. Coughlin, 87 F. Supp. 2d 205 [W.D.N.Y. 2000]]

    3.) Failure to follow terms of Castillo v. Alameida [USDC-ND Cal #C94-2847]
    re: "Gang-Activity" definition in CCR-Tit.15§ 3023 [which includes the
    caveate that such acts be, "unlawful or acts or misconduct classified as
    serious per. Tit.15§ 3315," which in turn, require a RVR, per. § 3312]; the
    CDCR/PBSP Reviews are a _SHAM_, merely rubber stamping inmate
    informant lies [such as I point out in my 11·19·07 response, disputing
    1030's of 3·29·06 & 9·18·06]; & use of artwork that's undated &/or given
    to me as a legal exhibit; and informant claims of my "status" all violate

           ⟨30⟩

AGO 001092

Castillo; & additional state & federal law. If there was real evidence supporting illegal acts, a R.V.R. is mandatory!

4.) Keeping me in (SHU) per. § 3378(e), while allowing thousands of active gang members/associates to remain on CDCR-Gen Population [per. 3378(d)], constitutes unequal treatment compared to those similarly situated, thus violating 14th Amend., U.S. Const.

5.) Keeping me on indefinite (SHU) status for over (16) yrs. & counting, without charges & findings of guilt for personal involvement in any "illegal, gang-related" acts; and premising my opportunity for release from (SHU) upon my willingness to agree to become an informant, is a violation of the U.S. Consts. 1st, 5th, 8th & 14th Amendments, as briefly shown by:

  Ⓐ I retain the right to remain silent, as well as right to be punishment free when choosing not to speak, per. 1st & 5th Amend's [See: U.S. v. Safirstein, 827 F.2d 1380, 1388 [9th Cir. 1988]; Hydrick v. Hunter, 2006 DJ DAR 13181, 13186 [9th Cir 2006]].

  Ⓑ Right not to be subject to "informant status", and thus subject myself and family to the danger associated with informants, per. 8th Amend. [See: Valendingham v. Bojorquez, 866 F.2d 1135, 1138 [9th Cir. 1989]

  Ⓒ Right to be free from conditions of confinement known to present serious danger to physical and/or mental health and safety, per. 8th & 14th Amends. Prisoner's don't have to wait & actually suffer harm to their physical-mental well being to obtain relief from unconstitutional conditions of confinement. It's well known that informants [and their families] face serious risk of danger to their physical welfare—

⟨31⟩

AGO 001093

which CDCR is not capable of remedying – Thus, CDCR-Policy of premising (SHU) release upon one's agreement to become an informant is a violation [see: Valandingham, supra); and, it's now recognized that the longer one is subject to (SHU) confinement conditions, the greater the risk of suffering serious mental-health damage – which is also a violation [See: Madrid v. Gomez; and U.S. v. Basciano, 369 F. Supp. 2d 344 [E.D.N.Y. 2005], for examples]

A federal court has given CDCR notice that a combination of the above (2) Factors [physical harm & mental health – risks] combine – to create an 8th Amend. Violation per, criteria and principles in Helling v. McKinney (1983) 509 US 25; and Ordered CDCR to release the prisoner From PBSP-SHU [see: Griffin v. Gomez, USDC-ND Cal C98-2103BJ.W., Order Granting Writ, filed: 6-28-06, citing Wilson v. Seiter [1991] 501 U.S. 294, 304-305 RE: combined conditions]]

You are on notice, Failure to cease the practices/policies briefly described will be cause for litigation, on above grounds [but not limited to such grounds)

82.) Ashker requested relief, as follows: "Release from [SHU) to a G.P. [alternatively, creation of a modified – less restrictive program with G.P. type programs & privileges]; and to be fully compensated for my (16) plus, years of illegal- pretextual-indefinite (SHU) confinement, and CDCR-PBSP's compliance with state & federal law & CCR-Tit. 15, Rules & Regulations re: Gang Activity & RVR [115's]," 

83.) The appeal was denied by Defendant Horel, at the Warden's Level on June 2, 2008.

〈32〉

84.) Defendants Horel and Wise, denied the appeal, claiming they "conducted a thorough investigation into Ashker's claim," and "Ashker did not raise any legitimate questions/evidence in his rebuttals to change outcome of active/inactive review."

85.) Ashker's position is that Defendants Horel, and Wise, did not conduct a substantive, independent investigation into the substantiation of the confidential inmate informants claims, in lieu of Ashker's rebuttal(s), and in fact merely rubber stamped the OCS' chrono, [Based on info. and belief. i.e., Def. Wise claims he conducted and completed this "thorough review/investigation" in one day [5·28·08]; and testimonies of Def. McGrath, and other I.G.I. staff, at the Lira, supra, trial, admitting no substantive investigations are done on appeals re: gang-status]

86.) Defendants Horel, and Wise, ignore all of Ashker's other points re: 1st, 5th, 8th Amendment violations, inspite of reference to support-ing case law. This is deliberate indifference [based on info. and belief, these defendants were personally made aware of these Constitutional violations via numerous inmate appeals; the Griffin ruling of 2006, referenced above; and numerous inmates becoming mentally ill in [SHU] at PBSP] [And doing nothing to fix the problems]

87.) On Oct. 7, 2008, Defendant Cate, denied the appeal at the Director Level, by rubber stamping the Warden's response, and ensuring the continuation of such Constitutional violations, inspite of being repeatedly put on notice [per. same manner as Def. Horel, as stated above.] [See above paras #5,14,19-41 re: Mr Cate's duty(s), and failures thereof demonstrating and supporting liability; Also, on Feb. 5, 2010, Plaintiff's sent Governor Schwarzenegger, and Sec. Cate, an (11) pg complaint re: PBSP-SHU conditions violating US CONST. & U.N.C.A.T. [Mr. Cate replied on 2/18/10 " File a 602, if you haven't already"]

(33)

<u>HARMFUL EFFECT FROM 23 YEARS OF SHU-CONFINEMENT</u>

88.) Ashker has presently been subject to more than [23] years of continuous [SHU] confinement; the past [14] years of which have been arbitrary and pretextual [based on defendants allegation that his gang-classification-automatically make him a serious *threat to safety/security, requiring (SHU)* housing for administrative reasons - *indefinitely [until he dies, or agrees to* become an informant], ..., *while allowing tens of thousands of gang-affiliates* to be in gen-population prisons], *without being found guilty of ever-committing* an illegal, gang-related act.

89.) Defendants' have punished him for refusing to become their inform-ant; and exercising his first amendment right of choosing *not to speak;* and, prior to being classified as a gang-affiliate, he was *never-notified the label* would be cause for indefinite (SHU), *unless he agreed to become a known* informant for the authorities [and thereby, face serious risk of reprisals, for informant status; such policy constituting an eighth amendment violation]

90.) Ashker has been isolated in (PBSP-SHU) since *May 2, 1990, and has no* information to provide; and, he's not willing to become an informant for Defendants, or anyone else, based on principle; and *unwilling to place himself* or family in the position of the serious danger informants face.

91.) This [23+] years of punitive (SHU) confinement has caused the ongoing harm, exemplified below:

   Ⓐ PBSP-SHU conditions are intentionally punitive [more so, than the other [3] SHU-facilities across the state-based on info, and belief]; with the purpose of coercing inmates to become informants. *Examples are:* more restrictions on allowable types of magazines and books, *appliances,* packages, clothing; lengthy mail delays, non-contact visits, no phonecalls, no education opportunities [that require proctored exam's]

⟨34⟩

AGO 001096

For [24] yrs, Ashker has been denied normal human contact & subject to sensory depriv

(B) Ashker has had no physical contact with family, no phone-calls, and no photographs of himself to send to family for 24 years; many of his neices, nephews and other relatives have never seen him- in person or photo. This, together with years of lengthy mail delays, has caused estrangement from many family members. And, as of the past year Defendant Jacques and Cate have cut off (SHU) educational opportunities [while permitting (SHU) informants such education ops., and, contact visits, phone calls, photo's, canteen in packaged wrappers etc.]

(C) He has been eligible for parole since [2004]; however, the [BPH] has an unwritten policy of issuing all (SHU) lifer's, multi-year denials. And they have applied this to Ashker in [2003] with a [5] year denial, and in [2008], with a [4] year denial [see details in below para's # 141 to 149]

(D) Ashker's mental health has been damaged as a direct result of his [23] plus years of [SHU] [based on info. and belief; e.g., experiences with insomnia, hypersensitivity, anxiety, aggression, rage, lethargy; difficulty with concentration, focus, and communication. And, sensory over load with related discomfort when leaving his cell/pod area]; and there's a serious risk that he may suffer severe mental illness - the longer he's subject to SHU [per many studies conducted between 1975 to present] And his physical-health has suffered, as he has a chronic pain condition from a permanently disabled right arm [caused by an exploding bullet fired by a PBSP-SHU Guard Ashker v. CDC, 112 F3d 392 (9th Cir 1997)] and his care and treatment has been harmed by his (SHU) placement — and has resulted in numerous civil-suits before this court]

‹357

AGO 001097

[D.] General Facts Re: Plaintiff Danny Troxell

92.) Plaintiff Troxell has been incarcerated in the CDCR prison system since July 1979, per, 26 year-to-life sentence – imposed after his plea of guilty to First degree Felony murder [while robbing a market the manager ran up and grabbed the end of Troxell's shotgun, causing it to discharge – killing him instantly]

93.) Soon after his arrival in CDCR, he was accused of being involved in a melee, and ended up in San Quentin (SHU); wherein he received additional rule violations that extended his stay there until being transfered to Folsom Gen. Population in January 1984.

94.) Upon his arrival at Folsom, he attended committee for clearance to G.P., and it was at this committee hearing that he was told for the first time that CDCR had classified him as an A.B. associate [this had been done at San Quentin, in 1982, based on allegations by confidential inmate informant – perjuror, Mike Thompson] This happened without notice, or opportunity to be heard – and Troxell immediately denied this.

95.) The Folsom committee cleared him for the G.P., inspite of the gang-assoc. Label; where he remained [programming via working in the kitchen and receiving positive work evaluations. And maintaining a good relationship with his fiancée and daughter via regular contact visits] until being placed back in (SHU) on Oct. 30, 1985, for unspecified reasons.

96.) Soon after this, he was transfered to an isolation strip cell in Chino – for unspecified "investigation" reasons. At Chino, he was lucky to get a visit once a month – behind glass; he was not charged with anything and believed he'd be back on G.P. within a year, because he hadn't done anything; and he married his fiancée in June 1986.

<36>

97.) In late (1986) he was transferred to newly built (SHU) at Tehachapi [CCI-IV]; wherein he was informed for the first time that he was on indeterminate (SHU) status because of his gang classification, and in order to get out he'd have to debrief [become an informant]. At the time, no one had ever heard of this before; and between 1979 to 1986, no one ever notified Troxell that a gang label was cause for indefinite (SHU), until becoming an informant.

98.) On January 4, 1988, his cell-mate assisted him with a 602 Appeal, challenging his indefinite (SHU) status [and release requiring informant status], on the basis that he had never been charged and found guilty of committing an illegal, gang-related act.

99.) This appeal was denied at the Director's level of review on April 11, 1988 [Director or log#8801657], based on, "... your A.B. involvement and its threat to institutional security" [while at the same time, tens of thousands of gang-affiliates were in general population prisons, all over the state. Based on info. and belief]

U.S. Constitutional Violations Re:
TROXELL'S Initial Gang Validation

100.) On May 25, 1989, the SSU-at CDCR Headquarters, received a gang-validation package from CCI-Gang Investigator C. Ford; this package contained [5] Confidential Memorandums dated: 5-2-88; 7-26-88; 8-5-88; 8-10-88; and 1-9-89. [NOTE ABLY these memos were created soon after his [602] was denied Id]

101.) The [5] confidential memos referenced above were composed from conf. inmate informants [4 of whom claimed Troxell was an A.B. member, and (1) of whom claimed Troxell was running Folsom's 2 Bldg., for the A.B, in 1985]; the [1989] SSU-Review determined this was sufficient to validate Troxell as an A.B. member, all without notice or opportunity to be heard.

⟨37⟩

**AGO 001099**

102.) On Dec. 27, 1989, Troxell was transferred to PBSP-SHU, where he has been housed ever since. Soon after arriving at PBSP-SHU, an administrator told him he would remain in PBSP-SHU until he died, paroled, or debriefed.

## U.S Constitutional Violations RE:
### Troxell's Re-Validations & Denial of Inactive Status

103.) On Dec. 14, 1999, ICC referred Troxell's case to the Law Enforcement Laison Unit [LEIU] at CDCR-Headquarters [via PBSP-I.G.I.] for clarification of his current gang-status [to determine if he met inactive status]

104.) On April 12, 2000, another ICC-Committee noted, "...Committee reviewed subject for inactive gang status and the date of the most recent gang-activity, as noted in the C-file, could not be established. On Dec. 14, 1999, ICC referred this case to the (LEIU) for gang status clarification. The (LEIU) review is pending."

105.) On March 21, 2001, another ICC-Committee noted that "S was referred to [IGI] by ICC of Dec. 14, 1999, for inactive gang status, but due to administrative oversight, he was not reviewed. Committee acts to resubmit the referral to [IGI] for inactive gang status review."

106.) In June 2001, the LEIU/SSU determined Troxell was an active A.B. member based on Defendant Wise' presentation of (2) Confidential Memos dated: 9-20-99; and 8-3-00 [noteably, these conf. memos were absent from Troxell's File when ICC looked for this type of information in 1999, 2000, and March 2001]

107.) These (2) confidential memos were based on conf. inmate informants' claimed (1) Troxell was an A.B. member keeping a low profile; and (2) Troxell was a member of the A.B. council.

〈38〉

108.) On June 23, 2001, the [LEIU] issued a CDC-128B-2 Chrono, validating Troxell as active, based on the (2) Conf. Memos referenced above, and stated he could request a new inactive review after Aug 3, 2006.

109.) Prior to this June 2001, (LEIU) review, Troxell was not provided with any notice of the information used against him [i.e., the (2) conf. memos] nor was he given opportunity to respond. The first time he was aware of this was when his counselor gave him the (2) CDC-1030 Confidential disclosure forms ... *AFTER* the June 23, 2001 (LEIU) decision. Troxell maintains he is not affiliated with any gang.

110.) On July 8, 2003, the LEIU/SSU reviewed Troxell's status, and again deemed him to be an active gang-member based on the same conf. memos from [1989, and 2001]; again, this was done without notice or opportunity to be heard.

111.) On July 25, 2003, Troxell celled up with Ashker; prior to this Troxell did not file additional 602 Appeals to challenge (SHU) issues, because he saw it as a futile effort to challenge the false claims against him, with the CDCR-PBSP staff just rubber stamping each others decisions.

112.) On Feb. 23, 2004 Troxell was party to the Group Appeal submitted by Ashker, requesting program opportunities - recommended by the [BPH] to enhance parole suitability.

113.) Defendant McGrath and Woodford *denied the appeal at all levels* by July 22, 2004, on the basis of, ". . . you're a member of a terrorist group, and until you fully cooperate with the authorities to bring down the A.B., you will remain in (SHU), and should never be paroled." [See above para's #64 [A to C, re: group appeal and Ashker's allegation's that the "inactive-reviews" are a SHAM. Troxell agrees, and re-alleges the same. *An example being* his own review, started in [1999] and ending June 2001, after Def. Wise fabricate

(39)

AGO 001101

the Sept. 20, 1999, and Aug. 3, 2000, Conf. Memo's. See details in above paras #103-108]

114.) Between Nov. 8, 2004 and April 11, 2005, Troxell attempted to file (4) 602-Appeals, challenging Defendant's policies re: indefinite (SHU) status, the "informant status" requirement for release, and "inactive" criteria. Defendant Bradbury, refused to process all of these appeals on the pretext that they were "untimely" [CCR-Title 15 states inmates have the right to challenge any policy(s) which have an adverse impact]

115.) Def. Bradbury, rejected the above appeals, at the same time the appeal exhaustion issue was pending in USDC-N.D. Cal. #C04-1467 CW [Dismissed without prejudice for failure to exhaust in early June 2005)

116.) On June 7, 2005, Troxell submitted another 602 Appeal, #C05-01550 [this appeal was the same as Ashker's appeal #C05-01551, See above para's #68-71].

117.) In this appeal he specified that, ...he was "challenging CDCR policy(s) of subjecting him to indefinite [SHU] status, for over [20] years [at that time], based on their gang-label. He pointed out that he had never received a CDC-115 rule violation for committing an illegal act on behalf of a gang, the gang label was based on hearsay from undisclosed inmate informants; and, the continued [SHU] status was used by the [BPH] to justify (4) year parole deferral in [2001], and his only avenue for [SHU] release is via debriefing, or inactive status.

118.) The above referrenced appeal pointed out that the policies and practices at issue violated U.S. Constitution 1st, 5th, 8th, and 14th Amend-ments, as follows: [wherein, he listed the same points, and case law as Ashker's appeal. See above para #69 [A-E] for details]

119.) Defendant Kirkland, denied the appeal at Warden's level of review, on Aug. 22, 2005 [the same day, for the same reasons as Ashker's, See above para #70]

120.) On Dec. 12, 2005, Defendant(s) [Hickman or Woodford] denied the appeal at

<40>

AGO 001102

the Director level, merely rubber stamping the Warden's Level denial.

121.) On August 7, 2005, Troxell was party to the memo he and Ashker created, and sent to Defendant Hickman, *pointing out that the CDCR-use of innocuous activity, and allegations from confidential inmate informants, to keep them in [SHU] indefinitely, unless they debrief, violated clearly established law [with case cites incorporated], and requested Hickman remedy the problem. His response was .'. the issues could not be addressed due to court litigation.'*

122.) On March 9, 2007, *PBSP-I.G.I.-Unit [Defendants' Thornton and McKinney] allegedly initiated an investigation regarding Troxell's current gang-activity [per, CCR-Tit. 15 § 3378(c), six year review re: inactive status]*

123.) This alleged "investigation" into Troxell's current gang activity, was a __SHAM__ - it was not meaningful because it lacked any semblance of substantive due process [no actual "investigation" took place] *as shown by the following:*

   Ⓐ On March 19, 2007, Defendants Thornton and McKinney, *signed a* CDC-128B Chrono, recommending that Troxell's gang status remain "active" based on their alleged "investigation" consisting of:

      1) Review of Troxell's Central File ['revealing current gang-activity,' via [8] confidential memo's]

      2) Property Search [with negative results]

      3) March 19, 2007 "interview" of Troxell [consisting of Troxell giving Def. Thornton (3) pages, denying each item used against him]

   Ⓑ The [8] confidential memo's, and Troxell's responsive denials, were as follows:

      1) Conf. Memo of Sept. 18, 2006, Informant, claims Troxell's name was on a "kite"

                           ‹41›

**AGO 001103**

informing other gang members of his location [__Response;__ I have no control over what someone else does. Also, the mention of my name and where I'm housed doesn't meet criteria of "Gang Activity" per. Tit. 15 §§ 3000, 3023]

2) __Memo of July 12, 2005,__ Written Material, during an investigation, info was discovered by staff indicating Troxell, and other AB members, were attempting to establish a line of communication with other AB's' [__Resp.__ This claim is a fabrication by c/o Sprouse and certain I.G.I. staff in order to prevent white PBSP-SHU prisoners from establishing positive support and programming opportunities...]

3) __Memo of July 11, 2005__ [same as above memo of 7-12-05, with addition of, "Troxell was also receiving funds from an AB members' family"] [__Resp.__ Same response as #2]

4) __Memo of April 25, 2005,__ Staff Info., "... AB members were discussing locations of other members. Troxell was discussed as to current housing.' [__Resp.__ "My response is same as #1 above...."]

5) __Memo of April 2, 2005,__ Debriefer claimed, "...Troxell communicated housing info. to another member. Troxell was identified as an AB member, who also sponsored an inmate for membership' [__Resp.__ your debriefer is a liar, and his statements-fabrications based on ⒶXhis imagination ⒷX stuff he's made up based on things he's seen about me on T.V. [like the Nov. 2002, KTVU Ch. 2 news story with my picture, name, and A.K.A. on it] ⒸX stuff he's read about in newspaper]

6) __Conf. CDC-128B dated Aug. 26, 2004,__ Written Material, staff confiscated an "AB roster" with Troxell's name and number on it' [__Resp.__ Same as #1 & 4 above]

7) __Memo of May 4, 2004,__ Debriefer claimed, "... Troxell is an active A.B member, who sponsored an inmate for membership, and gave orders to

〈42〉

AGO 001104

assault certain inmates throughout the state' [Resp. Your informant's claims are false, and not based on first hand information that I personally ordered him to do anything. I've not been issued a CDCR-115 Rule Violation. And it's been well publicized for past (20) years how prisoners fabricate info, and how easy it is for them to make it appear reliable. Also, many staff — including gang unit staff as far back as 2003 have gone around spreading rumors of conflict between whites and south mexicans]

8) Memo of March 3, 2004, Informant claimed, '...Troxell one of the AB members that gave orders to assault Southern Hispanics throughout the state.' [Resp. Same as #7 above. You have no real/reliable evidence I ever personally ever gave "orders" to anyone. If you did, Title 15 § 3312-3315 mandate issuance of a CDCR-Rule Violation Report period! Failing to follow Tit 15:3023 re: what constitutes "gang-activity."

© Defendants' Thornton and McKinney, received my points, which dispute each of the (8) items used [to the best of Troxell's ability, based on lack of specific details given], on March 19, 2007; they did not bother to conduct any substantive investigation into any of the (8) items used [either prior to, or after, Troxell's responses were received; based on info. and belief, i.e., Defs 128B-Chrono recommending (OCS) keep his gang status at "active" is dated the same day that he gave them his response [3-19-07] thus making it impossible to believe any "investigation" occurred; and Testimony in Lira case, supra — no substantive investigating is done'.)

124) On Dec. 4, 2007, Troxell received Defendant Marquez' CDC-128B-2 Chrono dated Oct. 18, 2007 — revalidating him as an active AB gang-member

⟨43⟩

AGO 001105

based on the [8] Confidential Memos, *submitted by Thornton and McKinney. And stating his next Active/Inactive Reviews, eligibility date would be Sept.1, 2012.*

125.) Defendant Marquez, *did not independently investigate any of the confidential memos at issue* [and, in lieu of Troxell's responsive denials]. He just rubber stamped Thornton and McKinney's recommendations [Based on info. and belief; i.e., CDCR-Testimony(s) *in Lira trial, supra, Order of 9.30.09, admitting no substantive review, or independent investigations, are done*] [And, on 9-26-07, PBSP-SHU-ICC, *had already* rubber stamped Thornton, and McKinney's, March 19, 2007, *decision to deny inactive status*]

126.) On Dec.12, 2007, Troxell submitted 602 Appeal #D07-02824, wherein he challenges [CDCR] Rules-Regs. [ccR-Title 15 §§ 3341.5 ¢ 3378(c)], and policies-practices related thereto, *on the basis that my [22 plus] years of indefinite (SHU) confinement on the basis of* status*"violates state ¢ federal Law, as detailed below."*

127.) The appeal continues,"... I've been *classified by CDC as an associate/member of the A.B. since Jan.1984, when I was released from S.Q., Max B, to Folsom G.P. The basis for this Label was confidential inmate informants. In Oct.1985, I was placed in (SHU) based on this Label ¢ have been in (SHU) ever since, I've never been issued a CDC-115 RVR for involvement in any illegal gang-activity.*

128.) The appeal continues,"... In 2000/2001, I was *denied inactive status on basis of conf. inmate informants claiming I was a gang member. I was told I can ask for another "inactive" review in 6 years; in the interim my sole means for release to G.P. is via informant status. In 2004, the Warden ¢ Director stated on my group 602 Appeal #C04-00566, that I will never get out of SHU unless I,"fully cooperate with the authorities to bring down the A.B." On 3-15-07, I was issued [8] 1030's being used to deny me "inactive" status again. On 3-19-07, I gave IGI my*

⟨44⟩

AGO 001106

written response to these (8) 1030's, wherein I dispute each one [see attach-ed copies]"

129.) The appeal continues, "... On 12-4-07, I received my copy of the SSU-Review, deeming me ineligible for inactive status, and notifying me my next review will begin Sept. 1, 2012 [see copy of CDC-228-B-2...] Thus, between now and 9-1-12, my only way out of SHU is to become an informant. Such policies - practices violate clearly established law as supported below [Troxell then makes the same points, with ref. to the same case cites as Ashker's appeal See above para# 81 [1-5.A-c], and requested the same relief. See above para# 82]

130.) Defendant Horel, denied the appeal at Warden's Level, on January 30, 2008, based on ..."a thorough investigation"...and determination that "there were no due process violations in relation to this validation." and, "This Reviewer has no authority to over Turn a decision by OCS or SSU."

131.) Troxell's position is that Defendant Horel's review, did not include a substantive, independent investigation into the substance of the confident-ial inmate informants claims /staff info., in lieu of Troxell's rebuttals, and merely rubber-stamped the OCS' Chrono. [Based on info. & belief. i.e., Def. Horel's, agent claimed he conducted and completed this "thorough invest" in one day (1-28-08 - 1-29-08); and trial testimonies of Def. McGrath, Marquez, and other I.G.I/SSU staff during Feb. 2009 Lira, case, supra, admitting no substantive reviews - investigations are done on appeals re: gang-status, See above para# 31(E)]

132.) Defendant Horel, ignores all of Troxell's other points re: 1st, 5th, 8th Amendment violation claims, inspite of the refererence to supporting case law. This is deliberate indifference [Based on info. and belief, each of

<45>

AGO 001107

the CDCR-Defendants have repeatedly been made personally aware of these Constitutional violations via numerous inmate appeals; the Griffin ruling, referenced in above para# 81 (5-C), and numerous inmates becoming mentally ill in (SHU) at P.B.S.P.; yet doing nothing to fix the problems).

133.> On May 15, 2008, Def. Cate, denied the appeal at the Director level, by rubber stamping the Warden's response, and thereby ensuring the continuation of such Constitutional violations, in spite of being repeatedly put on notice [per. same manner as Def. Horel, et al., as stated above]. [See also, above para# 87]

## HARMFUL EFFECT FROM 24 YEARS OF SHU-CONFINEMENT

134.> Troxell has presently been subject to more than [24] years of continued (SHU) confinement, on the basis of arbitrarily applied policy(s) and pretext-ual justification [based on defendants allegation that his CDCR-gang classif-ication automatically make him a serious threat to safety/security, requir-ing (SHU) housing indefinitely - for administrative reasons [until he dies, or agrees to become an informant],... while allowing tens of thousands of gang-affiliates to be in general population prisons], without ever being found guilty of committing an illegal, gang-related act.

135.> Defendants have punished him for refusing to become their inform-ant, and exercising his First amendment right of choosing not to speak; and, prior to being classified as a gang-affiliate, he was never notified the label would be cause for indefinite [SHU], unless he agreed to become a known inform-ant for the authorities [and thereby, face serious risk of reprisals, for informant status; such policy being an Eighth Amendment violation].

136.> Troxell has been isolated in [PBSP-SHU] since Dec. 27, 1989, and has no

<46>

AGO 001108

<u>information to provide</u>; and, he's not willing to become an informant for Defendants, or anyone else, based on principle; and, unwillingness to place himself, or family, in the position of the serious danger informants Face.

137) This [24+] years of punitive (SHU) confinement has caused the ongoing harm, as exemplified below:

Ⓐ PBSP-SHU conditions are intentionally punitive [more so than the other [3] SHU-Facilities across the state. Based on info. and belief]; with the purpose of coercing inmates to become informants. Examples are: more restrictions on allowable types of magazines and books, appliances, packages, clothing; lengthy mail-delays, *non-contact* visits, no phone-calls, no photograph's to send home, no education opportunities [none that require proctored exams - per. Def. Jacquez and Cate] While allowing informants, T.H.U., and G.P. inmates all of the above.

<u>For [24] yrs, Troxell's been denied normal human contact, & subject to sensory deprivation;</u>
Ⓑ Troxell has had no physical contact with family, no photographs of himself to send to family, no phone-calls, ... For over [24] years; many of his nieces, nephew, grandkids, and other relatives have never seen him in person - or photograph. This, together with years of lengthy mail delays, has caused estrangement from many family members.

Ⓒ He has been eligible for parole since [1996]; however, the [BPH] has an unwritten policy of issuing all (SHU) lifer's, multi-year denials. *And they have* applied this to Troxell in [1995] with a [6] year denial; in [2001] *with a [4] year* denial; in [2006] with a [3] year denial; and [2009] with a [7] year denial. [See details in below paras # 141-143, 150-161]

〈47〉

AGO 001109

(D) Troxell's mental health has been damaged as a direct result of his [24] plus years of [SHU] [Based on info. and belief; e.g., experiences of increased negativity, insomnia, anxiety, hypersensitivity, ruminations, aggression, rage, hopelessness and lethargy; and difficulty with ability to concentrate, focus, and communicate. And, sensory overload with related discomfort when leaving his cell/pod area], and there's a serious risk that he may suffer severe mental illness—the longer he is subject to SHU [per. many studies conducted between 1975 to the present]

### *ADDITIONAL FACTS PERTAINING TO VIOLATION OF 1st, 5th, 8th, 14th AMENDMENTS To U.S. CONSTITUTION VIA INDEFINITE PUNITIVE CONDITIONS [per. CDCR-INFORMANT PROCUREMENT AGENDA]*

138.> Defendants McGrath, Woodford, Jacquez, Horel, Cate, Johnson, Bradbury [▮▮▮▮▮▮▮], have intentionally sought to make conditions in (PBSP-SHU) progressively more punitive than the state's [4] other prison's [housing inmates indefinitely based on CDCR-gang classification], as well as more punitive than other state's and Federal Prison System [B.O.P] super-max prisons; for the sole purpose of coercing plaintiff's [and PBSP-SHU inmates similarly situated] into becoming CDCR-informants [Based on info. and belief, exemplified below]

139.> *California state prison inmates civil rights are to be the same as a free person, any restrictions on such rights must be solely based on <u>legitimate</u> penological interests [per. Cal. Penal Code § 2600]*

140.> California Code of Regulations [CCR], Title 15 § 3343, addresses

<48>

conditions of (SHU) housing, and specifies such conditions with respect to programming - privilege opportunities are to be the same as the general population inmates are afforded, ... subject to restriction - solely based on legitimate "safety and security reasons" [the most used and abused excuse] used by defendants as a pretext to justify what in reality is done punitively, with the intent of coercing (SHU) inmates at PBSP into becoming informants ... their only real means for (SHU) release [other than insanity or death] as exemplified below:

    Ⓐ Between Dec. 1989 and 2001, their were no educational opportunities - requiring proctored exams. In (2001) PBSP-SHU began allowing G.E.D. preparation via in cell study, and institutional T.V. channel instruction - and proctored exams [using the empty visiting cells]

    Ⓑ In late 2003, early 2004, plaintiffs began requesting additional education - vocation - self-help opportunities. In February 2004, they submitted a group appeal requesting such opportunities - based on CCR Tit 15§ 3343(K), and such are required by the parole board for lifers to enhance parole eligibility. Def. McGrath and Woodford denied the appeal, claiming plaintiffs needed to become informants if they wanted these opportunities [see above para's #64(A-C)re; 602 Appeal; also, several other inmates, of all races, did a similar group appeal, at the same time, which defendants denied - without reference to terrorism, or informant issues, mentioned] Many family members and friends were also contacting defendants about this.

    Ⓒ Although defendants denied the appeals referenced above, PBSP-SHU began offering some College courses in August 2004 [via cell-study, and

⟨49⟩

ability to purchase your own text-books; and, around Feb, 2005, they began including educational-instructional videos on the T.V., to go with the cell-study) [Based on info. and belief Def. Kirkland is the one allowing it)

(D) In mid-2005, Troxell obtained his G.E.D., and requested the College info. from education and never received any reply. He looked at the material other inmates received or noted he could not afford the cost of books anyhow [He filed a 602 Appeal (in 2006 asking to be able to offer his artwork on internet, for donations, to cover book costs - def. Horel, and Cate denied the appeal) [602 Appeal # D06-02017) This is also a denial of free speech - free expression, and an equal protection violation [other prisons allow inmates to offer their art for donations]

(2) In 2007-2008, the College program was expanded, and had some openings for free books too. Troxell's requests to participate went unanswered. And, in early 2009, rumor's were that (SHU) inmates were being excluded; thus, on March 8, 2009, he submitted a 602-Appeal, On May 15, 2009, Def. Jacquez, denied the appeal, and Def, Cate, denied it on Aug. 3, 2009. They claimed the College program was cut due to budget cuts and limited staff. However, the only one's not allowed to participate - are (SHU) inmates who refuse to debrief, The inmate informants, and general population inmates still get the College [ G.E.D. has also recently stopped in SHU) [See: 602 Appeal # D09-00940) The message being, ... if you want educational ops, you need to debrief.

(F) On [1-13-04] Def. McGrath, began a "photograph program" in (PBSP-SHU); wherein, debriefers and those meeting inactive status, can have photo - taken of themselves to send to family. Plaintiffs haven't been able to share a photo of themselves for over (20) years [yet, in 2002 def. McGrath provided a

⟨50⟩

news channel (KTVU-Ch.2, in Oakland) with plaintiffs' prison mugshots to air on T.V. in October-November 2002. The message being, if you want to send family a recent photo - you need to debrief. McGrath also banned hardcover books, and internet material in mail [both were struck down by this Court in 2002]

(C.) On June 25, 2008, Plaintiffs submitted 602 Appeals [Ashker's Log #D08-01791; Troxell's, Log# D08-01784], wherein they pointed out that their; serving indefinite (SHU) terms, and in 2004, McGrath stated they will not leave (SHU) absent informant status - and the program opportunities in (SHU) were not sufficient, to meet parole board requirements; and denying them such opportunities - while providing such to all other PBSP-inmates [including those in segregation for informant status (THU) and psych. problems (PSU) violated Tit. 15 §§3040/3343, as well as 1st, 5th, 8th, and 14th Amends [based on principles of equal-protection; and illegality of: denying programming necessary to enhance a lifer's parole chances, as a means of coercing inmates to become informants]. On July 2008, Defs. Johnson and Bradbury denied the appeals; On August 15, 2008, Def. Horel denied the appeals; and On Dec.5, 2008, Def. Cate denied the appeals at Third Level Review. Each of these defendants were put on notice [again] of the U.S. Constitutional issues [i.e., equal-protection; and punitive measures affecting parole chances, for purpose of coercing inmates to be informants] Each defendant ignored the points raised, ensuring continued violations [and, in fact Defs. Jacquez and Cate, have subsequently taken away all educational opportunities from (SHU) See above para# 140 (E)]

〈51〉

(H) On July 2, 2008, Plaintiffs submitted 602 Appeals [Ashker's, Log # D08-01848; Troxell's, Log # D08-01847. Notably, more than (30) other similarly situated SHU-inmates filed related, group-appeals, and Defendants used Troxell's Appeal Responses for all of them.] In these appeals, the complaints were that – denying [PBSP-SHU] inmates [serving indefinite SHU-terms, for administrative reasons] programming and privileges, that are available to all other PBSP-inmates [as well as, similarly situated [SHU] inmates in other states and federal system; evidencing lack of validity to defendant's rote safety-security claims], was a pretext for coercing inmates into becoming informants, and thereby be put in serious danger, and violated Cal. Pen. Code § 2600; Title 15 § 3343; and U.S. Constitution 1st, 5th, 8th, and 14th Amendments. Plaintiffs, et al, all requested [monthly phone calls; ability to have a personal photo taken to send home; art paper, colored-pencils, watercolors; state issue watch caps; to keep heads warm; increase in canteen and packages; exercise - pull-up/dip bars, on the yards; and T.V.-Radio combo-appliances. Defendants Johnson, Bradbury, Horel, and Cate, denied these appeals, at each level of review, between Aug. to Dec. 2008. Each of these Defendants had the power to provide the relief sought, and each refused, inspite of being on notice about the continuing U.S. Constitutional violations [which they all ignored]

(I) Defendants have also attempted to make (PBSP-SHU) more punitive, as part of their coercive, informant procurement agenda by: denying SHU-inmates the ability to exchange correspondence with incarcerated family members; Denying adequate medical care, and edible food; Denying many books and magazines, and recently - wall calenders [all of which are allowed in the other CDCR-32 institutions] [even barring blank white paper, to stop inmates drawing] Additional harm from conditions is summarized in above [paras # 88-91, 134-137]

⟨52⟩

AGO 001114

FACTS PERTAINING TO BPH-NO PAROLE
POLICY FOR CDCR-SHU-LIFER INMATES

141.) Plaintiffs' are serving term-to-life sentences, and California's parole scheme gives rise to a protected liberty interest in release on parole. That's because the parole statute, Calif. Penal Code § 3041, mandates that the Board shall set a date unless it determines further incarceration is necessary in the interest of public-safety." The California Supreme Court has repeatedly stressed that the Board must base its decision on the inmate's individual acts and ommissions - both for and against parole. The decision cannot be arbitrary- or, predetermined- categorical reasons [This is per. U.S. Supreme Court precedent(s) as well]

142.) The Calif. Supreme Court has also clarified that "... a decision to deny parole comports with due process only if there is a rational, specifically articulated, nexus between the relevant statutory factors as found by the Board and the determination that the inmate would be a current danger to the public if released"..." It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness - this is the key relevant consideration"... "The Board's failure to specifically articulate the nexus... linking the relation between factors cited with how they equate to evidence demonstrating current dangerousness is a denial of due process" In re Lawrence, 44 Cal. 4th 1181, 1205, 1212, 1219 [2008]

143.) Plaintiffs contend the Board [in tandem with CDCR] have subjected them to their unwritten predetermined [arbitrary - categorical] NO-PAROLE policy applied to all SHU-LIFERS [with Catch 22 of: Become an informant

⟨53⟩

AGO 001115

For the authorities, and thereby gain release from SHU-to a gen. prison population [and be subject to serious danger per informant status]; or, die in SHU, "It's your choice." In violation of the U.S. Const 1st, 5th, 8th, and 14th Amendments, as detailed below:

(A) Between 1989 to present date, not one SHU-Lifer has been found suitable for parole [based on info. and belief, i.e., plaintiffs' review of many SHU-Lifers' parole hearing documents; and Governor's Yearly, Executive Reports To Legislature On Parole Decisions, from Jan. 1, 1999 to present]

(B) Between 1989 to present date, the Board has found more than [2300] lifers suitable for parole - who were able to program on the general population. Between Jan. 1, 1999, and the present date, the Board has found more than (2000) lifers suitable [Id, Executive Rpts]

(C) Many of the (2000) lifers found suitable over past ten years had gang-related crimes, histories of gang activity in and out of prison, prior crime and drug histories. These inmates had all become CDCR informants [or deemed "inactive"; but Def. Schwarzenegger, still expects inmates deemed "inactive" to become informants, prior to parole. Id, Executive Rpts]

(D) In [1992] the Board submitted a proposal to the Governor, to eliminate lifer parole hearings for (SHU) inmates. This was shotdown because of recognition it would be illegal [Based on info. and belief, plaintiffs' have the transcript of the proposal]

⟨54⟩

AGO 001116

(E) Between 1989 and the present, Board Commissioners [including named defendants Fisher, Harmon, and Gillingham] have told SHU-lifers that they need to get out of SHU [via debriefing if necessary], to have a chance for parole, and issued multi-year *denials-based* solely on CDCR-Gang Label and related indefinite (SHU) status. [Based on info. and belief, *i.e.*, plaintiffs' personal experiences with the Board; and, review of several SHU-lifer inmates parole hearing transcripts, noteable is the fact that when asked directly if they have a no parole for (SHU)-debriefing requirement-they deny it, while applying it; this demonstrates intent to knowingly violate the law]. Also, only SHU-"Lifers" are denied parole; inmates in SHU [who have parole dates per. determinate sentence] get time reduction, even in SHU--for being discipline free.

(F) The Board [and Governor] expect SHU-lifers to get out of SHU-via "debriefing" [becoming a known informant], if they want a chance to parole; inspite of knowing inmate informants, and their families, face retaliation for informant status [including serious injury, and death. Based on info. and belief, *i.e.*, common knowledge, legislative hearings, Board members documented admissions in hearing transcripts, publicized incidents]. [NOTE: Robert Doyle, BPH-Chairman, is a named defendant for injunctive relief purposes]

(a) Facts Re: No Parole Policy Applied To Ashker

144) As stated above, Plaintiff Ashker was sentenced to a term of 21 years to life, subsequent to his conviction for second degree murder, with use of a knife, in April 1990 [per. statute, he received 15 to life for second degree murder, (1) year for knife, and (5) year enhancement for prior felony conviction. *See above* paras# 32-41, for additional details]

⟨55⟩

145.) Ashker received the 21 to Life sentence on April 23, 1990, and was transfered to PBSP-SHU on May 2, 1990, where he was informed he would remain until he paroled, died, or debriefed [and where he has remained ever since]

146.) Ashker had obtained his G.E.D. in March 1981, and there were no opportunities for him to formally upgrade his education, vocation, or self-help ops, in (PBSP-SHU) between 1990 and 2004 [see above para# 138-146]

147.) That the following facts are examples of parole board commission er's applying their unwritten, no parole for (SHU) lifer policy [with the <u>Catch 22 of</u>: Become a CDCR informant so you can get out of (SHU) to a lower level institution where programs are available; or, remain and die in (SHU), . . . it's your choice]:

 Ⓐ Ashker's first parole readiness documentation hearing was conducted by Commissioner Roos, on June 17, 1998, who recommends: Upgrade Education, Vocation, Self-Help, . . . "Get out of SHU-Debrief-Lower Points-Get To General Population".

 Ⓑ Ashker's second parole readiness documentation hearing was conducted by Comm. Roos, on July 24, 2001, who recommends: Upgrade Educ., Vocation, and Self-Help groups, and notes, . . . "has greatly improved disciplinary record- However, is still in SHU".

 Ⓒ Ashker's initial parole eligibility hearing was held Aug. 7, 2003 before Comm's Lawin and Lehman. Ashker declined to attend due to his pending appeal of conviction, and believed he'd receive a fair hearing regardless of attendance. Comm's Lawin and Lehman, denied Ashker due process, getting the facts of the life crime wrong - claiming it was an

⟨56⟩

"A.B. Gang-Hit" without reference to any supporting facts; and specific refer to his CDCR gang label and related (SHU) status, ... and "failure to follow prior recommendations to upgrade educ., vocation, self-help, and to get out of SHU", to deny parole with (5) year deferal.

(D) Ashker appealed the (2003) decision, and Comms. Risen and Moore, denied it on Jan. 13, 2004. Re: Ashker's claim board applied no parole policy [informant requirement, and dangers such entails] Risen and Moore, stated: The prisoner by his own actions has placed himself in the current custody situation where programs are not available. This is his choice and it is up to him to make the necessary changes in order to reduce his custody classification, so that he can participate in ... programs."

148.) The above commissioners knew at the time that they made the above assertions that Ashker's (SHU) status was "administrative" rather than behaviorial, and the "gang-label" was absent conviction(s) of any "illegal" gang-activity; and that Ashker's only avenue out of (SHU) was via becoming a known informant for CDCR [Based on info and belief. i.e. comm's claimed they reviewed Ashker's records, and common knowledge, bolstered by his appeal points on the issues]

149.) The Board's reliance on (SHU) inmates "lack of programming" to justify multi-year deferals is a pretextual excuse to cover their "no parole for (SHU)" policy, as exemplified below:

(A) On August 14, 2008, Ashker attended his parole hearing before Defendant Comms. Gillingham, and Smith. Between Jan. 2004, and the Aug. 14, 2008, Hearing Ashker accumulated over (31) certificates of completion, demonstrating upgrades in education-vocation [this

⟨57⟩

AGO 001119

included an AA Degree in Paralegal Studies] and self-help courses, on his own initiative, at his own expense [re: AA Degree], in SHU [this was possible with proctored exam opportunity — no longer avail to SHU-inmates. See above paras* 138-140]

Ashker also produced undisputable evidence, proving his life-conviction was not gang-related [i.e., Trial Transcripts]

Ⓑ Comm's. Gillingham, and Smith, both commended Ashker for his positive achievements, and stated those were the basis for only giving him a (4) year deferral [rather than a (5) year deferral]; Gillingham stated such positive achievements were outweighed by negative factors; and recited these immutable factors: Life crime, lack of remorse, prior crime history - unstable social history, gang validation and related (SHU) housing. These comm's, did not articulate the nexus linking such factors with how they equate to being evidence of current dangerousness.

Ⓒ Comm. Gillingham, also emphasized that so long as Ashker remains in (SHU) for gang-validation ... "you're going to have a difficult time" [of ever being found suitable]. This statement was made inspite of Ashker presenting evidence that the gang-validation was based on confidential inmate informants stories, which have never resulted in any charges; and neither Gillingham, nor Smith, considered any of the conf. info. they had in front of them. Thus, categorically denying Ashker parole, based on "status" [CDCR-Gang Label and related SHU-housing], rather than an individualized consideration based on all factors [and immutable factors - many of which are over (25) years old, and not true e.g., lack of remorse; or, demonstrate suitability e.g., prior crime history devoid of violence.] denying due process. [See below paras* 157-160 re: Troxell's 4.8.09, hearing before Comm. Gillingham)

〈58〉

AGO 001120

(D) Prior to Def's Gillingham, and Smith's, Aug. 14, 2008 <u>Decision</u>, Ashker presented evidence to show his gang-validation, and SHU-housing, was based on conf. inmate informant's claims, which he denied, and had never been found guilty of an "illegal" gang-related act; and his only avenue for (SHU) release was via "known" informant status - which he was not able, or willing to do [i.e., Lack of info. to provide, and not willing to place self, or family in danger that informants face], to which Gillingham's response was, 'as long as you're validated and in SHU, you'll continue to have problems' [being found suitable], demonstrating deliberate indifference, and predicating parole on "illegal principle [informant status] violating US Const. 1st, 5th, 8th, 14th Amendments [Ashker provided supporting case law to these Defs at the hearing]. With "nexus" linking label-SHU, to evidence of "current danger-to the public" [again, violating due process)

⟨b.⟩ <u>Facts Re: No Parole Policy Applied To Troxell</u>

150.⟩ As stated above, Plaintiff Troxell was sentenced on July 16, 1979, to a term of 26 years to life, subsequent to his plea of guilty to First degree Felony murder, and robbery [ <u>per, statute</u>, he received 25 to life for first degree murder, (1) year for prior prison term; with concurrent (5) year sentence for robbery] [<u>see above</u> para's # 92-99, for additional details]

151.⟩ Troxell arrived in the (CDCR) on July 23, 1979 [with credit going back to his <u>Jan. 1979</u>, arrest]; he spent the first [5] years in San Quentin (SHU) for various rule violations. In Jan. 1984, he was transferred to Folsom Prison General Population [despite CDCR-1982, A.B. association classification. <u>Id.</u>, <u>above</u> para's # 93-95, for details]

⟨59⟩

152) Troxell was programming on Folsom Prison Gen. Population, earning positive work evaluations from the kitchen supervisor, until being placed back in (SHU) Oct. 30, 1985, for undisclosed investigatory reasons. Subsequently, he was told he would remain in (SHU) indefinitely — until he agreed to debrief [based on confidential inmate informants, alleging he was an A.B. gang-member. All of Troxell's administrative appeals challenging this gang-label, and related SHU status-debriefing objections, have been denied. See above paras* 94-137, for details]

153) Troxell has been in (SHU) since Oct. 30, 1985, and he has been housed in [PBSP-SHU] since Dec. 27, 1989, where there were no opportunities for him to formally upgrade his education, vocation, or self-help, until 2001, when G.E.D. study [with ability to get the required proctored exams] was offered. Troxell obtained his GED in (2005) - delay caused by vision-problems requiring surgery - his repeat requests to participate in College have been ignored and denied [See above paras.* 138-140, for details]

154) That the following facts are examples of parole board commissioner's applying their unwritten, "no parole for (SHU) lifer policy [with Catch 22 of: Become a CDCR informant, so you can get out of (SHU) to a lower level institution where programs are available; or, remain and die in (SHU),... it's your choice]:

    (A) Troxell's initial parole eligibility hearing was held on Sept. 19, 1995 before Comm's Guaderrama, et al., ; they denied parole, and issued a [5] year deferal to his next hearing based on their boiler-plate recital of immutable factors [i.e., life crime; prior criminality and related drug addiction; lack of sufficient programming, continued disciplinary and anti social behavior [his last rule violation, 1988 verbal threat to staff] validated gang-member and SHU-status] [NOTE: Troxell, has read other PBSP-SHU lifer's (BPH) Transcripts, wherein Guaderrama states - as long as they're in SHU - refusing to debrief - no parole] ⟨60⟩

AGO 001122

(B) Troxell's next parole hearing was not held until nearly [6] years later, on July 10, 2001, before Comm's. Welch; Granlund; and Stern.

At the time, Troxell was working on his G.E.D., and believed he was still being considered for "inactive gang-status" [having been up for it since Dec. 1999; he did not know the decision to deny this had been made June 23, 2001, based on Def. Wise' fabricated info) [see above - para's # 103-108/13]; the Comm's, commended him for his efforts to achieve the G.E.D., and "inactive status" [without careful review of his file, or they'd have seen this had been denied Id., para's 103-108, 113], and then denied parole for (4) years - based on their boiler-plate recital of immutable factors [i.e., life crime; prior crime history and related drug habit; unstable social history; programmed in a limited manner, and failed to up-grade vocationally and self-help, per. prior panel's recommendations; failed to demonstrate positive change and continued to display negative behavior [based on SHU-status, and a 1997 fist-fight], as a result he is in [SHU] where his ability to demonstrate parole readiness will remain hampered; lack of parole plans] [NOTE: Troxell has read other PBSP-SHU inmates (BPH) transcripts, wherein Comm. Welch says they need to debrief.]

155.) Troxell's next parole hearing was held [4½] years later, on Jan. 10, 2006, before Defendant's [Comm's. Fisher and Harmon]; Troxell presented evidence at this hearing to challenge the validity of the repeat use of immutable factors to justify the prior panel's decision to deny parole. He also presented several certificates of completion in education and self-help [G.E.D.; math studies; Anger Mgt.; victim awareness; life-skills, and others] and viable parole-plans. He also pointed out his only avenue out of [SHU] is via informant-status, and explained why he could not, would not do this.

⟨61⟩

AGO 001123

156.) Defendants' Fisher, and Harmon, commended Troxell for his positive achievements, on his own initiative in [SHU], and noted he had viable parole plans; then, they denied parole for (3) years [per. application of the no parole for (SHU) policy] stating the following "reasons" without articulation of nexus re: how the factors cited, equate to evidence demonstrating a current danger to public safety:

Ⓐ Immutable Factors: Life crime; prior crime history, related to his drug-addiction, and institutional discipline history; until recently, had not been programming, in part, due to (SHU) placement; and ...

" Part of the reason for the multiple year denial, Mr. Troxell, is I'm sure you know, is the fact that you continue to be validated as a member of a prison gang" [NOTE: Troxell has read other PBSP-SHU Lifers (8PH) Transcripts wherein Comm, Harmon, repeatedly infers that they need to debrief out of SHU]

Ⓑ The above factors fail to constitute "evidence" of current danger to public-safety, as follows [as presented to Def's during the hearing]

1) Life crime was the unintended death of store mgr. during robber to obtain drug money; Troxell plead guilty, had served (27) years and no longer uses drugs.

2) Prior crime history - drug addiction; This was over (30) years old - history [noteable for zero physical harm to anyone - which is a factor for suitability], and zero drug use for (20) years.

3) Institutional Discipline History; Between 1988 - 2006, he'd received (1) Rule Violation classified serious, for a (1997) Fist-Fight.

4) He had been studying, on his own initiative his entire (SHU) term.

5) His gang-validation is based on allegations from Confidential - Inmate Informants, claiming he's a gang-member. That's why he's been in (SHU) for over (24) years. He has never been found guilty of illegal gang-activity.

⟨62⟩

AGO 001124

(C) Defendants Fisher, and Harmon, recommended Troxell, remain discipline free, reduce custody level [get out of SHU], and continue to upgrade education, vocation, and self-help areas;

157.) Troxell's next parole hearing was held more than [3] years later, on April 8, 2009, before Defendants Gillingham, and Tucker. Troxell's state appointed atty. present evidence - again, challenging the validity of repeat use of immutable factors to justify parole denials [as described in para #156]

158.) At the April 8, 2009 hearing, Troxell had over [30] years in on his sentence, and he presented evidence of his compliance with all of the (2006) panel's recommendations, except getting out of SHU [he produced several additional certificates of completion in self-help; demonstrated vocational skills per history [and had obtained all the information for attending Truck driving school, upon release], and he has viable parole plans. He detailed the basis of the CDCR- gang validation and related (SHU) status for (24) years ; and pointed out, his only way out of (SHU) was via known informant status [and reason(s) he can't, and won't, do this - with case law re: illegality of using "status" and refusal to become an informant against him).

159.) The Defendant Comm's. commended Troxell, for his positive achievements since the (2006) hearing, and acknowledged his viable- parole plans. They stated that these factors are why they were denying him for only (7) years [rather than 10 or 15 years]; the basis of this (7) year denial was Troxell's CDCR- gang label, and related continued (SHU) status [and refusal to debrief] is shown by:

(A) Defendants stated (7) year denial based on: life crime purpetrated to get money for drugs; prior crime history, related to drug-addiction;

⟨63⟩

AGO 001125

unstable social history, and problematic relationships, consisting of A.B. membership...". "You are in [SHU], and you're a validated member of the A.B., and that's what we have to base our decisions on," Lack of insight into life crime; prior prison discipline history."

(B) Defendants further stated, "... you're updated as a member of the A.B. ... you're on indeterminate status. Now you'll be here as long as it takes, and you have a choice either to debrief or make it through your lawsuit." ..." you're heading in the right direction. It's just a matter of disassociating yourself from this other A.B. stuff. That may take a long time." ... "But, again, what's hampering you is your placement"" [per April 8, 2009 (BPH) hearing transcript]

160.) Defendants admitted that they did not review any of the conf. information in Troxell's file [yet they used CDCR-gang validation against him, which is based on conf. info], and they admitted there was nothing in his file showing he'd ever been guilty of committing an illegal, gang-related act [with Tucker, speculating on why that may be. Id., transcript]

161.) Defendants failed to articulate a "nexus" between the factors cited to deny parole for (7) years, and how they demonstrate evidence of current danger, denying due process. And they denied Troxell individualized consideration, issuing the [7 year] denial based on "status", without bothering to delve into basis for such "status", nor considering evidence of what specific gang-activity has he actually been guilty of - to thereby find he personally poses a current danger [this is a "categorical" denial of parole, which is a denial of due process]; and they punished him with the (7) year denial for exercising his right not to speak [refusing to become an informant—

<64>

violating U.S. Const. 1st, 5th, 8th, and 14th Amendments [procedural and substantive due-process; and EX POST FACTO principles]

### FACTS PERTAINING TO PLAINTIFF'S CLAIMS
### RE: ACCESS TO COURT and FREE SPEECH

(a) LEGAL MAIL

162) Between 2005, and the present date, CDCR-Defendants have violated the Plaintiffs' U.S. Const. 1st Amendment rights via policies and practices in their handling confidential legal mail, which has interfered with and harmed plaintiffs' access to the Courts; and, inhibited, chilled, and interfered with - and harmed their confidential communications with attorneys, implicating free-speech violations, as follows:

(a) Between 2004 and October 2006, plaintiffs were represented by Attorney Franck [in related cases, USDC-N.D.Cal #C04-1967 C.W., and #C05-3286 C.W. See above paras #9-10]. During this time period, several items of confidential-legal mail [sent to, and coming from Attorney Franck, were never received. This caused alot of conflict, and in Oct. 2006, Attorney Franck withdrew as counsel, and plaintiffs went pro-se, where upon their ability to obtain evidence supporting their claims - via discovery and contact with inmate witnesses was severely-harmed, as was their entire case via lack of attorney to argue for them in court; resulting in the dismissal of most of their meritorious claims [Based on Court rulings, stating the claims had merit; and record on file in #C05-3286 CW]

(b) Between 2006 to the present CDCR-Defendants continued to

⟨65⟩

AGO 001127

excessively delay confidential-legal mail [sent to, and coming from attorney Franck, and other attorneys], and confidential mail from the U.S.D.C.-N.D.Cal., was never received. Defendant's opened legal mail outside of plaintiff's presense; and in May-June of 2008, they made (3) seperate phone-call's to assoc. Law Professor Rovner, asking if she was really an attorney, sending legal-mail to Ashker. All of which has chilled plaintiff's relationships with attorneys, making it difficult to communicate freely about confidential-legal issues, and next to impossible to obtain attorney assistance.

163.) On Feb. 4, 2008, Ashker submitted a 602 Appeal #D08-00399, to complain, and challenge the above legal-mail violations [including, attaching examples of his out-going confidential legal mail to attorneys being held by defendant's for[7 to 11] days; and incoming confidential mail opened outside his presense. He pointed out such violated the First amendment [per, Thornburgh v. Abbott, 490 U.S. 401, at 413-414 [1989]; and Procunier v. Martinez, at 413-414], and requested a halt to such practices, and monetary compensation.

164.) Between Feb. 7, 2008, and Aug. 29, 2008 Defendants' Horel; Cate, and Douglas, denied the appeal at each level of review. They were put on notice of the constitutional violation(s), and failed to correct the problem(s), thereby ensuring they continue unabated-indefinitely.

165.) On Sept. 3, 2006, Troxell, submitted a 602 Appeal #D06-02328, to complain about defendant's opening legal-mail outside his presense, and not giving it to him for(2) weeks thereafter. On Nov. 17, 2006, Defendant Horel cancelled the appeal [while also addressing the issues raised, and claiming Troxell did not submit support evidence, when he did attatch the envelopes] claiming he did not cooperate in interview—which is false, Def. Cate refused appeal on March 23, 2007.

⟨66⟩

AGO 001128

(b) <u>LEGAL MAIL FROM INMATE WITNESSES</u>

166.) Calif. Code of Regulations [CCR] Title 15 § 3163, authorizes CDCR-inmates to assist each other with the preparation of Legal-documents. This specifically includes the possession of other inmates ... 'Legal papers, books, opinions and Forms being used by one inmate to assist another with permission of owner.' and 'All papers must be returned to the respective owners when either inmate is transfered, or when other administrative action prevents direct communication."

167.) CCR-Title 15 § 3164(c) applies to plaintiffs and states, ..."Inmates who are in restricted housing units ... may possess and have access to any legal resourse material available to the general population and may assist each other in their legal work to the extent compatible with institutional security."

168.) P.B.S.P. Operational Procedure [O.P.] 205, as relevant here, states: "When an inmate needs to correspond with another inmate for reasons, which may include litigation, legal issues, and Family emergencies, a one-time correspondence approval may be approved by the respective Facility Captains."

169.) Ashker utilized the above provisions many times between 1990 to late (2007), in the Following manner, exemplified below:

    Ⓐ He would utilize Form CDC-1074 "Request For Correspondence Approval"; Filling out information [e.g. case number, and need to exchange correspondence with inmate so and so, as he is a potential witness I need a declaration and documents From ]

    Ⓑ This would be approved "One Time Only" [will be reviewed by I.G.I. [gang unit] and must only pertain to case listed].

    Ⓒ Ashker would send the letter, sample declaration, relevant

〈67〉

AGO 001129

documents, for the inmate witness' review and reply.

D) The inmate witness usually responds with a letter, declaration, with document exhibits; and possibly other material he thinks may be helpful.

E) Ashker would make a copy, and return a copy of the witness' declaration, with his original documents [without a letter]

F) When he needed to follow up, and recontact the witness, he'd complete a new form [CDC-1074]. And go through the process again.

170. Begining around November 1, 2007, Defendants Barlow, Johnson, Bradbury [and a Doe defendant identified as "CDC-Attorney"] informed Ashker, that the correspondence approvals were "one time only" for the entire case [meaning no follow ups at all, for any reason]; shortly after this Ashker was informed by Defendant Hernandez [per. Barlow], that he was not allowed to return anything to the inmate witnesses [who sent him declarations and documents]

171) Defendants did the same things, described above to Troxell, and other (SHU) inmates.

172.) Defendants actions described in para # 170 [in context with para's # 166 to 169], has damaged plaintiffs litigation efforts, and chilled their ability to obtain supporting documentary evidence from inmates [this is because most inmates do not want to lose their originals, and getting copies made is expensive]

173.) Ashker has been challenging CDCR-prison conditions, via state and Federal Court processes, since [1988]; and often the main way to obtain

〈68〉

AGO 001130

information and supporting evidence is via contact with similarly-situated inmates, many of whom are not knowledgable re: drafting a declaration. Thus, prior to Nov. 2007, Ashker would often contact potential inmate witnesses with a letter asking a series of questions and whether, or not the inmate had relevant documents, and was he willing to sign a declaration. Depending on the response, Ashker would draft a declaration - incorporating any documents relevant - obtain a new approval to correspond, and send it all to the inmate for review, revision, and return.

174.) Since Nov. 1, 2007, this has not been possible, and has damaged the plaintiffs' litigation efforts, as summarized [above paras #170-172]

175.) Ashker has also found it necessary to make followup contact with certain inmate witnesses, as the case(s) proceed, due to new information and developments. This is no longer possible, and has caused damage to litigation efforts [see above paras #170-172, and below]

176.) An example of the harm caused to plaintiffs' litigation efforts, due to defendant's interference described above, is as follows:

Ⓐ On (8-21-06) Ashker completed a onetime correspondence with PBSP-SHU inmate Bretches [re: USDC-N.D.Cal #C05-3286 CW] wherein, Bretches signed a declaration supporting Ashker's "NO PAROLE POLICY" claims. And, he attached (3) color copies of his art as exhibits - re: examples of his SHU programming efforts - on his own initiative.

Ⓑ Bretches (2006) declaration and exhibits were reviewed by PBSP-I.G.I. [gang-unit] prior to delivery to Ashker [per, policy]

Ⓒ On Oct. 29, 2007, Def. Thornton [I.G.I.] searched Ashker's cell re: (6) year inactive review; and he confiscated one of Bretches art copy-exhibits from (2006) [see above Ⓐ], and on 11-19-07, Thornton notified Ashker

〈69〉

AGO 001131

that Bretches art in his possession was to be used as an item of current gang-activity. Ashker submitted a written objection explaining the art was an exhibit to Bretches authorized legal declaration—reviewed by I.G.I. in (2006), and he wanted it returned. This was ignored, and on (4-22-08) Ashker received def. Harrison's notice that he was denied inactive [see above para's #73#re: inactive issues, and 602]

(D) Ashker then submitted a (CDC-1074) requesting to correspond with Bretches [in late April 2008], in order to notify him about the above issues re: 2006 Declaration as exhibit, and obtain a declaration from him in support of his [Ashker's] gang-validation and magazine ban claims in [#c05-3286 cw], to oppose defs M.S.J.; and on 5-16-08 Def. Johnson denied Ashker's request based on: "one time correspondence previously completed 8-21-06", thereby denying Ashker access to relevant evidence—and the claims at issue were dismissed 3-25-09.


177.) On May 26, 2008, Ashker submitted a detailed 602 Appeal #D08-01455, challenging PBSP-Defendant's interpretation and application of [O.P. 205], using the 5-16-08 Bretches denial, as an example; and pointing out that due process guarantees prisoners access to the courts that is "adequate, effective, and meaningful" [per. Casey v. Lewis, 4 F.3d 1516 [9th Cir. 1993]; and "regulations that unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts are invalid" [per. Procunier v. Martinez, 416 US 396, 419 [1974] [citing Ex Parte Hull, 312 US 546 [1941]], accord, Bounds v. Smith, 430 U.S. 817, 822 [1977] And…", when prosecuting a lawsuit, a pro-se prisoner has the right to undertake the legal investigation and documentation of his claims in the manner that an attorney would, subject to limited-legitimate security…needs of the prison." [Valandingham v. Bojorquez, 866 F. 2d 1135, 1141 [9th Cir 1989]

⟨70⟩

178.) On June 18, 2008, Defendants Johnson, and Bradbury, denied the appeal at First Level, ignoring Ashker's points. As did Def. Horel, at Second Level, on July 16, 2008; and Def. Cate, at Third Level, on Nov. 12, 2008. Thus, each of these defendants, with the authority to take corrective action – were put on notice of the constitutional violation, yet failed to take corrective action, thus ensuring the violation(s) continue indefinitely.

179.) Plaintiff Troxell's problems with defendants November 2007, re-interpretation of [O.P. 205] are similar, and related to Ashker's [they are co-plaintiffs in #C05-3286C.W.; plus, has (2) Petitions For Writ of Habeas Corpus – in state, and Federal Court, and at the state court level, the court denied a claim re: "no parole policy" due to lack of evidence – and the reason for this was, Def's only authorize the "one time correspondence", after a case has been filed, and discovery is permitted to proceed. And the court ruled summarily.

180.) Troxell, attempted to obtain permission to follow up with inmate witness Pifer, in late April 2008 [re: #C05-3286cw, inactive gang-status, and no parole policy claims] and on May 16, 2008, Def. Johnson denied the request stating: "One Time Only Correspondence Previously Completed 9-18-06".

181.) On May 26, 2008, Troxell submitted a detailed 602 Appeal #D08-01456, challenging PBSP-Defendant's interpretation and application of [O.P. 205], using the 5-16-08 Pifer denial, as an example [making same points, with supporting case law as Ashker's appeal. See above paras #177]

182.) On June 18, 2008, Def's Johnson, and Bradbury, denied the appeal at First Level, ignoring Troxell's points. As did Def. Horel, at Second Level, on July 15, 2008; and Def. Cate, at Third Level, on Dec. 5, 2008. Thus, each of these defendants, with the authority to take corrective action – were put on notice of the constitutional violation, yet failed to take corrective action, thus ensuring the violation(s) continue indefinitely.

⟨71⟩

AGO 001133

(C) INTERFERERENCE, and CONFISCATION of INMATE WITNESS'
LEGAL-MATERIAL

183) Between Sept.6, 2006, and the present, PBSP-Defendants have been
interfering with, and confiscating, legal material sent to Ashker in response
to his approved correspondence requests; these intentional actions were
done without legitimate penological justification, and have caused damage
to his litigation efforts, as well as, inhibiting, chilling their communications
with inmate witnesses, in violation of 1st and 14th Amendments to the U.S.
Constitution, as follows:

(A) In mid-2006, Ashker obtained approval to correspond with PBSP-
inmate Olivares; and he asked Olivares if he had any info, re: inmate
turned informate "Red", as such was relevant to his claims re: retaliation
by PBSP-Def's in 2004 [under pretext of safety-security, based on 1995-
1996 confidential informant claims. Re: USDC-N.D. Cal # C05-3759 CW)
On Sept.6, 2006, Olivares sent (3) pages about this informant [which
Ashker had read before and proved personal animosity on informant's
part [inmate Turner]. PBSP-I.G.I. % Buchanon confiscated the
(3) pages, without any documentation about this. Ashker was deprived
of this evidence - directed related to the main issue in that part
of the case - which was dismissed.

(B) In Nov/Dec. 2006, PBSP-I.G.I. refused to give Ashker a letter
from approved correspondent, PBSP-inmate witness Redd. Ashker
had requested information from Redd [re: # C05-3286CW, inactive -
gang status, and no parole-policy], this was done without any
documentation by I.G.I. Ashker learned later that this was done

⟨72⟩

AGO 001134

because Redd's letter included "a request for a copy of the civil-suit, if possible."

ⓒ In Mid-2008, Ashker gave Def. Hernandez, Legal-Correspondence for PBSP-inmate witnesses Haddix and Cole. This legal-correspondence consisted of a brief letter, explaining Ashker was challenging gang-validation issues [re: #C05-3286 CW] and he was seeking info. from them concerning allegations made by inmate informant Walley [per transcript of Whalley interview with Del Norte Prosecutor Fallman re: criminal case against Haddix, and implicating Cole, and Ashker in various conspiracies] this enquiry was directly related to at least (2) items used to deny Ashker inactive status in 2001 [see above paras #50 to 62, and memos ref'd therein]; he also enquired about another inmate informant [Wino Bob from Stockton, whom he believed was one fabricating "conspiracy to kill Blacks" story to get transferred out of PBSP] All of which is common knowledge.

Defs Hernandez [and poss. IGI staff] reviewed, and delivered this correspondence to Haddix and Cole, When they gave Def. Hernandez, their replies, she consulted with Def. Barlow, who was working closely with defendant's counsel in [#C05-3286 CW] and they decided to confiscate Haddix and Cole's replies. And on July 10, 2008, Def. Hernandez, gave Ashker a copy of her CDC-128B chrono stating the correspondence was being confiscated due to Ashker's request re: informant Whalley - based on an unspecified claim that this was ..."a threat against institutional security." [a copy of this chrono was placed in the files of *Haddix and Cole too*]

〈73〉

AGO 001135

184.) On July 10, 2008, Ashker challenged Defendants Hernandez, and Barlow's action, via 602 Appeal #D08-01998, pointing out that the informants' name is Whalley, C#47594 - it's not speculation, as he (Ashker) has the transcript referenced in his letters to Haddix and Cole." It's no secret Whalley is an informant, so there's no valid reason to keep Haddix and Cole's responses and C/o Hernandez does not articulate the alleged safety-security reason for keeping the approved legal-correspondence-directly related to my civil-case."

185.) On [7-10-08] Def. Hernandez, denied the appeal at the informal-level, stating per her conversations with Def. Barlow, "the correspondence was deemed to be gang activity."

186.) On July 30, 31st, 2008, Defendants Johnson, and Bradbury, denied the appeal at First Level, on basis of 'safety-security, and promoting gang activity' without any specifics; and, ignoring Ashker's points.

187.) On Sept. 9, 2008, Def. Jacquez, denied the appeal at the Second Level, merely rubber-stamping First Level; and, on Dec. 18, 2008, Def. Cate, denied the appeal at Third Level, merely rubberstamping the lower level decisions.

188.) Defendants Johnson, Bradbury, Jacquez, and Cate, were each in a position to remedy the illegal acts of Hernandez, Barlow; they were each put on notice of the constitutional violation - and each of them intention-ally chose not to, thus ensuring the violations continue indefinitely. This caused the following harm to plaintiffs.

Ⓐ The actions [confiscation, CDC-128 chrono, 602 Appeal respondents' allegations re: gang-activity] chilled plaintiffs from pursuing their investigative efforts [re:#C05-3286cw, gang-activity allegations], because of defendants' actions - plaintiffs did not want to risk being accused of additional gang-activity; nor did plaintiffs want to be

⟨74⟩

responsible for having documentation [alleging gang-activity] to be placed in inmate witnesses files. All of which prevented Ashker from obtaining evidence to dispute the confidential information used to re-validate him in (2001), and was responsible for the claim being dismissed March 25, 2009 [#CO5-3286 CW)

⑧ The (BPH) used the 128B-Chrono, and gang-activity allegations, against Ashker at his August 14, 2008, parole-hearing; which also had a chilling effect on plaintiff's efforts to pursue investigation, and documentation of their claims - out of concerns about having defendants make "gang-activity" assertions that will then be used by the (BPH) against them [and their witnesses]

### FACTS PERTAINING TO PLAINTIFF'S CLAIMS
### RE: DENIAL OF SEXUALLY EXPLICIT READING MATERIAL

189.) In Mid-2009, Ashker sought authorization to make a special-purchase of written-adult erotic material. The special purchase officer denied the request [per. CCR, Title 15, § 3006(c), (15), (A), (B) (C), (1), (2) re: Obscene Material is not allowed, absent Warden-or designee- approval]

190.) On June 7, 2009, Ashker sent a memo to Defendants Jacquez and Johnson, seeking clarification about the application of the above Title 15 section, pointing that he was seeking authorization to purchase-books about adult-erotica [in short story form-no pictures],

191.) On June 23, 2009, Def. Johnson denied the request stating these types of books will not be approved at this institution [via memo response]

192.) On July 12-15, 2009, Ashker submitted 602 Appeal #D09-02021; and

<75>

AGO 001137

Troxell, submitted 602 Appeal #D09-02028, challenging PBSP-Defendants refusal to permit written, adult erotic material [Books - without any nude pictures]; and, refusal to permit any exceptions to ban on nudity - for all books [per. Title 15 § 3006(C)(17) pointing out such actions violate both Cal. Penal Code § 2601; and U.S. Const. 1st Amend [per Mauro v. Arpaio, 183 F.3d 1054 [9th Cir.1999], stating, inmates have a 1st Amend. right to sexually explicit material - upholding a county-jail ban on nudity, while citing: Amatel v. Reno, 156 F.3d 192, 202 [inmate can read what he pleases].

193) Between August and December 2009, Defendants Jacquez, and Cate, denied the appeals, at the Second and Third Levels [adopting Defendant Johnson's 6-23-09, position] These Defendants had the authority to provide the relief sought; and, they were each duty bound to do so, once Plaintiffs put them on notice that the policies, or custom at issue violate the 1st Amendment, with support case law. They refused to do so, and actually approved of the violation(s), thus ensuring they continue indefinitely.

194) Also, the books at issue are allowed at other CDCR-institutions [e.g., such as, San Quentin's Adjustment Center, where Ashker, read some erotic-books - "Penthouse Letters", and looked at nude art, sketch books]; and, PBSP-Defendants action(s), denying these, is another example of them going out of their way to be unnecessarily punitive. [see above para's #138-140[A-I], for examples].

## V. LEGAL CLAIMS

### FIRST CAUSE OF ACTION

First Amendment Right To Association,

Free Speech, and Free Of Punishment For Not Speaking
(Against All Defendants Except Barlow & Hernandez)

195) Plaintiffs reallege and incorporate by reference, paragraphs #1 to 194, of this complaint, inclusive.

〈76〉

AGO 001138

196) This is an action for violation(s) of 42 U.S.C. §1983 based on Defendants' violations of Plaintiffs' right to associate, freedom of speech and expression, and to be free from punishment for choosing not to speak, under the First Amendment to the U.S. Constitution.

197) Defendants, and each of them, while acting under color of law, consciously disregarded Plaintiffs' federally protected rights, namely here the First Amendment Rights referenced above.

198) Defendants Cate, Hickman, Woodford, McGrath, Kirkland, Horel, Jacquez, Adams, Johnson, Bradbury, McKinney, Marquez, Rice, Harrison, Thornton, and Wise, have each participated in, and contributed to, the policies, customs, and practices, resulting in Plaintiffs' ongoing indefinite SHU-confinement based on arbitrarily applied policy(s) re: prison gang classification(s) [based on false, unreliable allegations made by confidential inmate informants; and, innocuous association and possession of greeting cards and artwork].

199) Defendants have each personally applied the unconstitutional policies, customs, and practices specified in the complaint; wherein they revalidated Plaintiffs as active members of the Aryan Brotherhood prison gang, based in part on innocuous associational activity, and possession of greeting cards and artwork. Each Defendant has been put on notice numerous times that the policies, customs, and practices violate the U.S. Constitution; and each of them failed to take corrective action, and actually condoned of the violative practices, via support of each others acts and omissions.

200) Defendants have each participated in, contributed to, condoned, and applied the additional/related policy, custom, and practice [that is unconstitutional on its face, and as applied] whereupon, Plaintiffs only avenue for release from (SHU) to a general prison population [and a parole date] is for

⟨77⟩

them to successfully "debrief" [meaning they have to agree to become known informants against other alleged gang-affiliates - and be subject to serious repercussions therefrom]; all of the above of which violates the following protected First Amendment Rights:

(a) Violation of right to associate, by basing Plaintiffs (24) years of indefinite (SHU) confinement, and thereby subject to the harm therefrom [see paras #88-91, 134-161 ] and denied parole [with multi-year deferals], wholly or in part, upon Plaintiffs innocuous, lawful association with other inmates, where such association did not consist of, nor was in furtherance of any illegal prison gang activity whatsoever, and is thereby not reasonably related to any legitimate penological interest [nor, is this evidence of being a current threat to public safety];

(b) Violation of right of free speech and expression, by basing their (24) years of indefinite SHU-confinement, denying inactive gang-status, and denying parole [with multi-year deferals], wholly or in part, upon policies, customs, and practices which penalize inmates for innocuous associational activity [and possessing greeting cards and artwork], when such activity is not in the furtherance of gang activity, nor violative of any law, is not reasonably related to any legitimate penological interest [nor, is it evidence of being a current threat to public safety];

(c) Violation of Plaintiffs' First Amendment right to be free of punishment for exercising their First Amendment Right to not speak, by subjecting them to (24)-years of indefinite SHU-confinement, denial of inactive status, and denial of parole [with multi-year derals]; and, subjecting them to the harm and progressively more punitive SHU-conditions [see paras #88-91, 134-161 ], wholly or in part, upon Plaintiffs' decision not to speak [i.e., refusal to become CDCR-informants via debriefing], is not reasonably related

⟨78⟩

to any legitimate penological interest [nor, is it evidence of being a current threat to public safety].

201) Defendant Schwarzenegger has contributed to the above referenced, U.S. Constitutional violations, and related harm therefrom to Plaintiffs, by approving such policies, customs, and practices, via his personal application thereof; whereupon, he requires inmates that have many years of positive progr- amming in general population [or inactive gang- status]; to debrief prior to parole. [the harm caused is summarized in paras# 88-91, 134-140, 141-161]

202) Defendants Doyle, Fisher, Harmon, Gillingham, Smith, and Tucker, have each subjected Plaintiffs to an arbitrary, status based, "No Parole For SHU-Lifers Policy, Custom, and Practice" based on the other above-named Defendants' allegations that they are prison gang-members, and related indefinite SHU-status; Each of these Defendants have personally violated Plaintiffs First Amendment Rights, in the same manner as stated for the above named Defendants, including denying parole, with multi-year deferrals, wholly or in part, based on Plaintiffs refusal to debrief [punishment for not speaking] [Contributing to harm; i.e., paras# 88-91, 134-161]

203) As a proximate cause of Defendants' acts and omissions, Plaintiffs have suffered and continue to suffer harm [i.e., paras# 88-91, 134-161] and general damages in an amount according to proof, but in excess of one million dollars in terms of loss of parole opportunities, and continuous punitive confinement in SHU [24 years, and counting, of torture], Plaintiffs each claim mental and emotional distress damag- es as well.

203) In acting as described herein above, Defendants acted knowingly, willfully, and maliciously, or with reckless or callous disregard for Plaintiffs' federally protected rights, entitling them to an award of exemplary and punitive damages.

Wherefore, Plaintiffs pray for relief as follows.

〈79〉

## SECOND CAUSE OF ACTION

### First Amendment and Equal Protection Clause Right To The Association With Ones Own Ethic Group & Equal Treatment As Those Similarly Situated (AGAINST ALL DEFENDANTS EXCEPT BARLOW and HERNANDEZ)

204) Plaintiffs re-allege and incorporate by reference herein the allegations in paragraphs *1 through 194, inclusive.

205) This is an action for violations of 42 USC §1983 based on Defendants' violations of the Plaintiffs right to associate with members of their own ethnic group - without being punished, and to equal treatment as those similarly situated, under the First and Fourteenth Amendments to the U.S. Constitution.

206) Defendants Cate, Hickman, Woodford, McGrath, Kirkland, Horel, Jacquez, Adams, Johnson, Bradbury, McKinney, Marquez, Rice, Harrison, Thornton, and Wise, have each violated Plaintiffs First and Fourteenth Amendment right to associate with members of their own ethic group by promulgating, condoning, enforcing, and applying the unconstitutional policies, custom, and practices that penalize PBSP-SHU inmates, including Plaintiffs, for innocuous associational activity with members of their own ethnic group. Said policies, custom, and practices penalize PBSP- SHU inmates for innocent contact with alleged gang-affiliats of ones own ethnic group [speaking to, having artwork from, alleged gang-affiliats of your own race is a violation; while the same activity with alleged gang-affiliats from other races, is not], by using such to document that the inmates are engaged in "gang-activity," and thereby deny them inactive status, and parole [with multi-year deferals].

207) Defendants have each participated in, condoned, and applied the above referenced unconstitutional policies, custom, and practices specified in the complaint; wherein, they revalidated Plaintiffs as active members of the A.B. prison gang, based in part on innocuous associational activity, and possession of

⟨80⟩

copies of art [re: members of their own race, while the same activity - cross-race is not]. Each Defendant has been put on notice that such policies, custom, and practices, violated the U.S. Const.; and each of them failed to take corrective action, and in fact condoned such practices, via mutual support of each others acts and ommissions -

208) Additionally, the above named Defendants, have violated Plaintiffs First Amend. right to associate, and Fourteenth Amendment, Equal Protection Clause right to be treated equally to similarly situated inmates [and, right to be free of punishment when choosing not to speak], by promulgating, condoning, enforcing, and applying the unconstitutional, vague, contradictory, overbroad, arbitrary, policies, customs, and practices, that unjustifiably curtail, and punish Plaintiffs, the exercise of their limited constitutional right of free association and speech [including right to be free of punishment for choosing not to, or being unable to, speak], by subjecting Plaintiffs to (24) years of indefinite SHU-confinement, denying inactive status, and parole [with multi-year deferals; and other, related harm summarized in para's *88-91, 134-16]], under the pretext that such is justified based on a CDCR-gang valid-ation, when in fact Defendants:

(a) Claim their validation classification alone, mandates SHU-status indefinitely, untill they debrief [via known informant status]; while giving an exception to this mandate, to thousands of other inmates [without written critera for an exception];

(b) know their validations are based on innocuous association, and unsupport-ed allegations of illegal activity [by unreliable confidential inmate informants; if they were credible - CDCR rules mandate issuance of rule violation report(s)]; yet, Plaintiffs have never been charged/found guilty of any illegal, gang-related acts;

(c) Punish them via progressive punitive measures, and deny parole [with multi-year deferals], for choosing and not to being able to speak [debrief];

(d) Claim to review them for "inactive gang-status" every (6) years [without any substantive review; and, making it clear that "inactive status" does not apply, and absent reliable evidence of Plaintiffs ever being "active"];

⟨81⟩

AGO 001143

(e) Claim Plaintiffs are reviewed for "inactive gang-status" every (6) years, while reviewing "active gang members/associates" in general population prisons for "inactive status", every (2) years [compare CCR-Title 15 §§ 3378(d) and 3378(e)].

209) Defendant Schwarzenegger, has contributed to the above referenced U.S. Constitutional violation(s), and related harm therefrom to Plaintiffs, in the same manner as stated in above [para # 201]

210) Defendants Doyle, Fisher, Harmon, Gillingham, Smith, and Tucker, contributed to and applied the above referenced U.S. Constitutional violation(s), and related harm therefrom to Plaintiffs, in the same manner as stated in above [para # 202]

211) As a proximate cause of Defendants' acts and omissions, Plaintiffs have suffered and continue to suffer harm [i.e., para's # 88-91, 134-161], and general damages in an amount according to proof, but in excess of one million dollars in terms of loss of parole opportunities, and continuous punitive confinement in S.H.U. [24 years, and counting, of torture].

212) In acting as described herein above, Defendants acted knowingly, willfully, and maliciously, or with reckless or callous disregard for Plaintiffs' federally protected rights, entitling them to an award of exemplary and punitive damages. Wherefore, Plaintiffs pray for relief as follows.

## THIRD CAUSE OF ACTION

### First Amendment And Equal Protection Clause Right To Court Access And Free Speech < Against Defendants Cate, and Horel >

213) Plaintiffs reallege and incorporate by reference herein the allegations in paragraphs # 1 through 194, inclusive.

214) Defendants Cate, and Horel, have each violated Plaintiffs' First and Fourteenth

<82>

AGO 001144

Amendment Equal Protection Clause, right to professional representation on their civil rights claims, and right to confidential communication(s) with attorneys, via their policies, customs, and practices of interference, and/or condoning their agents interference with, their confidential communications - to and from attorneys and the Courts; causing Plaintiffs harm and damaging their ability to maintain and, obtain, legal assistance from attorney(s), which was the cause, wholly, or in part, for most of their civil claims to be dismissed in USDC-N.D.Cal.C05-3286CW 215) Additionally, Defendants unconstitutional policies, customs, and practices of condoning their agents, interference with the Plaintiffs relationships with their attorneys, via harrassment, and unduly delaying the processing of their incoming and outgoing confidential legal-mail (and even trashing such mail); plus, opening confidential legal mail- outside of Plaintiffs presense, has violated their First Amendment Free Speech rights, causing harm, because Defendants acts and omissions have inhibited, chilled, and interfered with their confidential-communications with attorneys (e.g., Defendants pattern and practice has inhibited and chilled Plaintiffs from openly speaking, protesting, complaining, and discussing legal strategies and personal confidential information, via mail to attorneys).

216) As a proximate cause of Defendants' acts and omissions, Plaintiffs have suffered and continue to suffer harm and general damages in an amount according to proof, but in excess of twenty five thousand dollars in terms of lost costs and loss of professional legal representation in the prior action; and violations affects on other attorney communications.

Wherefore, Plaintiffs pray for relief as follows.

## FOURTH CAUSE OF ACTION

### First Amendment And Equal Protection Clause Right To Prepare And Prosecute Claims and Free Speech
(AGAINST DEFENDANTS CATE, HOREL, BARLOW, JOHNSON, & BRADBURY)

⟨83⟩

AGO 001145

217) Plaintiffs reallege and incorporate by reference herein the allegations in paragraphs #1 through 194, inclusive.

218) Defendants Cate, Horel, Barlow, Johnson, and Bradbury, have each violated Plaintiffs First Amendment and Fourteenth Amendment Equal Protection Clause right to investigate, prepare, and prosecute their legitimate legal claims in USDC-N.D.Cal# C05-3286 CW, via the Defendants November 2007, reinterpretation [or, change in interpretation-application] of P.B.S.P.-Operational Procedure #205, re: inmates ability to obtain declarations and legal exhibits, from each other [i.e., permitting no followup communication with inmate witnesses; and, prohibiting the return of inmate witness documents, or copies of their declaration(s)]; which in turn, has contributed to harming Plaintiffs ability to obtain evidence in support of their valid legal claims [resulting wholly, or partly, in some of their claims to be denied/dismissed]; and, such policies, custom, and practices have interfered, inhibited, and chilled Plaintiffs limited free speech right to contact and obtain evidence from inmate witnesses, to the extent that many inmates no longer send supportive legal documents to Plaintiffs, because they can't get them back. Such policies, customs, and practices are unconstitutional [on their face and/or, as applied], they are not reasonably related to a legitimate penological interests [or alternatively, is an exaggerated response to such interest].

219) As a proximate cause of Defendants' acts and omissions, Plaintiffs have suffered and continue to suffer harm, summarized above, and general damages in an amount according to proof, but in excess of ten thousand dollars in terms of the harm caused to their litigation efforts and the violation of their First Amendment free speech rights.

Wherefore, Plaintiffs pray for relief as follows.

<84>

AGO 001146

## FIFTH CAUSE OF ACTION

First Amendment And Equal Protection Clause Right To Court Access,
and To Prepare And Prosecute Legitimate Legal Claims and Free Speech
〈AGAINST DEFENDANTS CATE, JACQUEZ, BARLOW, JOHNSON, BRADBURY, HERNANDEZ〉

220) Plaintiffs realledge and incorporate by reference herein the allegations in paragraphs # 1 through 194, inclusive.

221) Defendants Cate, Jacquez, Barlow, Johnson, Bradbury, and Hernandez, have each violated Plaintiffs' First Amendment and Fourteenth Amendment Equal Protection Clause right to investigate, prepare, and prosecute their legitimate legal claims, via their policies, custom, and practices of condoning, enabling, and personally interfering with, and confiscating Plaintiffs legitimate legal-material(s), sent to them from approved inmate witnesses - in response to Plaintiffs request for the information, directly on point with their claims. Defendants Hernandez, and Barlow, personally confiscated the material; and Defendants Johnson, Bradbury, Jacquez, and Cate, were each put on notice of the unconstitutional action, and each had the authority, and duty, to take corrective action. Instead of doing so, all of the above defendants condoned and supported the action, falsely claiming the confiscated material was "gang-activity" and "posed a threat to safety and security", as a pretext, so they could prevent Plaintiffs from investigating, and obtaining support evidence, relevant to their claims challenging their gang-validation(s). Such acts and omissions regarding these unconstitutional policy(s), custom, and practices caused harm to Plaintiffs because it interfered, inhibited, and chilled their ability to obtain such evidence, which was wholly, or partly, responsible for their claims being denied/dismissed [in USDC-NDCal# C05-3286 CW; and # C05-3759 CW]; and it was used against Ashker, at his [2008] parole hearing.

222) Additional harm caused by Defendants acts and omissions, is such interfered,

〈85〉

AGO 001147

inhibited and chilled the Plaintiffs' limited free speech right to contact and obtain information and evidence, relevant and necessary to prosecute their legitimate legal claims, from inmate witnesses [they don't want to risk receiving additional documentation, accusing them, and their witnesses, of promoting gang-activity] such policies, custom, and practices are without penological justification [or, were exaggerated, pretextual reasons, for blatant violations]

223) As a proximate cause of Defendants' acts and omissions, Plaintiffs have suffered and continue to suffer harm, summarized above, and general damages in an amount according to proof, but in excess of twenty five thousand dollars in terms of the harm caused to their litigation efforts and violation of their First Amendment free speech rights.

Wherefore, Plaintiffs pray for relief as follows.

## SIXTH CAUSE OF ACTION

First Amendment And Equal Protection Clause Right To
Free Speech, Expression and Equal Treatment
⟨AGAINST DEFENDANTS CATE & HOREL⟩

224) Plaintiffs reallege and incorporate by reference herein the allegations in paragraphs #1 through 194, inclusive.

225) Defendants Cate, and Horel, have each violated Plaintiff Troxell's First Amendment and Fourteenth Amendment Equal Protection Clause right to freedom of speech and expression; and to be treated equally, as other CDCR-inmates are treated, via their policy, custom, and practice of denying all PBSP-SHU inmates, including Troxell's, reasonable request to be permitted to post his artwork on internet sites, and seek donations for the posted artwork, so he could afford books and postage costs, and be able to take some community college courses. While other CDCR prisons allow inmates to sell their art; and, Defendants denial was arbitrary; it is an unconst-

⟨86⟩

AGO 001148

itutional suppression of Troxell's right to free speech and expression; and said policy, custom, and practice violates state created liberty interests and equal protection [per. Calif. Penal Code § 2601(a), "prisoners' right to inherit, ow, sell, or convey real or personal property"], and is part of CDCR-PBSP-SHU, policy, custom, and practice of being excessively punitive, in order to coerce SHU-inmates to debrief [See paras # 138-140]. Defendants' acts and omissions, also resulted wholly, or in part, in Troxell's inability to participate in the College courses offered to PBSP-SHU inmates, who had funds for books; and said denial was without legitimate-penological interest [or, was a rote, pretextual and exaggerated response].

226) As a proximate cause of Defendants' acts and omissions, Plaintiff has suffered, and continues to suffer harm, summarized above, and general damages in an amount according to proof, but in excess of ten thousand dollars in terms of the harm caused to Troxell's right to free speech, expression, and equal treatment, Wherefore, Plaintiff prays for relief as follows.

## Seventh Cause Of Action

### First Amendment And Equal Protection Clause Right To Sexually Explicit Material and Equal Treatment
#### ⟨AGAINST DEFENDANTS CATE, JACQUEZ, JOHNSON⟩

227) Plaintiffs reallege and incorporate by reference herein the allegations in paragraphs # 1 through 194, inclusive.

228) Defendants Cate, Jacquez, and Johnson, have each violated Plaintiffs' First Amendment and Fourteenth Amendment Equal Protection Clause right to purchase and possess sexually explicit material, and to equal treatment as that of other CDCR-inmates; via their promulgation, condoning, and application of the unconstitutional [on its face, and as applied] policy, custom, and practice of refusing to allow Plaintiffs to purchase and possess books containing written, adult

⟨87⟩

AGO 001149

erotic material [without any pictures of frontal nudity]; and, their refusal to allow any exceptions to the ban on nude pictures - such as, "how-to-art" books. While other CDCR-prisons allow similarly situated inmates both types of material. And, such policy, custom, and practice is part of CDCR-PBSP-SHU, agenda - to make conditions progressively more punitive, as part of coercion to debrief; and is without legitimate penological interest [or, is a rote, pretextual, exaggerated response]

229) As a proximate cause of Defendents' acts and omissions, Plaintiffs have suffered, and continue to suffer harm, and general damages in an amount according to proof, but in excess of ten thousand dollars in terms of the harm caused to Plaintiffs First Amendent and Equal Protection rights [i.e., denied a whole range of reading material, and artist material]

Wherefore, Plaintiffs pray for relief as follows.

### EIGHTH CAUSE OF ACTION
#### Fifth Amendment Right Against Coercive Incrimination Of Self And Others, Loss Of Conditional Liberty
**⟨AGAINST ALL DEFENDANTS EXCEPT BARLOW&HERNANDEZ⟩**

230) Plaintiffs reallege and incorporate by reference herein the allegations in paragraphs #1 through 194, inclusive.

231) Defendants Cate, Hickman, Woodford, McGrath, Kirkland, Horel, Jacquez, Adams, Johnson, Bradbury, McKinney, Marquez, Rice, Harrison, Thornton, and Wise, have promulgated, condoned, and have each personally participated in, contributed to, and applied, the policies, customs, and practices, at issue and in violation of, Plaintiffs U.S. Constitutional Fifth Amendment right against coerced incrimination of one's self and others; and Fourteenth Amendment right to conditional liberty are implicated by way of related procedural and substantive due process violations, [pursuant to provisions of 42 U.S.C. §1983] to wit as follows,

⟨88⟩

232) Defendants have each been party(s) to the promulgation, upholding, enforcement, and personal application of, the unconstitutional policy, custom, and practice of indefinitely confining Plaintiffs, and similarly situated inmates, in SHU [for over (24) yrs] to date, subject to progressively more punitive conditions [in PB3P-SHU for over (20) years, to date], resulting in harm, including loss of parole opportunities and multi-year deferrals [see complaint para's #88-91, 134-161], based on a CDCR-Gang Validation, which Plaintiffs have always contested and is noteable for the fact that the label, is absent of any finding of guilt of committing an illegal, gang-related act; and predicating their release from SHU [and relief from the coercive measures therein i.e., punitive, harmfulness, and no parole], is upon Plaintiffs' agreement to successfully "debrief" [per Defendants policy, custom, and practice, "successful debriefing" requires the inmate to provide Def's with, "sufficient verifiable information that has an adverse impact on the gang, gang-members/assoc's, so they will never accept him back." This equates to requiring inmates to become "known-informants", who's statements are used to keep others in SHU-indefinitely and deny them parole, as well as other harm [Id., above ref'd para's]; with the inform-ant, and possibly family, facing serious danger of harm from retaliation for inform-ing]; Defendants acts/omissions are coercive-compulsion in violation of 5th & 14th Amend

233) Defendants Schwarzenegger, Dolle, Fisher, Harmon, Gillingham, Smith, and Tucker, are each personally involved, and responsible for violating Plaintiffs Fifth and Fourteenth Amendment rights, in the same manner as above [see para's # 201, 202, 231-232],

234) Plaintiffs have denied gang-affiliation; and have been isolated in SHU-for (24) years, wherein Defendants policy has been to isolate them as much as possible. Plaintiffs have no information to provide; thus, the only way they could debrief would be to make up stories, which they refuse to do, and therefore have no hope of getting out of SHU, or a parole date.

⟨89⟩

AGO 001151

235) Defendants' acts and omissions have caused Plaintiffs to suffer continued harm and injuries for exercising their rights to remain silent and refusal to falsely implicate others in gang activity [see paras # 88-91, 134-161 re: harm]; including subjection to progressively punitive conditions and loss of conditional liberty and mental-emotional distress, which is compulsion, and violation of procedural and substantive due-process, violating U.S. Const., Fifth and Fourteenth Amendments.

236) As a proximate cause of Defendants' acts and omissions, Plaintiffs have suffered and continue to suffer harm [Id., paras # re'd above], and general damages in an amount according to proof, but in excess of one million dollars in terms of loss of parole opportunities, and continuous punitive SHU-confinement [for (24) years, and counting].

237) In acting as described above, Defendants acted knowingly, willfully, and maliciously, or with reckless or callous disregard for Plaintiffs' federally protected rights, entitling them to an award of exemplary and punitive damages.

Wherefore, Plaintiffs pray for relief as follows.

## NINTH CAUSE OF ACTION

### Eighth Amendment Right Violation(s) By Way Of Deliberate Indifference - Cruel & Unusual Punishment
### <AGAINST ALL DEFENDANTS EXCEPT BARLOW & HERNANDEZ>

238) Plaintiffs reallege and incorporate by reference herein the allegations in paragraphs # 1 through 194, inclusive.

239) This is a claim for relief under 42 U.S.C. §1983 against Defendants Schwarzenegger, Cate, Hickman, Woodford, McGrath, Kirkland, Horel, Jacquez, Adams, Johnson, Bradbury, McKinney, Marquez, Rice, Harrison, Thornton, Wise, Doyle, Fisher, Harmon, Gillingham, Smith, and Tucker, for violating Plaintiffs' rights under the Eighth Amendment's prohibition of cruel and unusual punishment [and International Treaty Law, United Nation 1984 Convention Against Torture [C.A.T.], ratified by U.S.A. [1994]; defining torture

<90>

AGO 001152

as, "Any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information, or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or coercing or intimidating him or a third person... when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity" [C.A.T., article 1; per article 6, of the U.S. Const), ... Treaty law is the supreme law of the land].

240) The Eighth Amendment prohibits the "unnecessary and wanton infliction of pain, and other forms of cruel and unusual punishment(s), and punishment that is "grossly disproportionate to the severity of the crime".

241) Plaintiffs submit that the "debriefing process" [that Defendants require them to "successfully complete" in order to be released from SHU, as well as being able to have any chance of release on parole), is cruel and unusual punishment. This is because, pursuant to Defendants policy, custom, and practice, "successful debriefing" requires an inmate to become a notorious informant [one who other alleged gang affiliates know has told on and harmed them]; which puts the debriefer [informant], and possibly his family, at risk of serious harm, in retaliation for informing on others.

242) Defendants are each personally aware of the fact that "informants" are targets, as are informants' family members. Each of these Defendants knows of [and/or is responsible for knowing per. official duty(s)] numerous incidents of informants, and/or their family members on the streets, being threatened, attacked, subjected to physical harm, and killed. These Defendants all know that is simply not possible to ensure the safety of inmate informants – even those in CDCR's protective housing units [have been attacked, injured, and killed]. And they have no way of assuring the safety of family(s) outside CDCR- walls.

⟨91⟩

243) Additionally, Plaintiffs submitt that Defendants policy, custom, and practice of confining them in SHU-indefinitely, For (24+) years [more than (20) years of which has been in PBSP-SHU islotion-subject to sensory deprivation and related harm, and progressively more harsh-punitive conditions therein, as summarized in paras # 88-91, 134-140; without ever being found guilty of an illegal, gang-related act], based upon the exercise of their First and Fifth Amendment right to remain silent [and having no information to provide], and related decision to not risk the inherent dangers associated with debriefing, has had a detrimental impact on their mental health, and continued confinement therein places them at serious risk of severe mental illness over time, constituting cruel and unusual punishment in violation of the Eighth Amendment [and U.N.'s C.A.T., because said conditions amount to torture for purpose of coercion].

244) The combination of Defendants' policies, customs, and practices, enhance the threat that each poses to Plaintiffs well being [personal safety of self and family, and physical-mental health]. Such policies, customs and practices are vague, contridictory, and arbitrarily applied, they are unconstitutional [on their face, and as applied]; and, they violated the Plaintiffs U.S. Constitutional First, Fifth, and Eighth Amendment rights – as both, individual violations, and combined together. [e.g., Plaintiffs are essentially permanently subject to the harsh SHU-conditions, denied parole, ...based on a CDCR-gang Label alone [status-associational based, with no overt, illegal acts being charged]; the SHU-conditions, and multi-year parole deferals-progressively more punitive and harsh [based on refusal to speak "debrief", and face danger to self, and family therefrom; and thereby continue to suffer, and be at serious risk of severe mental health problems. See paras # 88-91, 134-16].

245) As a proximate cause of Defendants' acts and omissions, Plaintiffs have

<92>

suffered and continue to suffer harm [referenced above], and general damages in an amount according to proof, but in excess of one million dollars in terms of loss of parole opportunities, and continuous punitive SHU-confinement [for (24) years, and counting, of torture].

246) In acting as described above, Defendants acted knowingly, willfully, and maliciously, or with reckless or callous disregard for Plaintiffs federally protected rights, entitling them to an award of exemplary and punitive damages Wherefore, Plaintiffs pray for relief as follows,

## TENTH CAUSE OF ACTION

### Fourteenth Amendment Violations State Created Liberty-Interests, Due Process, Equal Protection, Ex Post Facto
### <AGAINST ALL DEFENDANTS EXCEPT BARLOW; HERNANDEZ>

247) Plaintiffs reallege and incorporate by reference herein the allegations in paragraphs #1 through 194, inclusive.

248) The Fourteenth Amendment imposes an obligation for the state(s) to safeguard the rights under the U.S. Constitution. Plaintiffs each state a fourteenth Amendment claim for relief, based on four violations, each of which constitutes a seperate violation, and they are a further violation-cumulatively, when combined. The four claims for relief are : (a) Deprivation of state created liberty interests ; (b) Violation of procedural and substantive due process ; (c) Violation of the Equal Protection Clause (d) Violation of the Ex Post Facto Clause [art. 1, §9 US Constitution-bar on retroactive-increase in punishments]; presented in order, as follows.

(a) State Created Liberty Interest(s)

249) Defendants Schwarzenegger, Cate, Hickman, Woodford, McGrath, Kirkland, Horel, Jacquez, Adams, Johnson, Bradbury, McKinney, Marquez, Rice, Harrison, Thornton, Wise [CDCR-DEFENDANTS]; Doyle, Fisher, Harmon, Gillingham, Smith, and

<93>

AGO 001155

Tucker [BPH-DEFENDANTS], have each deprived Plaintiffs of their state created liberty interests, via their promulgation or approval of, application, mutual support and condonement of, the policies, customs, and practices [detailed in the complaint], via their personal acts and omissions, when Defendants:

(1) Refused to release Plaintiffs from SHU, although they pose no immediate, severe threat to safety of people or institution security [CCR-Tit. 15 §§ 3335, 3339(a), and 3341.5(e)(3)];

(2) Failed to give Plaintiffs prior notice and a full hearing in order to present evidence and witnesses to refute the gang-validations, prior to being validated and subject to indefinite-SHU terms [Title 15 § 3338(d)(e)(h) and (I)];

(3) Used unreliable information to retain Plaintiffs in SHU [and deny parole] [Tit. 15 § 3321(b)(1)];

(4) Failed to provide Plaintiffs with mandatory procedural protections when alleging that Plaintiffs are involved in unlawful misconduct, including illegal gang-activity [Title 15 §§ 3312(a)(3), 3000 "Gang", 3023 "Gang Activity", and 3310-3320 "Inmate Discipline"];

(5) Failed to interpret and apply statutory law [Cal. Penal Code §§ 186.21, 186.22] as intended by the legislature, and interpreted by the Calif. Supreme Court [by sanctioning the Plaintiffs for innocuous associational activity - without ever being charged, and found guilty of an illegal gang-act [Tit. 15 §§ 3000 "Gang", and 3023 "Gang Activity", at authority"];

(6) Failed to articulate a nexus linking the factors cited to issue multi-year parole denials, with finding Plaintiffs are a current danger to the public [Cal. P. Code § 3041, per. Cal. Supreme Ct.];

(7) Failed to provide a neutral, non-biased, parole consideration hearing process; and related failure to base parole decisions, based on Plaintiffs individualized factors, per. consideration of all relevant-reliable evidence [per. Cal. P. Code § 3041, as interpreted by Calif. Supreme Court]

(b) <u>Federal Due Process</u> [procedural, substantive; equal protection; ex post facto]

250) Plaintiffs indefinite SHU-confinement, and related denial of parole, for alleged gang-affiliation and refusal to become informants, is a significant and atypical hardship.

<94>

AGO 001156

251) Defendants, via their acts and omissions summarized in [para. 249], related to their policies, customs, and practices of permanently confining Plaintiffs in SHU for (24) years, and related denial of parole [with multi-year deferals], violates the Due Process and Ex Post Facto Clause of the 14th Amendment to the US Const. in that Defendants:

(1) Initially placed, and revalidated Plaintiffs, for indefinite SHU confinement - based on erroneous, unreliable, false information, that did not constitute "some-evidence" of gang-affiliation; nor that they pose "individual, immediate, severe threats to inmates, staff, or institutional security;"

(2) Initially failed to give Plaintiffs prior notice, and opportunity to respond, dispute, and present their defense to the officials making the determinations that they were gang-affiliates; and, failed to provide any substantive review process [re: initial gang classification, revalidations, committee reviews - between 1982 and 2006]

(3) Failed to conduct meaningful, substantive reviews, or investigations, into the validity of the information [evidence] used to initially validate [and subsequently re-validate] Plaintiffs as active gang affiliates, in response to any of their 602 appeals [or their written rebuttals to the allegations used against them at their 2007, inactive reviews], or any of their committee reviews, between 1988 and today;

(4) Subjected Plaintiffs to the Catch 22 position, which violates the basic principles of due process, and ex post facto law, by predicating their release from SHU, and chance for parole, upon their agreement to become notorious 'informants [known to have informed on, and thereby harmed, other alleged gang affiliates; and there upon, subject themselves and family to serious danger from retaliation for informing], even though there's no evidence that they have information to provide; or alternative, remaining in SHU until death, or developing serious mental illness;

(5) Implemented a policy, custom, and practice of subjecting Plaintiffs to daily torture, in order to coerce them to implicate themselves & others in gang-activity;

(6) Utilized an arbitrarily imposed in item of gang-validation and debriefing, as a

<95>

pretext to justify indefinite SHU-status, with no chance for parole;
(7) Predetermined the outcome of Plaintiffs' parole hearings, with multi-year deferals, based on their refusal to become informants, and other categorical basis, rather than individual review of all relevant, reliable factors, re: current danger question.

252) Defendants named above, and as stated therein [para.# 249], have also violated Plaintiffs' Fourteenth Amendment due process, equal protection, and ex post facto rights, via their promulgation and continued use of policies, customs, and practices re: arbitrary, vague, contradictory rules and regulations that:
(a) Allow tens of thousands of active gang-affiliates to remain in CDCR general population prisons; while arbitrarily confining a few hundred in SHU-indefinitly, including Plaintiffs [see above para's# 18 to 35, for reference to specific rules and regulations];
(b) Reviewing SHU-inmates for "inactive" gang-status, every (6) years; while they review general population inmates for "inactive" gang-status, every (2) years [compare Tit.15 §§ 3378(d), and 3378(e)]; (c) Failed to give Plaintiffs prior adequate notice of what conduct was proscribed, and what is permitted - prior to sanctions; (d) Lack clarity for their enforcement; (e) Delegate unbridled discretion to Defendants;
(f) Reach a broad range of innocent conduct; (g) Lack sufficient minimal standards for substantively investigating Plaintiffs' denials, disputes, and rebuttal arguments in response to allegations of gang-affiliation, and activity [re: validation and committee, and 602, reviews]; (h) Fail to establish reasonable, minimul standards, to guide the Defendants in fairly judging whether, or not, Plaintiffs present an immediate, severe threat to the safety of others or the security of the institution [warranting SHU-status];
(i) Subject Plaintiffs to progressively more punitive SHU-conditions, than those of similarly situated inmates [in long term segregation in CDCR; and other state, and Federal, supermax's], in order to coerce PBSP-SHU inmates to become informants.
(j) Cumulative changes to [BPH] rules and regulations re: lifer's parole [1979 to 2010] is ex post facto-violation.

⟨96⟩

253) As a proximate cause of Defendants' acts and omissions, Plaintiffs have suffered and continue to suffer harm [i.e., para's # 88-91, 134-161], and general damages in an amount according to proof, but in excess of one million dollars in terms of loss of parole opportunities, and continuous punitive SHU-confinement [24 years of torture]

254) In acting as described herein above, Defendants acted knowingly, willfully, and maliciously, or with reckless or callous disregard for Plaintiffs' federally protected rights, entitling them to an award of exemplary and punitive damages. Wherefore, Plaintiffs pray for relief as follows,

## ELEVENTH CAUSE OF ACTION
### Failure To Lawfully Administer, Train, & Supervise
<AGAINST DEFENDANTS NAMED BELOW>

255) Plaintiffs reallege and incorporate by reference herein the allegations in paragraphs #1 through 254, inclusive.

256) Defendants Schwarzenegger, Cate, Hickman, Woodford, McGrath, Kirkland, Horel, Jacquez, Adams, and Doyle, in their chief executive and supervisory capacities, each had/have a duty to establish policies and procedures for the lawful administration of CDCR, PBSP, and BPH. As Supervisory Defendants [in addition to their personal involvement, as detailed in para's #1-254], each had/has a duty to perform, and to execute their duties in a manner consistent with state and federal law. Supervisory Defendants have a duty to properly train and supervise subordinate employees. Said Supervisory Defendants have breached and/or failed to perform their duties, thereby contributing wholly, or partly, to the continuing U.S. Constitutional violations at issue [Id., para's #1-254] as follows:

257) The system of CDCR underground regulations existing prior to January 1999, violated Plaintiffs' rights as described in the preceeding causes of action.

258) The system of regulations promulgated between Jan. 1999 and today, violate

<97>

AGO 001159

Plaintiffs' rights as described in the preceeding causes of action.

258) The system of the (BPH) and Defendant Schwarzenegger's underground policy [re: categorical - status based - parole denial(s), with multi-year deferrals, based on questionable, CDCR- gang classifications and related SHU-housing; and the catch 22- illegal - debriefing requirement, for a chance to parole], violate Plaintiffs rights as described in the preceeding causes of action.

259) Supervisory Defendants have each been notified of the unconstitutional policies, customs, and practices, at issue [numerous times, as stated herein], and were, and remain, deliberately indifferent to the violations of Plaintiffs' rights described herein [not only did each of them refuse to take corrective action, they each personally condoned, supported and committed said constitutional violations too. Id., paras #1-254]

260) Supervisory Defendants breached their duties to legally administer the CDCR, PBSP, and BPH, and to train and supervise their subordinates, where Plaintiffs rights were violated as a result of the application and enforcement of these underground regulations, and official policies, customs and practices, challenged herein.

261) Supervisory Defendants breached their duties to legally administer the CDCR, PBSP, and BPH, and to train and supervise subordinates where Plaintiffs rights were violated as a result of Defendants acting in violating the law, and Defendants' policies, customs, and practices harmed Plaintiffs [See paras #88-91,134-161], to the extent Supervisory Defendants had actual and constructive knowledge of the violations and did nothing to prevent or correct them [as stated in paras #1-254].

262) As a proximate cause of Defendants' acts and omissions, Plaintiffs have suffered and continue to suffer harm [as stated above], and general damages in an amount according to proof, but in excess of one million dollars in terms of loss of parole opportunities, and continuous punitive SHU-confinement [24+ years.....of torture].

263) In acting as described above, Defendants acted knowingly, willfully, and maliciously, or

<98>

with reckless or callous disregard for Plaintiffs' federally protected rights, entitling them to an award of exemplary and punitive damages.

Wherefore, Plaintiffs pray for relief as follows.

## VI. PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully pray for relief, as follows:

1) For declaratory judgement, that defendants' acts, omissions, policies, customs, and practices described herein, violate plaintiffs rights as stated herein; and any further relief deemed just, proper, and equitable.

2) For injunctive relief deemed just, necessary, and equitable.

3) Plaintiffs Todd Ashker and Danny Troxell, each request compensatory damages from each and all of the CDCR-Defendants, and Def. Schwarzenegger, according to proof in excess of [one million dollars re: Causes of Action #1, 2, and #8 toll]; [twenty five thousand dollars re: Causes of Action #3, 5]; [ten thousand dollars re: Causes of Action #4, 6, 7].

4) For punitive and exemplary damages against each and all of the CDCR-Defendants, and Def. Schwarzenegger, according to proof.

5) For attorney's fees according to proof per. 42 USC §1988.

6) For costs of the suit.

7) For trial by jury on all issues triable.

Dated: May 3, 2010.

Respectfully Submitted,

Todd Ashker    and Danny Troxell

Todd Ashker          Danny Troxell

– Plaintiffs, In pro-se –

⟨99⟩

G-9

## PROOF OF SERVICE BY MAIL

### (C.C.P. Section 101(a) # 2015.5, 28 U.S.C. 1746)

I, __Danny Troxell, B-76578__, am a resident of Pelican Bay State Prison, in the County of Del Norte, State of California. I am over eighteen (18) years of age and am a party to the below named action.

My Address is: P.O. Box 7500, Crescent City, CA 95531.

On the __11__ day of __MAY__, in the year of 20__10__, I served the following documents: (set forth the exact title of documents served) Re: C09-5796 CW
__Plaintiffs first Amended Complaint__
_____
_____

on the party(s) listed below by placing a true copy(s) of said document, enclosed in a sealed envelope(s) with postage thereon fully paid, in the United States mail, in a deposit box so provided at Pelican Bay State Prison, Crescent City, CA 95531 and addressed as follows:

__US. District Court__
__1301 Clay St. # 400 S__
__Oakland, CA 94612-5212__

I declare under penalty of perjury that the foregoing is true and correct.

Dated this __11__ day of __MAY__, 20__10__.

Signed: __Danny Troxell__
(Declarant Signature)

Rev. 12/06

AGO 001162

# EXHIBIT 9

**TO DEFENDANTS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**AGO 001163**

United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TODD ASHKER and DANNY TROXELL, | No. 09-05796 CW |
|       Plaintiffs, | ORDER SCREENING FIRST AMENDED COMPLAINT UNDER 28 U.S.C. § 1915A AND GRANTING PLAINTIFFS LEAVE TO SERVE DEFENDANTS |
|   v. | |
| ARNOLD SCHWARZENEGGER, et al., | |
|       Defendants. | |
| _____/ | |

On December 19, 2009, Plaintiffs Todd Ashker and Danny Troxell, state prisoners incarcerated in the Secured Housing Unit at Pelican Bay State Prison (PBSP), filed this civil rights action seeking injunctive relief and damages and requested leave to proceed in forma pauperis. On February 16, 2010, the Court issued an order denying Plaintiffs' request for leave to proceed in forma pauperis, screened the complaint in accordance with 28 U.S.C. § 1915A, dismissed several claims without leave to amend and dismissed the remaining claims with leave to amend. On March 15, 2010, Plaintiff Ashker paid the $350 filing fee. On May 28, 2010, the Court granted Plaintiffs' motion for reconsideration allowing

AGO 001164

United States District Court
For the Northern District of California

1  them to proceed with several claims that had been dismissed without
2  leave to amend in the February 16, 2010 Order.

3      On May 21, 2010, Plaintiffs filed a First Amended Complaint
4  (FAC).  In the FAC Plaintiffs remedy most of the deficiencies noted
5  in the February 16, 2010 Order: they have reduced the number of
6  causes of action from seventeen to eleven and they have indicated
7  which Defendants they are suing in regard to each cause of action.
8  The Court finds that the FAC states cognizable claims.

9      However, the FAC does not contain the causes of action that
10  the Court found to be cognizable in the May 28, 2010 Order granting
11  Plaintiffs' motion for reconsideration.  Plaintiffs need not file a
12  new Second Amended Complaint containing these causes of action.
13  Rather, they may file a Supplemental FAC that includes only the
14  causes of action found to be cognizable in the May 28, 2010 Order.
15  In the Supplemental FAC, Plaintiffs need not include a separate
16  facts section, but should list each cause of action in a separate
17  section, indicate which Defendants are being sued under each cause
18  of action, and for each cause of action indicate the conduct of
19  each Defendant that violated Plaintiffs' constitutional rights.

20      Therefore, within thirty-five days from the date of this
21  Order, Plaintiffs may file a Supplemental FAC.  If Plaintiffs
22  fail to do so within this time period, the claims addressed in the
23  Motion for Reconsideration will be dismissed.  If Plaintiffs file a
24  Supplemental FAC, the Court will then review it under 28 U.S.C.
25  § 1915A.  Plaintiffs now may serve Defendants against whom they
26  have stated claims in their FAC.  After the Court reviews the
27  Supplemental FAC, Plaintiffs then may serve Defendants against whom

28                              2

1   they have stated cognizable supplemental claims.

2        Because Plaintiffs are not proceeding in forma pauperis in

3   this action, they may not rely on the United States Marshal for

4   service of the summons and complaint without paying for this

5   service.  See Fed. R. Civ. P. 4(c)(3).  Title 28 U.S.C.

6   § 1921(a)(A) provides that the United States Marshal shall

7   routinely collect, and the court may tax as costs, fees for serving

8   a summons and complaint.  Title 28 C.F.R. § 0.114(a)(3) provides

9   that the United States Marshal shall collect a fee for personal

10  service of a summons and complaint at the rate of $55.00 per hour,

11  or portion thereof, plus travel expenses.  Consequently, Plaintiffs

12  may themselves arrange for service of all Defendants against whom

13  cognizable claims for relief have been found or they may request

14  the Court to order the Marshal to do so.  If Plaintiffs wish the

15  Marshal to serve the summons and complaint, they must inform the

16  Court of this within twenty days of the date of this Order and they

17  must arrange to pay the required fee.  Rule 4(m) of the Federal

18  Rules of Civil procedure provides:

19       If service and summons of a complaint is not made upon a
         defendant within 120 days after the filing of the
20       complaint, the court, upon motion or on its own
         initiative after notice to the plaintiff, shall dismiss
21       the action without prejudice as to that defendant or
         direct that service be effected within a specified time
22       . . .

23  Fed. R. Civ. P. 4(m).

24       In the alternative, pursuant to Rule 4(d) of the Federal Rules

25  of Civil Procedure, Plaintiffs may request that Defendants waive

26  service of summons.  Pursuant to Rule 4, if Defendants, after being

27  notified of this action and requested by Plaintiffs to waive

28

United States District Court
For the Northern District of California

                                3

United States District Court
For the Northern District of California

service of the summons, fail to do so, they will be required to bear the cost of such service unless good cause be shown for their failure to sign and return the waiver form. If service is waived, this action will proceed as if Defendants had been served on the date that the waiver is filed, except that, pursuant to Rule 12(a)(1)(A)(ii), Defendants will not be required to serve and file an answer before sixty (60) days from the date on which the request for waiver was sent or twenty (20) days from the date the waiver form is filed, whichever is later. (This allows a longer time to respond than would be required if formal service of summons is necessary.) Defendants are asked to read the statement set forth at the foot of the waiver form that more completely describes the duties of the parties with regard to waiver of service of the summons. Defendants are cautioned that Rule 4(d) of the Federal Rules of Civil Procedure requires them to cooperate in saving unnecessary costs of service of the summons and complaint. With this Order, the Clerk of the Court shall mail to Plaintiffs sufficient copies of the forms: "Notice of a Lawsuit and Request to Waive Service of a Summons" and "Waiver of the Service of Summons."

Defendants shall answer the complaint in accordance with the Federal Rules of Civil Procedure. The following briefing schedule shall govern dispositive motions in this action:

1. No later than ninety (90) days from the date their answer is due, Defendants shall file a motion for summary judgment or other dispositive motion. The motion shall be supported by adequate factual documentation and shall conform in all respects to Federal Rule of Civil Procedure 56. If Defendants are of the

4

United States District Court
For the Northern District of California

1  opinion that this case cannot be resolved by summary judgment, they

2  shall so inform the Court prior to the date the summary judgment

3  motion is due.  All papers filed with the Court shall be promptly

4  served on Plaintiffs.

5       2.  Plaintiffs' opposition to the dispositive motion shall be

6  filed with the Court and served on Defendants no later than sixty

7  (60) days after the date on which Defendants' motion is filed.  The

8  Ninth Circuit has held that the following notice should be given to

9  pro se plaintiffs facing a summary judgment motion:

> The defendants have made a motion for summary
> judgment by which they seek to have your case dismissed.
> A motion for summary judgment under Rule 56 of the
> Federal Rules of Civil Procedure will, if granted, end
> your case.
>
> Rule 56 tells you what you must do in order to
> oppose a motion for summary judgment.  Generally, summary
> judgment must be granted when there is no genuine issue
> of material fact—that is, if there is no real dispute
> about any fact that would affect the result of your case,
> the party who asked for summary judgment is entitled to
> judgment as a matter of law, which will end your case.
> When a party you are suing makes a motion for summary
> judgment that is properly supported by declarations (or
> other sworn testimony), you cannot simply rely on what
> your complaint says.  Instead, you must set out specific
> facts in declarations, depositions, answers to
> interrogatories, or authenticated documents, as provided
> in Rule 56(e), that contradict the facts shown in the
> defendant's declarations and documents and show that
> there is a genuine issue of material fact for trial.  If
> you do not submit your own evidence in opposition,
> summary judgment, if appropriate, may be entered against
> you.  If summary judgment is granted in favor of
> defendants, your case will be dismissed and there will be
> no trial.

Rand v. Rowland, 154 F.3d 952, 963 (9th Cir. 1998) (en banc).

     Plaintiffs are advised to read Rule 56 of the Federal Rules of

Civil Procedure and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)

(party opposing summary judgment must come forward with evidence

5

AGO 001168

United States District Court
For the Northern District of California

showing triable issues of material fact on every essential element of his claim). Plaintiffs are cautioned that because they bear the burden of proving their allegations in this case, they must be prepared to produce evidence in support of those allegations when they file their opposition to Defendants' dispositive motion. Such evidence may include sworn declarations from themselves and other witnesses to the incident, and copies of documents authenticated by sworn declaration. Plaintiffs will not be able to avoid summary judgment simply by repeating the allegations of their complaint.

3. If Defendants wish to file a reply brief, they shall do so no later than thirty (30) days after the date Plaintiffs' opposition is filed.

4. The motion shall be deemed submitted as of the date the reply brief is due. No hearing will be held on the motion unless the Court so orders at a later date.

5. Discovery may be taken in this action in accordance with the Federal Rules of Civil Procedure. Leave of the Court pursuant to Rule 30(a)(2) is hereby granted to Defendants to depose Plaintiffs and any other necessary witnesses confined in prison.

6. All communications by Plaintiffs with the Court must be served on Defendants, or Defendants' counsel once counsel has been designated, by mailing a true copy of the document to Defendants or Defendants' counsel.

7. It is Plaintiffs' responsibility to prosecute this case. Plaintiffs must keep the Court informed of any change of address and must comply with the Court's orders in a timely fashion.

8. Extensions of time are not favored, though reasonable

6

AGO 001169

1    extensions will be granted.  Any motion for an extension of time

2    must be filed no later than seven days prior to the deadline sought

3    to be extended.

4

5         IT IS SO ORDERED.

6

7    Dated: 12/20/2010

8                                        CLAUDIA WILKEN
                                         United States District Judge

AGO 001170

United States District Court
For the Northern District of California



UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF CALIFORNIA

TODD ASHKER et al,

         Plaintiff,

   v.

ARNOLD SCHWARZENEGGER et al,

         Defendant.

_____/

Case Number: CV09-05796 CW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on December 20, 2010, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Danny  Troxell
Pelican Bay State Prison
B76578
P.O. Box 7500
D1-120
Crescent City,  CA 95532

Todd  Ashker C58191
Pelican Bay State Prison
P.O. Box 7500
D1-SHU
Crescent City,  CA 95532

Dated: December 20, 2010

                       Richard W. Wieking, Clerk
                       By: Nikki Riley, Deputy Clerk

United States District Court
For the Northern District of California

8

AGO 001171

# EXHIBIT 10

**TO DEFENDANTS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**AGO 001172**

Case: 22-16162, 09/19/2023, ID: 12795412, DktEntry: 32-7, Page 114 of 194

Case 3:18-cv-06753-YVHA-CW Document 61-16 Filed 09/10/21 Page 1 of 190
Case 4:09-cv-06753-YVHA-CW Document 136 Filed 09/10/21 Page 1 of 190

1   JULES LOBEL (*pro hac vice*)
    CENTER FOR CONSTITUTIONAL RIGHTS
2   666 Broadway, 7th Floor
3   New York, New York 10012
    Tel: 212.614.6478
4   Fax: 212.614.6499
    Email: jll4@pitt.edu
5
6   CHARLES F.A. CARBONE (SBN 206536)
    LAW OFFICE OF CHARLES CARBONE
7   P.O. Box 2809
    San Francisco, California 94126
8   Tel: 415.981.9773
    Fax: 415.981.9774
9   Email: charles@charlescarbone.com

10  *Attorneys for Plaintiffs*
11  (Additional counsel listed on signature page)

12

13              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
14                    OAKLAND DIVISION

15  GEORGE RUIZ, JEFFREY FRANKLIN,         )
    TODD ASHKER, GEORGE FRANCO,            )
16  GABRIEL REYES, RICHARD JOHNSON,        )
    DANNY TROXELL, PAUL REDD, LUIS         )  Case No.: 4:09-cv-05796-CW
17  ESQUIVEL, and RONNIE DEWBERRY, on      )
    their own behalf, and on behalf of a class of  )  **PLAINTIFFS' SECOND AMENDED**
18  similarly situated prisoners,          )  **COMPLAINT**
19                                         )
                        Plaintiffs,        )  **CLASS ACTION**
20  v.                                     )
                                           )
21  EDMUND G. BROWN, Jr., Governor of the  )
    State of California; MATTHEW CATE,     )
22  Secretary, California Department of    )
    Corrections and Rehabilitation (CDCR); )
23  ANTHONY CHAUS, Chief, Office of        )
    Correctional Safety, CDCR; and G.D. LEWIS, )
24  Warden, Pelican Bay State Prison,      )
25                                         )
                        Defendants.        )
26  _____)

27

28

    PLAINTIFFS' SECOND AMENDED COMPLAINT
    Case No.: 4-09-cv-05796-CW

AGO 001173

## I.     INTRODUCTION

1.     Plaintiffs George Ruiz, Jeffrey Franklin, Todd Ashker, George Franco, Gabriel Reyes, Richard Johnson, Danny Troxell, Paul Redd, Luis Esquivel, and Ronnie Dewberry sue on their own behalf and as representatives of a class of prisoners who have been incarcerated in California's Pelican Bay State Prison's Security Housing Unit ("SHU") for an unconscionably long period of time without meaningful review of their placement.  Plaintiffs have been isolated at the Pelican Bay SHU for between 11 and 22 years.  Many were sent to Pelican Bay directly from other SHUs, and thus have spent even longer – over 25 years – in solitary confinement.

2.     California has subjected an extraordinary number of prisoners to more than a decade of solitary confinement at the Pelican Bay SHU.  According to 2011 California Department of Corrections and Rehabilitation (CDCR) statistics, more than 500 prisoners (about half the population at the Pelican Bay SHU) have been there for more than 10 years.  Of those people, 78 prisoners have been there for more than 20 years.  As one federal judge in the Northern District of California noted, retention of prisoners in the Pelican Bay SHU for 20 years "is a shockingly long period of time."  *See Griffin v. Gomez*, No. C-98-21038, slip op. at 10 (N.D. Cal. June 28, 2006).

3.     California's uniquely harsh regime of prolonged solitary confinement at Pelican Bay is inhumane and debilitating.  Plaintiffs and class members languish, typically alone, in a cramped, concrete, windowless cell, for 22 and one-half to 24 hours a day.  They are denied telephone calls, contact visits, and vocational, recreational or educational programming.  Defendants persistently deny these men the normal human contact necessary for a person's mental and physical well-being.  These tormenting and prolonged conditions of confinement have produced harmful and predictable psychological deterioration among Plaintiffs and class members.

PLAINTIFFS' SECOND AMENDED COMPLAINT          1
Case No.: 4-09-cv-05796-CW

AGO 001174

Case: 22-16162, 09/19/2023, ID: 12795412, DktEntry: 32-7, Page 116 of 194

Case 3:18-cv-06305-YGR-cw Document 61-18 Filed 03/10/21 Page 3 of 49
Case 4:09-cv-05796-cw Document 136 Filed 03/10/21 Page 3 of 190

4.      The solitary confinement regime at Pelican Bay, which renders California an outlier in this country and in the civilized world, violates the United States Constitution's requirement of due process and prohibition of cruel and unusual punishment, as well as the most basic human rights prohibitions against cruel, inhuman or degrading treatment.  Indeed, the prolonged conditions of brutal confinement and isolation at Pelican Bay cross over from having any valid penological purpose into a system rightly condemned as torture by the international community.

5.      The conditions at Pelican Bay have become so harsh and notorious that prisoners at the Pelican Bay SHU, as well as thousands of others incarcerated in facilities across the country, have engaged in two recent sustained hunger strikes.

6.      California, alone among all 50 states and most other jurisdictions in the world, imposes this type of extremely prolonged solitary confinement based merely on a prisoner's alleged association with a prison gang.  While defendants purport to release "inactive" gang members after six years in the SHU, in reality their so-called gang validation and retention decisions (and resulting indefinite SHU placement) are made without considering whether plaintiffs and class members have ever undertaken an illegal act on behalf of a gang, or whether they are – or ever were – actually involved in gang activity.  As one example, defendants continue to detain plaintiff George Ruiz in the Pelican Bay SHU after 22 years, based on nothing more than his appearance on lists of alleged gang members discovered in some unnamed prisoners' cells and his possession of allegedly gang-related drawings.

7.      Plaintiffs' and class members' only way out of isolation is to "debrief" to prison administrators (i.e., report on the gang activity of other prisoners); as such, defendants unreasonably condition release from inhumane conditions on cooperation with prison officials in a manner that places prisoners and their families in significant danger of retaliation.  *See Griffin*,

PLAINTIFFS' SECOND AMENDED COMPLAINT      2
Case No.: 4-09-cv-05796-CW

No. C-98-21038 at 8. Accordingly, for those many prisoners who refuse or are unable to debrief, defendants' policies result in "effectively permanent" solitary confinement. *Id.*

8.  The conditions at the Pelican Bay SHU are extremely harsh when compared to the experience of a typical California state prisoner, particularly given the extraordinary length of SHU confinement at Pelican Bay. Yet plaintiffs and the class they represent are incarcerated for years without any meaningful review of their SHU confinement or any notice of how they can earn their way back to the general population without becoming informants.

9.  A few years after Pelican Bay opened its doors in December 1989, a class of Pelican Bay prisoners brought a constitutional challenge to the conditions, practices, and abuse at the facility. After an extensive trial, the court found that, for a subclass of prisoners at high risk for developing mental illness, the isolation and harsh conditions in the Pelican Bay SHU constituted cruel and unusual punishment. *See Madrid v. Gomez*, 889 F. Supp. 1146, 1265 (N.D. Cal. 1995). Although the court rejected Eighth Amendment claims brought by prisoners outside this high risk group, it emphasized that it had only considered isolation lasting up to three years. The court could "not even begin to speculate on the impact on inmates confined in the SHU for periods of 10 to 20 years or more[.]" *Id.* at 1267. This case presents the substantial question left unanswered by *Madrid*.

10.  Plaintiffs and the class seek a declaration that the ongoing practices of the defendants – the Governor of California, the Secretary and the Chief of the Office of Correctional Safety of the CDCR, and the Warden of Pelican Bay State prison – violate their constitutional rights, and injunctive relief compelling defendants to provide prisoners at Pelican Bay with meaningful review of their indeterminate SHU assignment and to cease holding prisoners in the inhumane conditions of solitary confinement for extremely prolonged periods.

PLAINTIFFS' SECOND AMENDED COMPLAINT     3
Case No.: 4-09-cv-05796-CW

AGO 001176

## II. JURISDICTION AND VENUE

11.     Plaintiffs and the class bring claims pursuant to 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the United States Constitution.

12.     This Court has jurisdiction for claims seeking declaratory and injunctive relief pursuant to 28 U.S.C. §§ 1331 and 1343 and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

13.     Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to the claims brought by plaintiffs and the class have occurred in this District.

## III. PARTIES

### A.     Plaintiffs

14.     Plaintiff GEORGE RUIZ (B82089) is a 69-year-old prisoner who has spent 22 years at the Pelican Bay SHU, and the last 28 years in solitary confinement, due to his validation as a member of the Mexican Mafia (EME).  He has had no significant rule violations since his incarceration began in 1980.  Indeed, he has only had one disciplinary violation of any kind since 1986.  He is serving a seven year to life sentence and has been eligible for parole since 1993, but multiple parole boards have indicated that he will never be paroled while he is housed in the SHU.

15.     Plaintiff JEFFREY FRANKLIN (C08545) is a 52-year-old prisoner who has spent the last 22 years at the Pelican Bay SHU.  In 2006, he was denied inactive Black Guerilla Family (BGF) status based solely on evidence that he associates with other gang members, shares a common ideology, and attempts to educate the community and other prisoners to his philosophy.

16.     Plaintiff TODD ASHKER (C58191) is a 48-year-old prisoner who has spent over 25 years in solitary confinement, and 22 years at the Pelican Bay SHU.  He was validated as an

PLAINTIFFS' SECOND AMENDED COMPLAINT     4
Case No.: 4-09-cv-05796-CW

AGO 001177

Aryan Brotherhood member in 1988, and has been denied inactive status based on confidential memoranda from informants and artwork found in his cell. Ashker has never been charged with or disciplined for a proven gang-related act. As the Warden stated in response to one of Ashker's administrative grievances, unless Ashker debriefs, by "formally renounc[ing] his membership" in the Aryan Brotherhood and "divulg[ing] all of their secrets to the authorities," he will remain incarcerated in the SHU for the rest of his life.

17. Plaintiff GEORGE FRANCO (D46556) is a 46-year-old prisoner who has spent 20 years in solitary confinement at the Pelican Bay SHU. In 2008, Franco was denied inactive Nuestra Familia status based on confidential statements by informants regarding his role within the gang, and the fact that his name appeared on gang rosters found in other prisoners' cells. None of the source items relied on to retain Franco in the SHU for another six years alleged any gang activity or criminal conduct.

18. Plaintiff GABRIEL REYES (C88996) is a 46-year-old prisoner who has spent almost 16 years continuously in isolation in California, and has been kept in the Pelican Bay SHU for 14 and one-half years. Reyes is serving a sentence of 25 years to life as a result of California's "three strikes" law. At his last inactive review in 2008, he was denied inactive EME associate status solely on possession of artwork allegedly containing gang symbols.

19. Plaintiff RICHARD JOHNSON (K53293) is a 61-year-old prisoner who has spent almost 15 years in solitary confinement at the Pelican Bay SHU due to his validation as a BGF member. Under California's "three strikes" law, Johnson is currently serving 33 years to life for drug-related offenses. Johnson has never incurred a major disciplinary offense, yet continues to languish in the Pelican Bay SHU.

20. Plaintiff DANNY TROXELL (B76578) is a 59-year-old prisoner who has spent over 26 years in solitary confinement, and 22 years at the Pelican Bay SHU due to his validation

AGO 001178

as a member of the Aryan Brotherhood. Troxell's only act of violence in the last 30 years involved a fist fight in 1997 in which nobody was significantly injured. He has been eligible for parole since 1996, but pursuant to a practice of denying parole to all SHU prisoners, he has no hope of being released from prison.

21.     Plaintiff PAUL REDD (B72683) is a 55-year-old prisoner who has spent almost 33 of the past 35 years in solitary confinement in California and has spent the last 11 and one-half years in Pelican Bay's SHU. Redd was first validated as a BGF gang member in 1980 based on six confidential memoranda stating that he had communicated with other BGF prisoners and that his name was on a coded roster found in a validated BGF member's possession. Over 30 years later, he continues to be labeled a gang member based merely on association.

22.     Plaintiff LUIS ESQUIVEL (E35207) is a 43-year-old prisoner who has spent the last 13 years in solitary confinement in the Pelican Bay SHU. He has never incurred a serious disciplinary violation. In 2007, after more than six years in the SHU, Esquivel was determined to be an inactive gang associate, but was nonetheless retained in the SHU. He was revalidated as an active EME associate a year later because he possessed allegedly gang-related Aztec artwork.

23.     Plaintiff RONNIE DEWBERRY (C35671) is a 53-year-old prisoner who has spent the last 27 years in solitary confinement. He has been repeatedly validated as a BGF member based merely on his associations and his political, cultural, and historical writings. He has had no major disciplinary infractions since 1995. Dewberry would be eligible for parole consideration but for his retention in the SHU.

24.     As detailed below, plaintiffs are suffering serious mental and physical harm due to their prolonged confinement in isolation at the Pelican Bay SHU.

**B.     Defendants**

25.     Defendant EDMUND G. BROWN, Jr., is the Governor of the State of California.

AGO 001179

As such, he has caused, created, authorized, condoned, ratified, approved or knowingly acquiesced in the illegal, unconstitutional, and inhumane conditions, actions, policies, customs and practices that prevail at Pelican Bay SHU, as described below.  He has, therefore, directly and proximately caused, and will continue to cause in the future, the injuries and violations of rights set forth below.  Defendant Brown is sued in his official capacity only.

26.     Defendant MATTHEW CATE is the Secretary of the CDCR.  As such, he has caused, created, authorized, condoned, ratified, approved, or knowingly acquiesced in the illegal, unconstitutional, and inhumane conditions, actions, policies, customs and practices that prevail at the Pelican Bay SHU, as described below.  He has, therefore, directly and proximately caused, and will continue to cause in the future, the injuries and violations of rights set forth below.  Defendant Cate is sued in his official capacity only.

27.     Defendant ANTHONY CHAUS is the Chief of the Office of Correctional Safety of the CDCR.  The Office of Correctional Safety houses and supervises the Special Services Unit (SSU), which is CDCR's primary departmental gang-management unit responsible for investigating prisoners suspected of gang affiliation.  As such, he has caused, created, authorized, condoned, ratified, approved, or knowingly acquiesced in the illegal, unconstitutional, and inhumane conditions, actions, policies, customs and practices that prevail at the Pelican Bay SHU, including but not limited to issues of gang validation.  He has, therefore, directly and proximately caused, and will continue to cause in the future, the injuries and violations of rights set forth below.  Defendant Chaus is sued in his official capacity only.

28.     Defendant G.D. LEWIS is the Warden of Pelican Bay State Prison.  As such, he has caused, created, authorized, condoned, ratified, approved or knowingly acquiesced in the illegal, unconstitutional, and inhumane conditions, actions, policies, customs, and practices that prevail at the Pelican Bay SHU, as described below.  He has, therefore, directly and proximately

AGO 001180

caused, and will continue to cause in the future, the injuries and violations of rights set forth below. Defendant Lewis is sued in his official capacity only.

## IV. FACTUAL ALLEGATIONS

### A. Conditions at the Pelican Bay SHU

29. California opened Pelican Bay State Prison on December 1, 1989. It is the most restrictive prison in California and one of the harshest super-maximum security facilities in the country.

30. The prison is split between general population units for maximum security prisoners and the Security Housing Unit (SHU). The SHU contains 1,056 cells explicitly designed to keep the alleged "worst of the worst" in the state prison system under conditions of extreme isolation, sensory deprivation, and restricted movement. Also characteristic of Pelican Bay's SHU are the extremely limited recreational and cultural opportunities afforded to prisoners, a near total lack of contact with family and loved ones, an absolute denial of work opportunities, limited access to personal property, and extraordinary levels of surveillance and control.

31. Pelican Bay was specifically designed to foster maximum isolation. Situated in rural Del Norte County, on California's northern border with Oregon, its lengthy distance from most prisoners' families was considered advantageous by the California correctional administrators who developed the facility. The prison is a 355-mile drive from San Francisco and a 728-mile drive from Los Angeles, where many of the prisoners' families live.

32. The original planners did not contemplate that prisoners would spend decades at Pelican Bay. Rather, they designed the prison under the assumption that prisoners would generally spend up to 18 months in the SHU – a term consistent with practices in the rest of the country.

33. According to CDCR, there were on average 1,106 people incarcerated in the

PLAINTIFFS' SECOND AMENDED COMPLAINT      8
Case No.: 4-09-cv-05796-CW

Pelican Bay SHU in 2011.  About half (513) had been in the SHU for more than 10 years.  Of those people, 222 had been incarcerated in the SHU for 15 or more years, and 78 had been there for more than 20 years.  Of the remaining people, 544 had been in the SHU for five to 10 years, and the rest, 54, were there for five years or less.

34.     Many plaintiffs and class members, including Ruiz, Ashker, Troxell, Franklin, and Dewberry, have been at Pelican Bay since the year it opened.

35.     Some plaintiffs and class members have spent even longer in continuous isolation, as they were transferred directly from other solitary units to the Pelican Bay SHU.  For example, Ruiz has been held in solitary confinement since 1984 – for approximately 28 years.  Dewberry has been in isolation for 27 years.  Troxell has spent over 26 years in isolation, and Ashker has spent over 25 years in isolation.

36.     All plaintiffs have been held in the Pelican Bay SHU for over 10 years.

37.     California's prolonged isolation of thousands of men is without equal in the United States.  There is no other state in the country that consistently retains so many prisoners in solitary confinement for such lengthy periods of time.

38.     The cost of housing a prisoner at the Pelican Bay SHU is considerably higher than the cost of incarcerating a prisoner in general population housing.  CDCR reports that it cost the State $70,641 in 2010-2011 to house a single prisoner at the Pelican Bay SHU – tens of thousands of dollars more per prisoner than in the general population.

39.     Plaintiffs and the hundreds of other long-term SHU residents at Pelican Bay are warehoused in cramped, windowless cells, are given almost no access to recreation or exercise, and have no access to programming or vocational activities.  Prisoners never leave the Pelican Bay SHU except under rare circumstances for medical purposes or a court appearance.

40.     Compounding the extremity of their situation, plaintiffs and class members must

PLAINTIFFS' SECOND AMENDED COMPLAINT     9
Case No.: 4-09-cv-05796-CW

face these conditions in a state of near total solitude. Pelican Bay prisoners have absolutely no access to group recreation, group education, group prayer, or group meals. Most are housed in a single-occupancy cell and cannot have a normal human conversation with another prisoner. Their only avenue of communication is by speaking loudly enough for the prisoner in the next cell, or a cell down the line, to hear. Guards, however, have discretion to issue warnings and punish any loud communication as a rule violation, and do so. Moreover, any communication with another validated gang member or associate, even just a greeting, may be and has been used by CDCR as evidence of gang affiliation justifying the prisoners' retention in the SHU.

41.     For example, CDCR cited as evidence of Franklin's continued gang affiliation the fact that he was observed in 2006 "communicating by talking" between pods with another prisoner who is a validated member of a different gang.

42.     Similarly, in March 2011, Franco received a disciplinary violation simply for speaking to a prisoner in the next pod as he passed by his cell on the way back from the shower. Redd, too, was disciplined in 2007 for talking to another prisoner in passing.

43.     While some plaintiffs and class members have had cellmates at Pelican Bay, being locked up with a cellmate all day in an 80-square-foot cell does not compensate for the severe isolation of the Pelican Bay SHU, as the *Madrid* Court found. *See Madrid*, 889 F.Supp. at 1229-30. Instead, double-celling requires two strangers to live around-the-clock in intolerably cramped conditions, in a cell barely large enough for a single human being to stand or sit.

44.     Plaintiffs' and class members' communication with loved ones outside the facility is also subject to severe restrictions.

45.     Prisoners at the Pelican Bay SHU are prohibited from any access to social telephone calls absent an emergency. A single telephone call may be granted to a prisoner in the event of an emergency (such as a death in the family), but Pelican Bay staff retains complete

AGO 001183

discretion to determine whether the circumstances allow for a call. Ashker, for example, was able to speak to his mother only twice in 22 years: once in 1998, and once in 2000. She has since died. Reyes was denied a telephone call home after his stepfather died, because he had been allowed a telephone call several months earlier when his biological father died.

46. Neither plaintiffs nor the experts they have consulted are aware of any other federal, local or state correctional system in the United States that forbids all non-emergency telephone communication.

47. The remote location of Pelican Bay means that most SHU prisoners receive no visits with family members or friends for years at a time. Many prisoners have thus been without face-to-face contact with people other than prison staff for decades.

48. When they do occur, family visits are limited to two two-hour visits on weekends. No physical contact whatsoever is allowed; visits occur behind plexiglass, over a telephone, in a cramped cubicle. This means that prisoners may not even hug or hold hands with visiting family members, children, or other loved ones. Despite the non-contact nature of the visits, prisoners are strip-searched before and after.

49. The visits are monitored and recorded, and the tapes are later reviewed by gang investigators seeking evidence of gang communication to use against the prisoner and his visitor.

50. When Ashker's disabled mother visited him, no accommodation was made for her wheelchair, causing a shortened and difficult visit. She never visited again. Dewberry, whose family lives in Oakland, has had less than one visit per year since his 1990 transfer to Pelican Bay. He had no visits between 2008 and February 2012. Franklin's last social visit was in 2005.

51. Troxell's family has given up trying to visit him because of the distance and cost of traveling to Pelican Bay and because non-contact visits are so upsetting. He has five grandchildren and one great-grandchild, but has never met them.

PLAINTIFFS' SECOND AMENDED COMPLAINT      11
Case No.: 4-09-cv-05796-CW

AGO 001184

52.     Esquivel sought a hardship transfer from Pelican Bay, due to his mother's difficulty in visiting him from San Diego.  The transfer was denied, and he was told to debrief instead.  As a result, Esquivel was unable to see or speak to his parents between 2000 and 2009, when his mother died.  After her death, he was allowed one phone call with his father and sister – his only social call in nine years.  As soon as he hung up the phone, Pelican Bay gang investigators told him to think about taking advantage of the debriefing program.

53.     The lack of telephone calls and functional lack of visitation imposes considerable strain on family relationships; those relationships have frequently broken down entirely.  Reyes has not hugged his daughters in almost two decades, since they were in pre-school.  They are now adults.  Reyes was only recently allowed to send his children a photograph of him – his first in 17 years.  His aging mother is ill and cannot travel the considerable distance to Pelican Bay, and the rules forbid him to speak with her by phone.

54.     Esquivel has not shaken another person's hand in 13 years and fears that he has forgotten the feel of human contact.  He spends a lot of time wondering what it would feel like to shake the hand of another person.

55.     Prisoners at the Pelican Bay SHU may receive non-legal mail, but they may only keep 10 pieces of social mail at a time; any other mail is confiscated.  There are significant delays in the delivery of both social and legal mail to prisoners.

56.     These extreme restrictions on human contact are imposed on plaintiffs and class members as a matter of official CDCR policy and have been approved or implemented by defendants.

57.     In addition to the near total isolation that prisoners at Pelican Bay face, the physical conditions under which they live are stark.

58.     The cells in the Pelican Bay SHU are completely concrete, measure approximately

PLAINTIFFS' SECOND AMENDED COMPLAINT     12
Case No.: 4-09-cv-05796-CW

AGO 001185

80 square feet, and are eight feet high.  They contain a bed made of concrete, a sink, and a toilet.
Concrete slabs projecting from the walls and floor serve as a desk and stool.  The cells have no
window, so prisoners have no view of the outside world, nor any exposure to natural light.  Until
the summer 2011 hunger strike described below, prisoners were not allowed to put up any
decorations, drawings, or photographs on their walls; now they are permitted one wall calendar.
The doors to the cells consist of solid steel, rather than bars, and are perforated with small holes
that allow for a partial view into a concrete hallway.  The door has a food slot that an officer may
unlock to insert food or mail, and that is also used to handcuff the prisoner before the door is
opened.  The cells do not contain an emergency call button, so prisoners must yell for help in the
event of an emergency, or rely on a staff member noticing that they are in distress.

59.     The unit is loud – guards' conversations echo down the tier all day.  At night the
guards stamp mail loudly, open and close doors, and walk the tier with rattling keys and chains
for count.  Prisoners who are not "showing skin" during these counts are awakened.  As a result
of these conditions, and the impact of their long-term isolation, many prisoners have developed
sleep disorders, vision problems, and headaches.

60.     Bedding consists of a hard, lumpy mattress, sheets, and two thin blankets.

61.     The temperature in the cells can be excessively hot or cold.  The ventilation
consists of recycled air, which is cold in the winter and hot in the summer.

62.     Property is tightly restricted.  Plaintiffs and the class are allowed a total of only 10
books or magazines, and up to six cubic feet of property.  They may purchase a television set or
radio if they have the means, though available stations are limited.  Prisoners at the Pelican Bay
SHU are given one quarter of the regular monthly canteen allowance and may receive one annual
package, not exceeding 30 pounds in weight, including packaging.

63.     Plaintiffs and the class normally spend between 22 and one-half and 24 hours a

PLAINTIFFS' SECOND AMENDED COMPLAINT     13
Case No.: 4-09-cv-05796-CW

AGO 001186

day in their cells.  They are typically allowed to leave their cells only for "exercise" and to shower.

64.     "Exercise" occurs in a barren, solid concrete exercise pen, known as a "dog run." It is supposed to last for one and one-half hours, seven times weekly.  However, prisoners often do not receive even this minimal amount of exercise due to staff shortages and training days, disruptions, inclement weather, or arbitrary staff decisions.

65.     The exercise pen is small and cramped, with high walls.  Half of the roof is partially covered with painted plexiglass and a metal mesh grate that obstructs direct sunlight; the other half allows the only exposure Pelican Bay SHU prisoners ever have to the sky.  Pelican Bay is situated in one of the wettest areas of California, with an average rainfall of 67 inches.  Rain falls directly into the exercise pens, causing water to pool on the floor.  The walls of the exercise pen have accumulated mildew or mold, aggravating respiratory problems among the prisoners.

66.     Until the 2011 hunger strike, there was no equipment whatsoever in the exercise pen.  Since then, prisoners have been provided one handball. Prisoners exercise alone, unless they share their cell, in which case they are permitted to exercise with their cellmate.  If a prisoner with a cellmate wants to exercise alone to get a brief period of privacy, then his cellmate must forfeit his opportunity to exercise.

67.     Plaintiffs and other Pelican Bay SHU prisoners have absolutely no access to recreational or vocational programming.  While those prisoners who can afford them are allowed to take correspondence classes, there has been no consistent access to proctors for exams that would allow prisoners to get credit for their coursework.  Until the 2011 hunger strike, prisoners at the facility were banned from purchasing art supplies or hobby or crafting materials.  Prisoners who are discipline free for one year are now permitted to purchase and retain a limited amount of art supplies.

PLAINTIFFS' SECOND AMENDED COMPLAINT     14
Case No.: 4-09-cv-05796-CW

AGO 001187

68.     Prisoners at the Pelican Bay SHU are allowed one 15-minute shower in a single shower cell three times weekly.

69.     Prisoners are allowed access to the law library for two hours, once a month, unless they have a court deadline within 30 days.

70.     Whenever a prisoner is moved outside of the "pod" in which he is housed and in which the shower and exercise pen is located, he is handcuffed, his hands are shackled to his waist or behind his back, and he is escorted by two guards.  The prisoner is also strip searched in public, near the door to the pod.

71.     While prisoners in the SHU are supposed to be served the same meals as other prisoners in California, in practice it is common that the meals prisoners receive in the SHU are substandard in that they contain smaller portions, fewer calories, and often are served cold, rotten, or barely edible.

72.      Conditions at Pelican Bay are so harsh, even compared to other California SHUs, that in 2011 Franklin requested to be transferred out of the Pelican Bay SHU to any of the other three SHUs in California so that he could have "minimal human contact" and not suffer the "extreme sensory deprivation" at Pelican Bay.  In his request, he explained that other SHUs have windows in the cells, allow some time for prisoners to "see and talk with each other," and permit prisoners to "see grass, dirt, birds, people and other things."

73.     Defendants are directly responsible for these stark conditions at Pelican Bay, and for the degree to which the conditions are compounded by other punitive measures, including a pattern and practice of coercive denial of standard medical care.

74.     Plaintiffs have serious medical conditions, some of which, upon information and belief, have been caused or exacerbated by their confinement at the Pelican Bay SHU.  Franklin, for example, has chronic back and eye problems, and Dewberry suffers from melanin deficiency

PLAINTIFFS' SECOND AMENDED COMPLAINT     15
Case No.: 4-09-cv-05796-CW

AGO 001188

leading to severe pigmentation loss, vitamin D deficiency, chronic lower back problems and pain, stomach problems, and swollen thyroid glands. Redd suffers from hypertension, diabetes, vision problems, and a thyroid disorder for which he receives no medication.

75. Johnson has osteoporosis, arthritis, and cysts in both kidneys, and he has suffered renal failure. He also had a heart attack in 2009 while in the SHU, and takes heart medication. He was scheduled to be transferred to Folsom Prison because of his heart condition, but was later refused transfer after his participation in the Pelican Bay hunger strike.

76. Reyes suffers from several chronic medical ailments, including Sjogren's Disease, for which he was prescribed effective medications; those medications have been discontinued at the Pelican Bay SHU, and other medical treatment has also been withdrawn without explanation.

77. Ruiz has glaucoma and had a corneal transplant on his left eye. He may need one for his right. He has diabetes, which became aggravated after a change in his medication. He recently developed pneumonia, kidney failure, and difficulty breathing, and experienced a delay in being seen by a medical practitioner.

78. Despite these serious conditions, prisoners with medical concerns are routinely told by prison officials that if they want better medical care for their conditions or illnesses, or improved pain management, the way to obtain adequate care is to debrief.

79. Ashker, for example, who suffers from almost constant pain due in part to an old gunshot wound, was told by Pelican Bay medical staff in 2006 that he "holds the keys" to getting better medical care, presumably by debriefing and moving to the general population.

80. Ruiz and Johnson have also been told that the only path to better health care is debriefing.

81. The denial of adequate medical care at Pelican Bay is not isolated to a few doctors or correctional officials, but is rather a longstanding pattern and practice which, on information

PLAINTIFFS' SECOND AMENDED COMPLAINT      16
Case No.: 4-09-cv-05796-CW

AGO 001189

and belief, has been officially sanctioned by defendants for the purpose of coercing plaintiffs and class members to debrief.

82. The serious mental-health impact of even a few years in solitary confinement is well documented, yet mental health care at the Pelican Bay SHU is grossly inadequate. Every two weeks, a psychologist walks past the prisoners' cells, calling out "good morning," or "you okay?" The psychologist walks past eight cells in approximately 30 seconds during these "rounds." It is incumbent on a prisoner to get the psychologist's attention to indicate that he wants to talk. As a result, prisoners in neighboring cells are aware when someone calls out to the psychologist for help. There is no opportunity during this brief encounter for a private consultation with a mental-health practitioner.

83. Indeed, beyond a brief intake screening upon their arrival to the SHU, the only mental health assessment that many SHU prisoners receive occurs at Institutional Classification Committee meetings, at which a mental health staff member is present. Each prisoner is asked two standard questions: (1) whether he has a history of mental illness; and (2) whether he wants to hurt himself or others. These questions are asked in front of the Warden, Correctional Captain, and numerous other correctional staff. No further mental health evaluation occurs.

84. For these reasons, plaintiffs and class members have received inadequate mental health care or none at all. Though prisoners may request mental-health services by filling out a form, some plaintiffs have declined to seek any mental health care while incarcerated because of concerns over lack of confidentiality. Others do not talk to mental health staff because those staff members seem uncaring, and because officers can overhear sessions or are told of prisoners' personal problems.

85. When one plaintiff actually requested mental health care, he was referred to a "self-help" library book.

PLAINTIFFS' SECOND AMENDED COMPLAINT    17
Case No.: 4-09-cv-05796-CW

AGO 001190

86.    SHU assignment also prolongs plaintiffs' and class members' time in prison. Since legislative changes in 2010, prisoners cannot earn "good time" or "conduct" credit while in the SHU for gang affiliation.  Therefore, a prisoner with a determinate (fixed) sentence such as Esquivel, who was convicted in 1997 of robbery and burglary and is serving a flat 34-year sentence, will be released between four and five years later than he otherwise would have simply because he is incarcerated in the SHU.

87.    In addition, an unwritten policy prevents any prisoner held in the SHU from being granted parole.  Ruiz, Ashker, Troxell, Franklin, and Dewberry are all eligible for parole, but have been informed by parole boards that they will never attain parole so long as they are housed in the SHU.

88.    Ruiz, for example, has been incarcerated in California since 1981, after he was convicted of robbery and kidnapping and sentenced to seven years to life in prison.  He was told by the judge that he would likely serve 13 and one-half years, and has been eligible for parole since 1993.  However, multiple parole boards have indicated that he will never get parole as long as he is housed in the SHU.

89.    Franklin has been eligible for parole since 2000, and although the parole board has characterized his disciplinary history at Pelican Bay as "minimal," it has repeatedly denied him parole, citing, among other things, his refusal to disassociate with the gang through debriefing.  In 2001, he was explicitly told that he needed to get out of the SHU to gain parole.

90.    So too, Dewberry and Ashker have been eligible for parole since 1996 and 2004 respectively, but have been informed that they will not receive parole unless they first get out of the SHU.

AGO 001191

**B.** **Assignment to and Retention in the Pelican Bay SHU**

**i.** **Initial Assignment to the SHU**

91.  CDCR places prisoners who have been validated as gang affiliates into the above conditions in SHU for an indefinite term, served in repeatedly renewed six-year increments. *See* CAL. CODE REGS. tit. 15, § 3341.5(c)(2)(A)(2) (2012).

92.  Ignoring prisoners' actual behavior, CDCR identifies prison gang affiliates through a process called prison gang validation. *See* CDCR, OPERATIONS MANUAL § 52070.21 (2009).  Validation does not require CDCR to show that the prisoner has violated a prison rule, broken the law, or even acted on behalf of the gang.  Indeed, many prisoners who have not engaged in any gang-related misconduct or rule violations before validation are placed in the SHU based merely on allegations that they have associated with a gang.

93.  For example, Ruiz, Johnson, Redd, Esquivel and Dewberry were all validated as gang members or associates without allegations of actual gang activity or gang-related rule violations.  Rather, the prison relied on confidential informants who claimed these plaintiffs were gang members or associates, on possession of allegedly gang-related art, tattoos, or written material, and/or on inclusion of their names on alleged lists of gang members and associates.

94.  When validated, prisoners are classified as either gang members or gang associates.  A "member" is a prisoner who has been accepted into membership by a gang.  CAL. CODE REGS. tit. 15, § 3378(c)(3).  An "associate" is a prisoner or any person who is involved periodically or regularly with members or associates of a gang.  *Id.* at § 3378(c)(4).  Both members and associates (referred to globally as "gang affiliates") are subject to indefinite SHU confinement.

95.  California's practice of placing people in long-term SHU confinement simply because of gang association is unusual and does not comport with the general practice of other

AGO 001192

states that maintain super-maximum security prisons.

### ii. Periodic Review

96.     Once a prisoner is validated as a gang affiliate and sent to the SHU for an indefinite term, he is entitled to periodic "reviews" of his validation. Pursuant to California regulations, a classification committee must review the prisoner's status every 180 days, allegedly so they can consider releasing the prisoner to the general population. *Id.* at § 3341.5(c)(2)(A)(1). In reality, classification reviews do not substantively review the prisoner's SHU assignment, but rather involve three steps. First, the prisoner is urged to debrief from the gang. Second, a mental health staff member asks two questions: (1) do you have a history of mental illness; and (2) do you want to hurt yourself or others? This mental health evaluation occurs in front of all members of the classification committee, including the Warden, Facility Captain, Correctional Captain, the Assignment Lieutenant, and other correctional staff. *See id.* at § 3376(c)(2). Third, the classification committee "reviews" the paperwork in the prisoners' file, to make sure that all required paperwork is accounted for.

97.     Unless a prisoner is willing to debrief, the 180-day review allows absolutely no possibility of release from the SHU.

98.     No examination of continued gang activity or association occurs at the 180-day review, nor is there any assessment of whether the prisoner's behavior requires continued SHU placement. For this reason, such reviews are meaningless, and few Pelican Bay SHU prisoners attend them.

99.     The only review at which the classification committee team even purports to determine whether the prisoner should be released from the SHU occurs once every six years. *See id.* at § 3378(e). Therefore, all gang validated prisoners in the SHU must remain in solitary confinement for six years without even the possibility of any review to obtain their release. This

AGO 001193

six-year interval is far longer than any equivalent classification review at other supermax or high-security systems in other states, the federal system, or other nations, and is far longer than the 120-day period that the Ninth Circuit deemed constitutionally permissible for prisoners housed in solitary confinement in *Toussaint v. McCarthy*, 926 F.2d 800 (9th Cir. 1990).

100.   Yet even this six-year inactive review is meaningless for most prisoners housed in the SHU.

101.   In some cases, like that of plaintiffs Ashker and Troxell, defendants have made a predetermined decision to deny inactive status and thus retain the prisoner in the SHU until he either debriefs or dies.  For example, in 2004, Pelican Bay Warden Joe McGrath wrote in response to one of Ashker's grievances that Ashker had been identified as an active member of the Aryan Brotherhood and that "such an inmate must formally renounce his membership in this group and divulge all of their secrets to the authorities.  The alternative is remaining where extremely dangerous inmates belong: the SHU."

102.   For many, the six-year review results in SHU retention even though the prison can produce no evidence (or even allegations) of gang activity.  The review is supposed to determine whether the prisoner is "active" with the prison gang or has assumed "inactive" status.  Under California regulations, "when the inmate has not been identified as being involved in gang activity for a minimum of six (6) years," he can achieve "inactive status" and may be released from the SHU.  CAL. CODE REGS. tit. 15, § 3378(e).

103.   Logically, one who achieves "inactive" status is still a gang member or associate, but not an "active" one, in that he does not engage in any gang activities.  Yet CDCR routinely and regularly denies inactive status to prisoners even where there is no evidence whatsoever of any gang activity.  This longstanding pattern and practice is not the result of failings by individual gang investigators, but is instead CDCR policy which, upon information and belief, has been

PLAINTIFFS' SECOND AMENDED COMPLAINT       21
Case No.: 4-09-cv-05796-CW

AGO 001194

approved and implemented by defendants. Plaintiffs' experiences demonstrate this pattern.

104.   Ruiz, for example, was denied inactive gang status in 2007 based on: (a) two 2006 searches of unnamed prisoners' cells that uncovered Ruiz's name on a laundry list of purported EME members and associates in "good standing"; and (b) possession of photocopied drawings in his cell. Ruiz openly possessed this artwork, drawn by other prisoners, for at least eight years without any complaint or objection from prison officials. Three days before his 2007 inactive review, CDCR asserted that the drawings contained symbols associated with the EME. Neither of these source items provides any evidence of active gang involvement.

105.   Reyes too has been repeatedly denied inactive status based on association, without evidence of any gang activity. At his first inactive review, for example, Reyes was denied inactive status based on one source item: exercising with other validated prisoners in a group yard while in administrative segregation. At his last inactive review, in 2008, Reyes was denied inactive status based only on drawings found in his cell, including a drawing for a tattoo of his name with alleged Mactlactlomei symbols and a drawing of a woman, man and Aztec warrior, with a geometric pattern known as the G-shield. The G-shield also appears in a tattoo on Reyes' left pectoral and was rejected as a gang-related source item in 1996, 2003 and 2005.

106.   Franklin has had similar experiences. In 2006, he was denied inactive status because he was listed as a board member of George Jackson University, claimed by CDCR to be a gang front, and because his name appeared on gang rosters confiscated from other prisoners. Shortly thereafter he was seen "communicat[ing] by talking" with a validated member of a different gang. CDCR officials instructed that this should be considered during Franklin's next inactive review.

107.   Johnson's inactive reviews have also largely focused on association and shared ideology. In 1997, for example, he was denied inactive status based on a Black Power tattoo,

PLAINTIFFS' SECOND AMENDED COMPLAINT     22
Case No.: 4-09-cv-05796-CW

AGO 001195

possession of a book about George Jackson (Paul Liberatore's *The Road to Hell: the True Story of George Jackson, Stephen Bingham, and the San Quentin Massacre*), and a photograph collage of him and George Jackson. Staff confidential informants also alleged, without any supporting facts attached, that Johnson was a high-ranking member of the BGF and that he communicated with BGF members through third parties. Johnson was denied inactive status in 2006 based on old source items and possession of a copy of "N-GOMA Pelican Bay Support Project, Black August 2005," a newsletter which includes dedications to alleged BGF members who have died. None of these source items provide any evidence of Johnson's active involvement in a prison gang in the prior six years.

108. Redd was denied inactive status in 2011 based purely on association and not on any gang-related actions. His SHU retention was based on possession of drawings, collages, and booklets related to George Jackson and the Black Panthers, as well as a card from a former Black Panther Party member and his appearance on a roster of purported gang affiliates found amid the property of another prisoner. In addition, according to confidential informants, Redd is a "captain" of BGF who has communicated with other BGF members. None of these source items provide any evidence of Redd's actions on behalf of a prison gang in the prior six years.

109. Dewberry was recently denied inactive status in November 2011 based on his name appearing on a coded roster in another prisoner's possession, as well as such materials as his political and historical writings, his possession of a pamphlet in Swahili, which defendants' inactive review materials state is "a banned language at PBSP," confidential memoranda stating that he is an "enforcer," and his participation in George Jackson University, which according to defendants' inactive review materials "is not a university at all," but rather a "concept," "to teach the philosophies and ideologies of all 'Political Prisoners'" and "to enlist individuals who are not in prison to help spread the ideologies of the BGF (Black Guerilla Family)." None of the

PLAINTIFFS' SECOND AMENDED COMPLAINT    23
Case No.: 4-09-cv-05796-CW

materials used to deny Dewberry inactive status and consign him to the SHU for at least six more years contained any evidence whatsoever that Dewberry was involved in any violent or gang-related activity.

110. The most recent review of Franco's validation was in 2008, when he was found inactive in the Northern Structure but was revalidated as an active Nuestra Familia member. His SHU retention was based on several confidential memoranda from informants regarding his status within the Nuestra Familia along with inclusion of his name on several gang rosters found in the cells of other validated gang members. None of the source items relied on to consign Franco to another six years in the SHU alleged any actual gang activity or criminal conduct.

111. At the same time that they were repeatedly denied inactive status, many plaintiffs have demonstrated their ability to follow prison rules by avoiding any significant prison misconduct. Ruiz, for example, has been disciplined only once for violating a prison rule in over 25 years. Indeed, his only rule violations in the past 30 years have been for missing count in 1981, possession of wine in 1983, possession of unlabeled stimulants and sedatives in 1986, and a 2007 rule violation entitled "Mail Violation With No Security Threat." Despite this innocuous prison record, he has spent over 25 years in harsh isolation, without access to normal human contact.

112. Similarly, Reyes' only disciplinary offenses in the last 12 years involved the recent hunger strike and unauthorized donation of artwork to a non-profit organization. Johnson has had only one rule violation in close to 15 years in the Pelican Bay SHU: in 2000, he was disciplined for a mail violation.

113. With the exception of violations in 2011 related to his involvement in the hunger strikes and his possession of a Black History scrapbook including information on the BGF's history, Dewberry has not been charged with violating any prison rule since 1995.

PLAINTIFFS' SECOND AMENDED COMPLAINT     24
Case No.: 4-09-cv-05796-CW

AGO 001197

114. Redd's disciplinary offenses since 2000 consist mainly of simply speaking with other prisoners in passing, along with one mail violation.

115. When, in the rarest of cases, a long-term prisoner does achieve inactive status, even this is no guarantee of escape from solitary confinement. In 2007, after more than six years in the SHU with only minor disciplinary write-ups, including, for example, refusing handcuffs, refusing to leave the yard, and yelling, Esquivel was determined to be an inactive EME associate. Nevertheless, he was retained in the SHU for a 12-month observation period. In 2008, after one year of SHU observation, Esquivel was revalidated as an active gang associate based on one source item: a report that officers found three items of artwork with Aztec symbols in his cell.

116. CDCR informs prisoners that they can gain release from the SHU as an "inactive" gang member if CDCR has no evidence that they have been involved in "gang activity" for at least six years, but in practice it denies prisoners inactive status even where there is no evidence of any "gang activity" as that word is understood by the ordinary person. This denies meaningful review.

117. At the same time, plaintiffs and class members are not given information about an actual path out of the SHU, besides debriefing.

118. The disconnect between CDCR's stated policy and actual practice has been compounded by the settlement in the case of *Castillo v. Almeida*, C-94-2847 (N.D. Cal. 1994), agreed to on September 23, 2004. In that settlement, CDCR officials agreed that "laundry lists" – that is, lists by confidential sources, including debriefers, of alleged associates or members without reference to gang-related acts performed by the prisoner – would not be used as a source item to either validate a prisoner as a gang affiliate or deny him inactive status. CDCR officials also agreed that "the confidential source must identify specific gang activity or conduct performed by the alleged associate or member before such information can be considered as a

PLAINTIFFS' SECOND AMENDED COMPLAINT    25
Case No.: 4-09-cv-05796-CW

AGO 001198

1  source item." *Id.* at ¶ 21.

2  119.    The *Castillo* settlement was memorialized in a public document filed with the

3  court and widely publicized to the prisoners at Pelican Bay prison.  Despite the *Castillo*

4  settlement, defendants continue to rely on "laundry lists" and on informants who identify no

5  specific gang activity or conduct by the prisoner to retain plaintiffs and class members at the

6  Pelican Bay SHU at the six-year inactive review.  Such review violates due process a) by denying

7  Plaintiffs and class members' fair notice of the evidence that can be used against them to deny

8  inactive status, and b) by providing confusing and misleading notification of what they need to do

9  to get out of the SHU.

10  120.    Thus, CDCR's practice of denying prisoners release despite their record of

11  inactivity operates as a cruel hoax.  This bait-and-switch furthers the hopelessness and despair

12  that plaintiffs and other prisoners experience in the SHU and leads them to reasonably believe

13  that there is no way out of the SHU except to debrief or die.

14

15  121.    Defendants' policy of retaining prisoners in the SHU who are not active gang

16  affiliates, or against whom no reliable evidence exists that they present any threat of gang-related

17  violence or misconduct, is unmoored from any legitimate penological purpose or security need.

18

19  122.    These are not isolated aberrations limited to plaintiffs.  Rather, defendants engage

20  in an unwritten but consistent pattern and practice of equating gang association or shared

21  ideology with "current gang activity."  All prisoners in the Pelican Bay SHU are subject to this

22  practice.

23

24  **C.    Psychological Harms**

25  123.    In addition to being deprived of the minimal civilized measure of life's necessities

26  as described above, plaintiffs and class members are also experiencing unrelenting and crushing

27  mental anguish, pain, and suffering as a result of the many years they have spent without normal

28

PLAINTIFFS' SECOND AMENDED COMPLAINT     26
Case No.: 4-09-cv-05796-CW

AGO 001199

Case: 22-16162, 09/19/2023, ID: 12795412, DktEntry: 32-7, Page 141 of 194

Case 3:12-cv-06359-WHO Document 61-3   Filed 02/10/21   Page 40 of 48
Case 4:09-cv-05796-CW   Document 136   Filed 03/10/11   Page 34 of 190

human interaction, in stark and restrictive conditions, without any hope of release or relief. Prisoners describe this confinement as "a living nightmare that does not end and will not end."

124.    The devastating psychological and physical effects of prolonged solitary confinement are well documented by social scientists: prolonged solitary confinement causes prisoners significant mental harm and places them at grave risk of even more devastating future psychological harm.

125.    Researchers have demonstrated that prolonged solitary confinement causes a persistent and heightened state of anxiety and nervousness, headaches, insomnia, lethargy or chronic fatigue (including lack of energy and lack of initiative to accomplish tasks), nightmares, heart palpitations, and fear of impending nervous breakdowns.  Other documented effects include obsessive ruminations, confused thought processes, an oversensitivity to stimuli, irrational anger, social withdrawal, hallucinations, violent fantasies, emotional flatness, mood swings, chronic depression, feelings of overall deterioration, as well as suicidal ideation.  Individuals in prolonged solitary confinement frequently fear that they will lose control of their anger, and thereby be punished further.

126.    Plaintiffs suffer from and exhibit these symptoms.

127.    While these symptoms are reported by people who have suffered from being placed in solitary confinement for days, months or a few years, they become more pronounced and cause greater pain and suffering when, as with plaintiffs and the class, one is incarcerated in these conditions for many years without any meaningful hope of release.  As plaintiff Gabriel Reyes wrote in 2011:

> You don't really know what makes [the SHU psychological torture] unless you live it and have lived it for 10, 15, 20 plus years 24/7. Only the long term SHU prisoner knows the effect of being alone between four cold walls with no one to confide in and only a pillow for comfort.  How much more can any of us take? Only tomorrow knows. Today I hold it all in hoping I don't explode.

PLAINTIFFS' SECOND AMENDED COMPLAINT    27
Case No.: 4-09-cv-05796-CW

AGO 001200

128.    As a result of their prolonged SHU placement, most plaintiffs suffer from extreme and chronic insomnia.  For Johnson, "I am so busy suppressing feelings and isolating myself all day, and so much anger builds up in me from the conditions, that I can't sleep at night because the sound of a door opening or closing wakes me and I get anxious about someone coming in on me and I can't fall back to sleep."

129.    Similarly, Ashker only gets approximately one to three hours of sleep a night both because his mattress is too short for him, causing him to sleep on bare concrete from his knees down, and because noise from the doors constantly slamming open and shut in the SHU at night wakes him and causes anger and anxiety.  The startling loud noises cause flashbacks of the incident in which he was set up and shot unlawfully by a guard which began with the opening and slamming of his cell door.

130.    Many of the plaintiffs also suffer from severe concentration and memory problems.  For example, reading newspapers and books used to be a large part of Ruiz's daily routine, but the severe concentration and memory problems that he developed in the SHU now prohibit him from reading more than a few sentences at a time, and he forgets the paragraph he just read.  Therefore he has essentially given up reading.  Similarly, Franklin and Franco have trouble concentrating, and their attention span and memory are deteriorating because of the effects of long-term isolation in the SHU.

131.    Plaintiffs experience life in the SHU as a struggle to avoid becoming mentally ill.  They have done so thus far by developing responses that deaden feelings and emotions, suppress anger, and develop a psychological and physical state which removes much of what makes normal human beings human – namely, feelings, emotions, daily physical contact, regular social communication, and being able to see another person or living thing.

132.    Plaintiffs experience growing and persistent rage at the conditions under which

PLAINTIFFS' SECOND AMENDED COMPLAINT    28
Case No.: 4-09-cv-05796-CW

they are incarcerated in the SHU. They attempt to suppress that rage in order to avoid self-destruction, irresponsible acts of violence, or a mental breakdown. Plaintiffs' attempts at suppression, in combination with their isolation, have led them to increasingly withdraw into themselves and become emotionally numb to the point of feeling "non-human."

133. Troxell, for example, does not initiate conversations, is not motivated to do anything, and feels as if in a stupor much of the time. He often becomes "blank" or out of touch with his feelings.

134. Ashker experiences great feelings of anger, which he tries to control and suppress, but this just deadens his feelings. He feels that he is "silently screaming" 24 hours a day.

135. Reyes copes with his years of SHU confinement by suppressing his anger, but to do so he has had to suppress all feelings to the point where he no longer knows what he is feeling.

136. Esquivel experiences a near-total loss of the capacity to feel. He states that he does not feel anything and this makes him "feel dead." He reports that days go by without him feeling anything, "as if I am walking dead." He watches some television but has no emotional reaction to the dramas he watches.

137. So too, when Redd suppresses his anger, he starts to not feel anything at all and becomes numb. He often "feels like a caged animal."

138. This mounting anger, and attempts to suppress it, is a recurring and predicable human reaction to the extreme situation that is isolated confinement. It is not a propensity unique to plaintiffs.

139. Plaintiffs also experience a range of other psychological symptoms stemming from their confinement in the SHU, including hallucinations, anxiety disorder, hypersensitivity, severe mood swings, violent nightmares and fantasies, and panic attacks. At least one plaintiff hears voices when no one is talking to him. Redd experiences frequent nightmares about

AGO 001202

violence, something that he never experienced before being in the SHU.

140.    The harm to plaintiffs is compounded by their prolonged and indefinite lack of contact with their families and others. For example, Ashker speaks of never having any face-to-face communication with others; he just hears disembodied voices. Other plaintiffs describe the pain of not being able to hug, share photos with, have phone calls with, or in some cases even see, family members for what they expect will be the rest of their lives.

141.    Plaintiffs are convinced that they will be kept in the SHU for the rest of their sentences, or the rest of their lives. This causes them acute despair.

142.    These psychological symptoms are precisely those reported in the literature about individuals placed in prolonged solitary confinement. But the extreme duration of plaintiffs' and class members' confinement has meant that the isolative and emotionally numbing effects of solitary confinement have become even more pronounced. Plaintiffs' symptoms are almost identical to those described in psychological literature about the long-term effects of severe trauma and torture.

143.    Upon information and belief, numerous prisoners confined in the SHU for long periods of time have developed mental illness, and some have committed or attempted suicide while in the SHU. All prisoners confined in the SHU for prolonged periods have a significant risk of descending into mental illness due to prolonged exposure to the conditions in the SHU.

144.    Most plaintiffs recently participated in two hunger strikes (described below), which provide additional evidence of the severe psychological distress, desperation, and hopelessness that they experience from languishing in the SHU for decades. Almost every plaintiff participant reported viewing the possibility of death by starvation as a worthwhile risk in light of their current situation.

145.    Numerous plaintiffs also have serious physical ailments and illnesses caused or

PLAINTIFFS' SECOND AMENDED COMPLAINT       30
Case No.: 4-09-cv-05796-CW

AGO 001203

exacerbated by their prolonged incarceration under the harsh conditions in the SHU, including

eye and vision problems, headaches, diabetes, hypertension, and chronic back problems. These

health concerns add to their psychological distress, as they fear that as they age and their health

problems worsen, they will be left to die in the SHU without adequate medical care because they

have refused to debrief.

**D.  International Standards Regarding Torture and Cruel, Inhuman or Degrading Treatment**

146.   In light of the well-documented harms described above, there is an international

consensus that the type of prolonged solitary confinement practiced in California at Pelican Bay

violates international human rights norms and civilized standards of humanity and human dignity.

International human rights organizations and bodies, including the United Nations, have

condemned indefinite or prolonged solitary confinement as a human rights abuse that can amount

to torture.

147.   As just one example, in August 2011, the United Nations Special Rapporteur of

the Human Rights Council on Torture and Other Cruel, Inhuman or Degrading Treatment or

Punishment concluded that the use of solitary confinement is acceptable in only exceptional

circumstances, and that its duration must be as short as possible and for a definite term that is

properly announced and communicated.

148.   Plaintiffs' and class members' prolonged detention meets none of these criteria.

149.   The Special Rapporteur concluded that prolonged solitary confinement is

prohibited by the International Covenant on Civil and Political Rights (ICCPR) and the

Convention Against Torture (CAT), and that prolonged solitary confinement constitutes torture or

cruel, inhuman or degrading treatment or punishment. The Special Rapporteur has concluded that

even 15 days in solitary confinement constitutes a human rights violation.

150.   Plaintiffs and class members have been held in solitary confinement for at least

PLAINTIFFS' SECOND AMENDED COMPLAINT       31
Case No.: 4-09-cv-05796-CW

250 times this duration.

151.    The Special Rapporteur's view comports with standards laid out by the Istanbul Statement on the Use and Effects of Solitary Confinement, the ICCPR Human Rights Committee, and the United Nations Office of the High Commissioner for Human Rights.

152.    The Convention Against Torture (CAT), ratified by the United States in 1994, provides the following definition of torture:

> For the purposes of this Convention, torture means any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

CAT, art. 1, para. 1.  By being forced to either debrief or endure the crushing and inhumane policies and conditions at the Pelican Bay SHU described above, plaintiffs and class members are being subjected to treatment consistent with CAT's definition of torture.

**E.    Pelican Bay Hunger Strikes**

153.    Coinciding with this international consensus against solitary confinement, prisoners at Pelican Bay have repeatedly organized hunger strikes to draw public attention to the conditions described above.

154.    A hunger strike occurred at Pelican Bay in 2002 and lasted approximately one week.  The prisoners called off the strike after a California State Senator promised to look into the strikers' complaints, primarily centered on the debriefing policy.  No reforms, however, were implemented.

155.    In light of ongoing concerns, a 2007 report commissioned by CDCR examined national standards about the handling of security threat group members and recommended a step-down program through which prisoners in the SHU could be released to the general population

AGO 001205

without having to debrief. *See* CDCR, SECURITY THREAT GROUP IDENTIFICATION AND

MANAGEMENT (2007). Instead, they would spend a minimum of four years in a program in which

their "acceptable custodial adjustment" resulted in stages of increased social contact and

privileges. *Id*. at 6. CDCR also failed to implement these recommendations.

156. On February 5, 2010, plaintiffs Ashker and Troxell sent a formal Human Rights

Complaint to then-Governor Arnold Schwarzenegger and Defendant Cate, titled "Complaint on

Human Rights Violations and Request for Action to End 20+ Years of State Sanctioned Torture

to Extract Information From (or Cause Mental Illness to) California Pelican Bay State Prison

Security Housing Unit (SHU) Inmates." The complaint outlined the history of Pelican Bay State

Prison and set forth the prisoners' factual and legal claims for relief.

157. In May 2011, the complaint was again sent to the Governor and Secretary. This

time, it was accompanied by a "Final Notice" that an indefinite hunger strike would begin on July

1, 2011, and it provided five broad demands that CDCR: (1) end group punishment; (2) abandon

the debriefing program and modify the active/inactive gang status criteria; (3) end long-term

solitary confinement and alleviate conditions in segregation, including providing regular and

meaningful social contact, adequate healthcare and access to sunlight; (4) provide adequate food;

and (5) expand programming and privileges.

158. In June 2011, the complaint and final notice were sent again to the Governor, the

Secretary, and the Warden.

159. On July 1, 2011, the hunger strike began. At its peak, over 6,600 prisoners at 13

California prisons participated. Ashker, Dewberry, Franco, Redd and Troxell were among the 11

principal representatives and negotiators for the prisoners at Pelican Bay State Prison. Most of

the other plaintiffs also participated, as did prisoners from every major ethnic, racial, and

geographic group. The hunger strike garnered national and international media attention and

PLAINTIFFS' SECOND AMENDED COMPLAINT      33
Case No.: 4-09-cv-05796-CW

AGO 001206

support.

160.  CDCR staff met with prisoner representatives, and on July 20, 2011, the hunger strike was temporarily suspended after CDCR officials agreed to provide a few basic amenities and to revise the regulations by which a prisoner is assigned to and kept in the SHU.

161.  On August 23, 2011, an informational hearing on California's SHUs was held by the California State Assembly Public Safety Committee.  Hundreds of family members and supporters attended, and many testified about the conditions their loved ones endure in the SHU and in Administrative Segregation Units.  *See* http://solitarywatch.com/2011/08/24/historic-california-assembly-hearing-on-solitary-confinement.

162.  On September 26, 2011, the hunger strike resumed because prisoners lost faith that CDCR would implement a revision of the regulations as it had promised.  This time nearly 12,000 prisoners participated.  The hunger strike ended on October 12, 2011, after CDCR assured the prisoner representatives that it was working on the new regulations and would continue conversations about other improvements sought by the prisoners.

163.  On March 9, 2012, CDCR publicly issued a "concept paper" describing its proposed changes to gang validation regulations.  That document has been condemned by prisoners and prisoner-rights advocates as making virtually no meaningful changes and, instead, expanding the net of who may be incarcerated in the SHU.  No new regulations have been implemented to date.

164.  Since the hunger strike, CDCR has issued disciplinary rule violations against participants in that peaceful protest, and particularly serious rule violations against those it alleged were its leaders.  Ashker, Dewberry, Franco, Redd, and Troxell received disciplinary write-ups on this ground.

**F.    Class Allegations**

PLAINTIFFS' SECOND AMENDED COMPLAINT        34
Case No.: 4-09-cv-05796-CW

AGO 001207

165.    Plaintiffs bring this action on their own behalf and, pursuant to Rules 23(a), 23(b)(1), and 23(b)(2) of the Federal Rules of Civil Procedure, on behalf of all prisoners serving indeterminate SHU sentences at the Pelican Bay SHU on the basis of gang validation, none of whom have been or will be afforded meaningful review of their confinement, in violation of the Due Process Clause of the Fourteenth Amendment.

166.    Plaintiffs also bring this action on behalf of a subclass of Pelican Bay prisoners who are now, or will be in the future, imprisoned by defendants at the Pelican Bay SHU under the conditions and pursuant to the policies described herein for longer than 10 continuous years. Such imprisonment constitutes cruel and unusual punishment within the meaning of the Eighth Amendment.

167.    The class is so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1). As of April 1, 2012, there were more than 1,000 prisoners imprisoned at the Pelican Bay SHU. Upon information and belief, all of these prisoners have been denied meaningful notice and review, and thus fit the class definition. Of those prisoners, over 500, or approximately half, have been imprisoned for over 10 years in the Pelican Bay SHU, where they have been subjected to cruel and unusual punishment. These 500 comprise the Eighth Amendment subclass.

168.    The class members are identifiable using records maintained in the ordinary course of business by CDCR.

169.    All members of the Eighth Amendment subclass are suffering the deprivation of at least one basic human need due to their prolonged confinement in the SHU, including mental and physical health, physical exercise, sleep, nutrition, normal human contact, meaningful activity, and environmental stimulation. In addition, all class members are suffering significant mental and physical harm. While the exact nature of those harms may differ in some respects for each

AGO 001208

prisoner, the source of the harm complained of here is the same – namely, defendants' policies and practices in placing the class of prisoners for a lengthy period of time in conditions of confinement shown to cause serious mental and physical harm.

170.  In addition, all prisoners placed in the conditions at the Pelican Bay SHU face a common risk of suffering even more serious mental harm caused by their retention in the SHU for such a lengthy period of time.

171.  There are questions of law and fact common to the members of the class.  Those questions include, but are not limited to:

    a)  Whether prolonged confinement in the SHU for over 10 years under the conditions and policies maintained by the defendants objectively constitutes cruel and unusual punishment prohibited by the Eighth Amendment.

    b)  Whether defendants have been deliberately indifferent to the mental and physical suffering incurred by the plaintiff class.

    c)  Whether incarceration under the conditions and policies imposed by defendants results in constitutionally cognizable harm, or presents a constitutionally unacceptable risk of harm.

    d)  Whether a legitimate penological reason exists for defendants to incarcerate prisoners for decades in the conditions described herein simply because they are members or associates of a gang, without demonstrating that they are currently engaged or have been recently engaged in some illegal or wrongful gang-related misconduct.

    e)  Whether the conditions at the Pelican Bay SHU and the policies imposed by defendants on all prisoners housed in the SHU constitute an atypical and significant hardship compared to the ordinary incidents of prison life.

PLAINTIFFS' SECOND AMENDED COMPLAINT   36
Case No.: 4-09-cv-05796-CW

AGO 001209

f) Whether SHU confinement extends the duration of incarceration because of a de facto policy of denying parole to SHU prisoners.

g) Whether defendants deny prisoners incarcerated in the SHU meaningful, periodic review of their confinement as required by the Due Process Clause of the Fourteenth Amendment by: (1) failing to provide them with notice of what they can do to get released from the SHU apart from risking their lives and safety and that of their families by debriefing; (2) providing misleading notice that they can become eligible to be released from the SHU by becoming an "inactive" gang member or associate and refraining from any gang activity, when in fact prisoners who are not involved in any current gang activity are still routinely retained in the SHU; and 3) making a predetermination that many prisoners will stay in the SHU until they either die or debrief, thus rendering the periodic reviews meaningless.

h) Whether defendants fail to provide timely meaningful review of prisoners' imprisonment in the SHU by engaging in 180-day reviews that do not substantively review whether the prisoners should be retained in the SHU and therefore are meaningless, and only affording the so-called "inactive" review every six years.

172. Defendants are expected to raise common defenses to these claims, including denying that their policies and practices violate the Constitution.

173. The claims of the plaintiffs are typical of those of the plaintiff class, as their claims arise from the same policies, practices, courses of conduct, and conditions of confinement, and their claims are based on the same legal theories as the class' claims. The cause of the named plaintiffs' injuries is the same as the cause of the injuries suffered by the rest of the class, namely

defendants' policies and practices.

174.     Plaintiffs are capable of fairly and adequately protecting the interests of the plaintiff class because plaintiffs do not have any interests antagonistic to the class.  Plaintiffs, as well as class members, seek to enjoin the unlawful acts, policies, and practices of the defendants. Indeed, some of the named plaintiffs have already served as de facto representatives of the class by presenting the demands of thousands of Pelican Bay and other California hunger strikers to defendants during the two hunger strikes in the summer and fall of 2011.  Finally, plaintiffs are represented by counsel experienced in civil rights litigation, prisoners' rights litigation, and complex class litigation.

175.     This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(1) because the number of class members is numerous and prosecution of separate actions by individuals create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for defendants.  Moreover, the prosecution of separate actions by individual members is costly, inefficient, and could result in decisions with respect to individual members of the class that, as a practical matter, would substantially impair the ability of other members to protect their interests.

176.     This action is also maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) because defendants' policies and practices that form the basis of this Complaint are generally applicable to all the class members, thereby making class-wide declaratory and injunctive relief appropriate.  Common questions of law and fact clearly predominate within the meaning of Rule 23(b)(2) as set forth above.  Class treatment provides a fair and efficient method for the adjudication of the controversy herein described, affecting a large number of persons, joinder of whom is impracticable.

AGO 001211

## V.    CLAIMS FOR RELIEF

### First Cause of Action: Eighth & Fourteenth Amendments
### (Cruel and Unusual Punishment)

177.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

178.    Plaintiffs advance this claim on their own behalf, and on behalf of the Eighth Amendment subclass, against all defendants.

179.    By their policies and practices described herein, defendants have deprived and continue to deprive plaintiffs and the class of the minimal civilized measure of life's necessities, and have violated their basic human dignity and their right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution for each of the reasons set forth below.

**A.    Deprivation of Basic Human Need**

180.    First, the cumulative effect of extremely prolonged confinement, along with denial of the opportunity of parole, the deprivation of earned credits, the deprivation of good medical care, and other crushing conditions of confinement at the Pelican Bay SHU, constitute a serious deprivation of at least one basic human need, including but not limited to normal human contact, environmental and sensory stimulation, mental and physical health, physical exercise, sleep, nutrition, and meaningful activity.

**B.    Imposition of Serious Psychological and Physical Injury, Pain and Suffering**

181.    Second, extremely prolonged exposure to these deprivations of basic human needs is currently imposing serious psychological pain and suffering and permanent psychological and physical injury on Plaintiffs and the class they represent.

182.    In addition to plaintiffs' current psychological and physical pain, the likelihood that plaintiffs and the class will remain in SHU for the foreseeable future subjects plaintiffs and

AGO 001212

the class they represent to a significant risk of future debilitating and permanent mental illness and physical harm.

**C.      SHU Confinement Designed to Coerce Plaintiffs to Provide Information**

183.    Third, Defendants' harsh policies are not legitimately related to security or other penological needs of isolating alleged dangerous prisoners from others, but rather are designed to coerce plaintiffs to debrief and become informants for the State.  This policy of holding plaintiffs and class members in prolonged solitary confinement for many years at the Pelican Bay SHU until they debrief or die is, as one Court put it, "tantamount to indefinite administrative segregation for silence – an intolerable practice in modern society." *Griffin*, No. C-98-21038 at 11.  It is cruel and unusual punishment for defendants to coerce prisoners to provide information on other prisoners – if indeed they have any such information – by maintaining them in stifling and punitive conditions that constitute an atypical and significant hardship, unless they so inform.

184.    Prisoners who debrief incur a substantial risk of serious harm and retaliation to themselves and to their families.  The combination of the crushing conditions in the SHU, the policies designed to coerce prisoners to debrief, the lack of any effective means of obtaining release from the SHU without debriefing, and the substantial risk of serious harm if one does debrief, puts prisoners in an untenable position and constitutes an unconstitutional threat to the safety of prisoners confined in the SHU in violation of the Eighth and Fourteenth Amendments to the Constitution.

**D.      Disproportionate Punishment**

185.    Fourth, defendants' policy of indefinite and prolonged SHU placement imposes disproportionate punishment on plaintiffs and class members.  Defendants have no legitimate penological interest in retaining prisoners indefinitely in the debilitating conditions of the SHU simply because they are gang members or associates, without recent, serious disciplinary or gang-

PLAINTIFFS' SECOND AMENDED COMPLAINT      40
Case No.: 4-09-cv-05796-CW

AGO 001213

related infractions.  Nor is this policy and practice rationally related to legitimate security needs.  Defendants' decades-long infliction of  significant psychological and physical harm and the risk of future debilitating harm on these prisoners simply for allegedly being gang members or associates offends civilized society's sense of decency, constitutes an intolerable practice in modern society, and is a disproportionate punishment which violates the Eighth and Fourteenth Amendments to the Constitution.

**E.      Deprivation of Human Dignity in Violation of Contemporary Standards of Human Decency**

186.     Finally, Defendants' continuation of Plaintiffs' solitary confinement for many years under the debilitating and extreme conditions existing at the Pelican Bay SHU strips human beings of their basic dignity and humanity in violation of contemporary standards of human decency and constitutes cruel and unusual treatment prohibited by the Eighth and Fourteenth Amendments to the United States Constitution.

187.     That California's policies and practices violate contemporary standards of human dignity and decency is evidenced by the fact that those practices are unusual in comparison to other states' practices with respect to segregated prisoner housing.  Virtually no other state uses mere gang association or membership to confine prisoners in the SHU.  Other states do not warehouse hundreds of prisoners in the SHU for decades at a time.  Plaintiffs and class members are subject to unusually harsh conditions of confinement even in comparison with other supermax prisons, such as windowless cells and a lack of telephone calls to family members and friends.  And finally, California's SHU policies and practices are atypical in effectively prolonging incarceration, in that prisoners in the SHU are deprived of good time credit and are rendered functionally ineligible for parole.

188.     That California's practices with respect to the plaintiff class violates contemporary standards of human decency and dignity is also evidenced by the international community's

PLAINTIFFS' SECOND AMENDED COMPLAINT      41
Case No.: 4-09-cv-05796-CW

AGO 001214

condemnation of the practice of prolonged and indefinite solitary confinement under very harsh and stifling conditions such as exist at the Pelican Bay SHU. Such condemnation is reflected in international treaties such as the Convention Against Torture, the International Covenant on Civil and Political Rights, decisions and declarations of international bodies, customary international law, and decisions of regional and national courts such as the European Court of Human Rights and Canadian courts.

**F.      Defendants' Deliberate Indifference to the Deprivations Suffered by Plaintiffs**

189.     The policies and practices complained of herein have been and continue to be implemented by defendants and their agents, officials, employees, and all persons acting in concert with them under color of state law, in their official capacity.

190.     Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

191.     It should be obvious to defendants and to any reasonable person that the conditions imposed on plaintiffs and class members for many years cause tremendous mental anguish, suffering, and pain to such prisoners. Moreover defendants have repeatedly been made aware, through administrative grievances, hunger strikes, and written complaints that plaintiffs and class members are currently experiencing significant and lasting injury. Defendants have been deliberately indifferent to the plaintiffs' pain and suffering.

192.     Indeed, defendants have deliberately and knowingly caused such pain in an effort to force plaintiffs and the class to debrief.

AGO 001215

Case: 22-16162, 09/19/2023, ID: 12795412, DktEntry: 32-7, Page 157 of 194

Case 2:18-cv-06359-WHO Document 61-12 Filed 01/10/21 Page 156 of 190
Case 4:09-cv-05796-CW Document 113 Filed 09/10/12 Page 45 of 48

### Second Cause of Action: Fourteenth Amendment
### (Due Process)

193.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

194.    Plaintiffs advance this claim on their own behalf, and on behalf of the class, against all defendants.

195.    Defendants have deprived plaintiffs and class members of a liberty interest without due process of law by denying them meaningful and timely periodic review of their continued long-term and indefinite detention at the Pelican Bay SHU and meaningful notice of what they must do to earn release, in violation of the Fourteenth Amendment to the United States Constitution.

196.    The conditions and the duration of defendants' confinement of plaintiffs and class members at the Pelican Bay SHU constitute an atypical and significant hardship as compared with the ordinary incidents of prison life for three basic reasons: (a) the exceedingly harsh and isolated conditions in the SHU; (b) the lengthy duration of confinement in the SHU; and (c) the effect on the possibility of parole being granted and the overall length of imprisonment that results from such confinement.

**A.     Conditions at the Pelican Bay SHU**

197.    The conditions in the SHU are unduly harsh, and do not generally mirror those conditions imposed upon prisoners in administrative segregation and protective custody in California.  These harsh conditions include but are not limited to:  isolation in cells that are sealed off from contact with other prisoners, the lack of windows in cells, a prohibition on all social phone calls except in emergencies, no contact visits and very limited visiting hours, no or minimal educational or general programming, exercise facilities that provide very little natural sunlight and have virtually no recreational equipment, food which is inferior to that served to

PLAINTIFFS' SECOND AMENDED COMPLAINT     43
Case No.: 4-09-cv-05796-CW

AGO 001216

other California prisoners, and denial of standard medical care to prisoners unless they debrief.

**B.    Duration of Confinement at the Pelican Bay SHU**

198.    Plaintiffs have been held in the crushing conditions described above for 11 to 22 years.  Indeed, about half of the prisoners detained at the Pelican Bay SHU have been there for over 10 years, more than 20 percent have been held there for more than 15 years, and almost 10 percent have been held there for over 20 years.  Upon information and belief, this shockingly lengthy confinement is atypical in comparison to the ordinary disciplinary and administrative segregation imposed in California.

**C.    Effect of SHU Confinement on Overall Length of Imprisonment**

199.    An unwritten, but uniformly enforced policy imposed by CDCR precludes plaintiffs and class members from being released on parole while they are at the Pelican Bay SHU.  In addition, under California law, prisoners housed in the SHU cannot earn good-time credits no matter how impeccable their behavior.  The effect of these policies and practices has been that many prisoners, including some of the named plaintiffs, spend a longer time incarcerated in prison than had they not been housed in the SHU.

**D.    Lack of Meaningful Process**

200.    Because indefinite placement in the Pelican Bay SHU constitutes a significant and atypical hardship, plaintiffs and class members are entitled to meaningful notice of how they may alter their behavior to rejoin general population, as well as meaningful and timely periodic reviews to determine whether they still warrant detention in the SHU.

201.    Defendants have denied and continue to deny any such notice or meaningful review by: (1) failing to provide prisoners with notice of what they can do to get released from the SHU apart from providing information that they do not have or risking their life and safety and that of their families by debriefing; (2)  providing misleading notice that they can become

PLAINTIFFS' SECOND AMENDED COMPLAINT    44
Case No.: 4-09-cv-05796-CW

AGO 001217

1  eligible to be released from the SHU by becoming an "inactive" gang member or associate and

2  refraining from engaging in any gang activities, when in fact prisoners who are not involved in

3  any current gang activity are still routinely retained in the SHU; (3) making a predetermination

4  that many prisoners will stay in the SHU until they either die or debrief, thus rendering the

5  periodic reviews substantively and procedurally meaningless; and (4) making the length of time

6  between reviews far too long to comport with the constitutional due-process standard.

7        202.    Defendants are also violating plaintiffs' due process rights by retaining plaintiffs

8  and the class in conditions that amount to an atypical and significant hardship without legitimate

9  penological interest, as this detention occurs without reliable evidence that plaintiffs and the class

10  are committing any acts on behalf of a prison gang and are thus active gang members.

## PRAYER FOR RELIEF

Plaintiffs and the class they represent have no adequate remedy at law to redress the

wrongs suffered as set forth in this Complaint.  Plaintiffs have suffered and will continue to suffer

irreparable injury as a result of the unlawful acts, omissions, policies, and practices of defendants,

as alleged herein, unless plaintiffs and the class they represent are granted the relief they request.

The need for relief is critical because the rights at issue are paramount under the United States

Constitution.

WHEREFORE, the named plaintiffs and the class they represent request that this Court

grant them the following relief:

a.  Declare that this suit is maintainable as a class action pursuant to Federal Rules of Civil

    Procedure 23(a) and 23(b)(1) and (2);

b.  Declare that defendants' policies and practices of confining prisoners in the Pelican Bay SHU

    violate the Eighth and Fourteenth Amendments to the United States Constitution;

PLAINTIFFS' SECOND AMENDED COMPLAINT    45
Case No.: 4-09-cv-05796-CW

AGO 001218

c.  Issue injunctive relief ordering defendants to present a plan to the Court within 30 days of the issuance of the Court's order providing for:

 i.  the release from the SHU of those prisoners who have spent more than 10 years in the SHU;

 ii.  alleviation of the conditions of confinement of prisoners in the SHU so that prisoners no longer are incarcerated under conditions of isolation, sensory deprivation, lack of social and physical human contact, and environmental deprivation;

 iii.  meaningful review of the continued need for confinement in a SHU of all prisoners currently housed in the SHU within six months of the date of the Court's order; and

 iv.  meaningful review of SHU confinement for prisoners housed in the SHU in the future;

d.  Award plaintiffs the costs of this suit and reasonable attorneys' fees and litigation expenses pursuant to 42 U.S.C. § 1988, and other applicable law;

e.  Retain jurisdiction of this case until defendants have fully complied with the orders of this Court; and

f.  Award such other and further relief as the Court deems just and proper.

Dated: May 15, 2012                    Respectfully submitted,

 /s/ Jules Lobel

 JULES LOBEL (*pro hac vice*)
 ALEXIS AGATHOCLEOUS (*pro hac vice*)
 RACHEL MEEROPOL (*pro hac vice*)
 CENTER FOR CONSTITUTIONAL RIGHTS
 666 Broadway, 7th Floor
 New York, New York 10012

PLAINTIFFS' SECOND AMENDED COMPLAINT          46
Case No.: 4-09-cv-05796-CW

AGO 001219

Tel: 212.614.6478
Fax: 212.614.6499
Email: jll4@pitt.edu

CHARLES F.A. CARBONE (SBN 206536)
EVAN CHARLES GREENBERG (SBN 271356)
LAW OFFICE OF CHARLES CARBONE
P.O. Box 2809
San Francisco, California 94126
Tel: 415.981.9773
Fax: 415.981.9774
Email: charles@charlescarbone.com,
evan@charlescarbone.com

MARILYN S. MCMAHON (SBN 270059)
CALIFORNIA PRISON FOCUS
1904 Franklin Street, Suite 507
Oakland, California 94612
Tel: 510.734.3600
Fax: 510.836.7222
Email: marilyn@prisons.org

ANNE BUTTERFIELD WEILLS (SBN 139845)
SIEGEL & YEE
499 14th Street, Suite 300
Oakland, California 94612
Tel: 510.839.1200
Fax: 510.444.6698
Email: aweills@aol.com

CAROL STRICKMAN (SBN 78341)
LEGAL SERVICES FOR PRISONERS WITH CHILDREN
1540 Market Street, Suite 490
San Francisco, California 94102
Tel: 415.255.7036
Fax: 415.552.3150
Email: carol@prisonerswithchildren.org

*Attorneys for Plaintiffs*

AGO 001220

# EXHIBIT 11

**TO DEFENDANTS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT**

**AGO 001221**

Case: 22-16162, 09/19/2023, ID: 12795412, DktEntry: 32-7, Page 163 of 194

Case 2:18-cv-06359-WHA Document 41-12 Filed 11/10/21 Page 163 of 190
Case 4:09-cv-05796-CW Document 424-2 Filed 09/01/15 Page 2 of 25

KAMALA D. HARRIS
Attorney General of California
JAY C. RUSSELL
Supervising Deputy Attorney General
ADRIANO HRVATIN
Deputy Attorney General
State Bar No. 220909
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA 94102-7004
 Telephone: (415) 703-1672
 Fax: (415) 703-5843
 E-mail: Adriano.Hrvatin@doj.ca.gov
*Attorneys for Defendants*

JULES LOBEL (*pro hac vice*)
ALEXIS AGATHOCLEOUS (*pro hac vice*)
RACHEL MEEROPOL (*pro hac vice*)
SAMUEL MILLER, State Bar No. 138942
CENTER FOR CONSTITUTIONAL RIGHTS
 666 Broadway, 7th Floor
 New York, NY 10012
 Telephone: 212.614.6432
 Facsimile: 212.614.6499
 E-mail: jll4@pitt.edu
*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

|  |  |
|---|---|
| **TODD ASHKER, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**GOVERNOR OF THE STATE OF CALIFORNIA, et al.,**<br><br>Defendants. | C 09-05796 CW<br><br>**SETTLEMENT AGREEMENT** |

The parties enter into this Settlement Agreement (the Agreement) to address and settle Plaintiffs' claims for declaratory and injunctive relief regarding the policies and practices of the California Department of Corrections and Rehabilitation (CDCR) for placing, housing, managing, and retaining inmates validated as prison gang members and associates, as well as the conditions of confinement in the Security Housing Unit (SHU) at Pelican Bay State Prison and other CDCR SHU facilities.

## I. BACKGROUND AND PROCEDURAL POSTURE

1. Plaintiffs in this matter are inmates Todd Ashker, Ronnie Dewberry, Luis Esquivel, George Franco, Jeffrey Franklin, Richard Johnson, Paul Redd, Gabriel Reyes, George Ruiz, and Danny Troxell (Plaintiffs).

AGO 001222

2.      Defendants are the Governor of the State of California, CDCR's Secretary, Pelican Bay's Warden, and the Chief of CDCR's Office of Correctional Safety, each of whom is sued in his official capacity (Defendants).

3.      This action was originally filed on December 9, 2009, as an individual pro se civil-rights suit by Plaintiffs Todd Ashker and Danny Troxell.  A First Amended Complaint was filed on May 21, 2010.  On September 10, 2012, Plaintiffs, having retained counsel, filed a Second Amended Complaint, which added class allegations and eight additional Plaintiffs.  The Second Amended Complaint alleges that CDCR's gang management regulations and practices violate the Due Process Clause of the Fourteenth Amendment and that the conditions of confinement in Pelican Bay's SHU constitute cruel and unusual punishment in violation of the Eighth Amendment.  The Second Amended Complaint seeks declaratory and injunctive relief to address the alleged constitutional violations.

4.      Defendants filed a motion to dismiss the Second Amended Complaint, which the Court denied on April 9, 2013.  (ECF No. 191.)  On April 30, 2013, Defendants answered the Second Amended Complaint.  (ECF No. 194.)

5.      Plaintiffs filed a motion for class certification, which the Court granted in part and denied in part on June 2, 2014.  (ECF No. 317.)  Some Plaintiffs were appointed to represent two classes of inmates certified under Rules 23(b)(1) and (b)(2) of the Federal Rules to include:  (i) all inmates assigned to an indeterminate term at Pelican Bay's SHU on the basis of gang validation, under CDCR's policies and procedures, as of September 10, 2012; and (ii) all inmates who are now, or will be in the future, assigned to Pelican Bay's SHU for ten or more continuous years.  (*See*, *e.g.*, ECF No. 317 at 11, 14, 21; ECF No. 387 at 13-17.)

6.      On October 18, 2012, CDCR implemented its Security Threat Group (STG) program as a pilot program which modified the criteria for placement into the SHU and initiated a Step Down Program designed to afford validated inmates a way to transfer from the SHU to a general population setting within three or four years.  On October 17, 2014, and upon expiration of the pilot, CDCR's STG regulations were approved and adopted in Title 15.

2

AGO 001223

Case: 22-16162, 09/19/2023, ID: 12795412, DktEntry: 32-7, Page 165 of 194

Case 3:12-cv-06350-WHA Document 64-12 Filed 05/10/21 Page 4 of 25
Case 4:09-cv-05796-CW Document 424-2 Filed 09/01/15 Page 4 of 190

1      7.    Plaintiffs filed a motion for leave to file a Supplemental Complaint, which the Court

2 granted on March 9, 2015. (ECF No. 387.) On March 11, 2015, Plaintiffs filed their

3 Supplemental Complaint. (ECF No. 388.) The Supplemental Complaint alleges an additional

4 Eighth Amendment claim on behalf of a putative class of gang-validated inmates transferred to

5 another CDCR SHU facility under CDCR's Step Down Program, after having been housed in

6 Pelican Bay's SHU for ten or more years. Plaintiffs Dewberry, Franklin, Ruiz, and Troxell are

7 the putative class representatives of this supplemental Eighth Amendment claim. Plaintiffs

8 transferred from Pelican Bay's SHU also pursue relief on an individual basis. Plaintiffs contend

9 that the alleged constitutional violation that inmates suffered because of their confinement in

10 Pelican Bay's SHU for ten or more continuous years does not end notwithstanding their transfer

11 from Pelican Bay to another facility under the Step Down Program. The Court stayed the

12 litigation of this additional Eighth Amendment claim until resolution of the Eighth Amendment

13 claim alleged in Plaintiffs' Second Amended Complaint. (ECF Nos. 387, 393.)

14      8.    Apart from a 45-day litigation stay in early 2014 to discuss settlement, the parties

15 engaged in extensive discovery for over three years. Fact discovery closed on November 28,

16 2014. The parties responded to hundreds of written discovery requests, produced hundreds of

17 thousands of pages of documents, and completed approximately thirty depositions of current and

18 former prison officials and inmates. Expert discovery closed on May 29, 2015. Plaintiffs

19 disclosed ten experts, Defendants disclosed seven, and the parties collectively completed a dozen

20 expert depositions. The parties produced over 45,000 pages of documents in response to

21 subpoenas directed to their respective experts.

22      9.    The parties have conducted extensive negotiations over several months to resolve

23 Plaintiffs' demands that CDCR revise its gang management and SHU policies and practices.

24 Those negotiations have been undertaken at arm's length and in good faith between Plaintiffs'

25 counsel and high-ranking state officials and their counsel. The parties have reached agreement on

26 statewide policies and practices to settle Plaintiffs' claims for declaratory and injunctive relief,

27 and, for settlement purposes only, agree that this Agreement meets the requirements of 18 U.S.C.

28 § 3626(a)(1).

AGO 001224

Case: 22-16162, 09/19/2023, ID: 12795412, DktEntry: 32-7, Page 166 of 194

Case 2:12-cv-06357-WHR Document 61242 Filed 11/10/21 Page 165 of 25
Case 4:09-cv-05796-CW Document 424-2 Filed 09/01/15 Page 5 of 190

10.     The parties agree that the putative supplemental class asserted in Plaintiffs'
Supplemental Complaint—namely, all prisoners who have now, or will have in the future, been
imprisoned in Pelican Bay's SHU for longer than 10 continuous years and then transferred from
Pelican Bay's SHU to another SHU in California in connection with CDCR's Step Down
Program—may be certified as a class for settlement purposes under Rule 23(b)(2) of the Federal
Rules of Civil Procedure.  The parties agree that, after notice and an opportunity to object is
provided to members of the two classes previously certified by the Court as well as members of
the supplemental settlement class, the Court may enter an order finding this Agreement to be fair
and reasonable to all class members.

11.     All parties and their counsel recognize that, in the absence of an approved settlement,
they face lengthy and substantial litigation, including trial and potential appellate proceedings, all
of which will consume time and resources and present the parties with ongoing litigation risks
and uncertainties.  The parties wish to avoid these risks, uncertainties, and consumption of time
and resources through a settlement under the terms and conditions of this Agreement.

ACCORDINGLY, without any admission or concession by Defendants of any current and
ongoing violations of a federal right, all claims for declaratory and injunctive relief asserted in the
Second Amended Complaint and Supplemental Complaint shall be finally and fully settled and
released, subject to the terms and conditions of this Agreement, which the parties enter into freely,
voluntarily, knowingly, and with the advice of counsel.

## II.     JURISDICTION AND VENUE

12.     The Court has jurisdiction of this matter under 28 U.S.C. §§ 1331 and 1343.  Venue is
proper under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiffs'
claims occurred in the Northern District of California.

## III.    TERMS AND CONDITIONS

### A.    NEW CRITERIA FOR PLACEMENT IN SHU, ADMINISTRATIVE SEGREGATION, OR THE STEP DOWN PROGRAM.

13.     CDCR shall not place inmates into a SHU, Administrative Segregation, or Step Down
Program solely on the basis of their validation status.

4

AGO 001225

14. CDCR shall amend the SHU Assessment Chart located in Title 15 of the California Code of Regulations, section 3341.5, subsection (c)(9). The SHU Assessment Chart shall be amended as set forth in Attachment B.

15. Under the revised Step Down Program policy, STG-I inmates, as defined in Title 15 of the California Code of Regulations, section 3000, will be transferred into the Step Down Program if they have been found guilty in a disciplinary hearing of committing, with a proven nexus to an STG, a SHU-eligible offense, as listed in the SHU Assessment Chart.

16. STG-II inmates, as defined in Title 15 of the California Code of Regulations, section 3000, will be transferred into the Step Down Program if they have been found guilty in a disciplinary hearing of committing, with a proven nexus to a STG, two SHU-eligible offenses within a four year period, as listed in the SHU Assessment Chart.

17. Any STG-I or STG-II inmate shall be transferred into the Step Down Program as described in Paragraphs 15 and 16, upon the completion of the determinate, disciplinary SHU term imposed by the Institution Classification Committee for that offense. All time spent in the SHU following completion of the determinate SHU term prior to actual transfer into the Step Down Program shall be credited as part of the inmate's Step Down Program time. The Institution Classification Committee shall continue to have the authority to impose, commute, or suspend any part of the determinate SHU term, as provided in regulations.

**B.** **MODIFICATIONS TO THE STEP DOWN PROGRAM.**

18. CDCR shall modify its Step Down Program so that it is based on the individual accountability of each inmate for proven STG behavior, and not solely on the inmate's validation status or level of STG affiliation.

19. The revised Step Down Program shall be 24 months in duration and consist of 4 program steps that take place within a SHU. Except as provided in Paragraphs 22 and 23, each step will be 6 months in duration. Step 5 of the existing Step Down Program shall be eliminated. Upon successful completion of the Step Down Program, the inmate shall be transferred to a General Population prison commensurate with his specific case factors and in accordance with existing regulations.

AGO 001226

Case: 22-16162, 09/19/2023, ID: 12795412, DktEntry: 32-7, Page 168 of 194

Case 3:18-cv-06357-WHA Document 61-12 Filed 11/10/21 Page 167 of 190
Case 4:09-cv-05796-CW Document 424-2 Filed 09/01/15 Page 7 of 25

20.    Each Step within the Step Down Program shall provide incremental increases in privileges and freedom of movement commensurate with program placement as set forth in Attachment A.

21.    The Step Down Program incorporates rehabilitative programming consisting of both required and elective components.  Within 90 days of the Court's preliminary approval of this Agreement, CDCR will afford Plaintiffs' counsel and four inmate representatives identified by Plaintiffs an opportunity to meet with CDCR officials to discuss the nature, content and substance of the mandatory and elective programming.  It is CDCR's intent to provide programming with clear requirements and outcomes to provide an alternative path away from STG behavior and promote critical life skills.  CDCR shall convene a panel of experts, of CDCR's choosing, to evaluate the Step Down Program curriculum and to make recommendations in keeping with this intent.  CDCR will provide Plaintiffs' counsel with a copy of the panel of experts' recommendations.  Plaintiffs' counsel and the four inmate representatives will have the opportunity to meet with Defendants regarding recommended components; however, CDCR retains its discretion to implement the mandatory programming of its choosing for this population.

22.    Participation in the Step Down Program is mandatory for any inmate placed into the program.  An inmate's refusal to participate in or complete the required programming in the Step Down Program shall not result in regression or retention in the program, but shall be addressed as follows:  At the 180-day review performed by the Institution Classification Committee at the end of Step 3, if the Committee determines that the inmate refused to participate in or has not completed all components of the Step Down Program, the Committee shall retain the non-participating inmate in Step 3 for an additional 6 months.  If, at the end of that additional 6-month period, the inmate continues to refuse or does not complete all Step Down Program components, the Institution Classification Committee shall remove the inmate from the program and transfer him to a Restricted Custody General Population (RCGP) facility.  That inmate shall be assigned to the Step 3 privilege group, however the Institution Classification Committee may later reassign the inmate to the Step 4 privilege group based on his progression through the commensurate Step Down Program components remaining to be completed.  If the inmate elects to complete the Step

6

AGO 001227

1    Down Program requirements, he shall do so within the RCGP and shall not be returned to the

2    SHU to complete the program, unless he is found guilty in a disciplinary hearing of a new SHU-

3    eligible offense.  If the inmate completes the Step Down Program components and, while in the

4    RCGP, is not found guilty of either one serious STG-related or two administrative STG-related

5    rules violations as listed in the STG Disciplinary Matrix, during the 180-day review period, he

6    will then be released to the General Population.  (*See* Attachment C.)  The Institution

7    Classification Committee shall conduct reviews no less than every 180-days to determine whether

8    the inmate has completed the Step Down Program and is eligible for release to the General

9    Population.  Non-participation or lack of completion that is due to the unavailability or

10   inaccessibility of programming components necessary for Step Down Program compliance shall

11   not impede an inmate's progress to the next step and shall not be considered as a factor in an

12   inmate's regression or retention in any step.  CDCR shall provide an opportunity for each inmate

13   to complete Step Down Program programming for each step within 6 months.  All time spent

14   awaiting transfer to another step shall be credited to the completion of the next step.

15        23.    The Step Down Program is intended to be a rehabilitative, gang behavior diversion

16   program for STG affiliated inmates.  As such, inmates within the program are expected to remain

17   disciplinary-free.  Misconduct shall be addressed in accordance with existing disciplinary rules

18   and regulations.  The commission of repeated STG violations while in the Step Down Program

19   shall not result in regression or retention in the program, but shall be addressed as follows:  If an

20   inmate has committed either 3 serious STG rules violations or 5 administrative STG rules

21   violations as listed in the STG Disciplinary Matrix while in the Step Down Program, he shall be

22   transferred to the RCGP facility.  The Institution Classification Committee shall review the

23   inmate's disciplinary history and make this determination during the 180-day reviews performed

24   at the end of Steps 3 and 4.  If, during the Step 3 review, the inmate is guilty of committing 3

25   serious STG rules violations or 5 administrative STG rules violations while in the Step Down

26   Program, the Committee shall retain the inmate in Step 3 for an additional 6 months.  At the end

27   of that additional 6-month period, the Committee shall remove the inmate from the program and

28   transfer him to the RCGP.  An inmate transferred to the RCGP pursuant to this Paragraph shall be

AGO 001228

Case: 22-16162, 09/19/2023, ID: 12795412, DktEntry: 32-7, Page 170 of 194

Case 2:18-cv-06350-WHA Document 1-12 Filed 11/01/15 Page 9 of 25
Case 4:09-cv-05796-CW Document 424-2 Filed 05/01/15 Page 9 of 190

1  assigned to the Step 3 privilege group.  The inmate can appeal the decision to transfer him to the

2  RCGP to the Departmental Review Board, which would review the inmate's disciplinary history

3  and determine whether removal from the program and transfer to the RCGP is appropriate; a

4  hearing before the Board is not required for a determination of such an appeal.  Consistent with

5  Paragraph 22, if the inmate completes the Step Down Program components and, while housed in

6  the RCGP, is not found guilty of either one serious STG-related or two administrative STG-

7  related rules violations as listed in the STG Disciplinary Matrix during the RCGP 180-day review

8  period, he will then be released to the General Population.  The Institution Classification

9  Committee shall conduct reviews no less than every 180-days to determine whether the inmate

10  has completed the Step Down Program and is eligible for release to the General Population.

11      24.    If an inmate is found guilty of committing a SHU-eligible offense while assigned to

12  the Step Down Program or RCGP, he shall complete the intervening determinate, disciplinary

13  SHU term as imposed by the Institution Classification Committee for that offense before

14  returning to the Step Down Program or RCGP.  If such SHU-eligible offense has a proven nexus

15  to an STG as described in Paragraphs 15 and 16, upon completion of the determinate term

16  imposed by the Committee, the inmate shall be returned to the Step Down Program at Step 1 or

17  another step as determined by the Committee.

18      **C.    REVIEW OF STG-VALIDATED INMATES CURRENTLY IN SHU.**

19      25.    Within twelve months of the Court's preliminary approval of this Agreement, CDCR

20  shall review the cases of all validated inmates who are currently in the SHU as a result of either

21  an indeterminate term that was previously assessed under prior regulations or who are currently

22  assigned to Steps 1 through 4, or who were assigned to Step 5 but are retained within the SHU.

23  These reviews shall be conducted by Institution Classification Committees and prioritized by the

24  inmates' length of continuous housing within a SHU so that those of the longest duration are

25  reviewed first.  If an inmate has not been found guilty of a SHU-eligible rule violation with a

26  proven STG nexus within the last 24 months, he shall be released from the SHU and transferred

27  to a General Population level IV 180-design facility, or other general population institution

28  consistent with his case factors.  An inmate who has committed a SHU-eligible rule violation

1   with an STG nexus within the last 24 months shall be placed into the Step Down Program based

2   on the date of the most recent STG-related rule violation, as follows:  Step 1:  violation occurred

3   within the last 6 months; Step 2:  violation occurred within the last 6-12 months; Step 3:

4   violation occurred within the last 12-18 months; Step 4:  violation occurred within the last 18-24

5   months.  Inmates currently assigned to Step 5 in the General Population shall remain in the

6   General Population and shall no longer be considered current Step Down Program participants.

7       26.    During the review described in Paragraph 25, any inmate housed in a SHU program

8   for 10 or more continuous years who has committed a SHU-eligible offense with a nexus to an

9   STG within the preceding 2 years, will be transferred into the RCGP for completion of Step

10  Down Program requirements.  Inmates subject to this provision who are currently serving a

11  disciplinary SHU term will be allowed to complete the SHU term in the RCGP prior to beginning

12  the Step Down Program, unless the Institution Classification Committee determines by a

13  preponderance of the evidence that to do so would pose an unreasonable risk to individual or

14  institutional safety and security.  This function of the RCGP shall be implemented as a pilot

15  program.  If the inmate completes the Step Down program requirements, he will be transferred to

16  a General Population prison setting in accordance with his case factors.  One hundred twenty days

17  after completion of the reviews described in Paragraph 25, CDCR will produce a report on the

18  functioning of this pilot program and shall inform plaintiffs' counsel whether it intends to make

19  permanent, modify, or terminate this RCGP function.  Within 30 days of receiving the notice

20  from CDCR, the parties shall meet and confer regarding any proposed changes to the RCGP pilot

21  program.  If CDCR decides to terminate the RCGP pilot program, inmates housed in the RCGP

22  pursuant to this Paragraph will, in the absence of pending disciplinary charges of a new SHU-

23  eligible offense requiring segregation, either remain in the RCGP until they transition into

24  General Population or will be transferred to non-segregated housing.

25      27.    For those STG inmates considered for release to the General Population either

26  following Step Down Program completion or pursuant to the review described in Paragraph 25,

27  and against whom there is a substantial threat to their personal safety should they be released to

28  the General Population as determined by a preponderance of the evidence, the Departmental

9

AGO 001230

1  Review Board retains the discretion, in accordance with existing authority, to house that inmate in

2  alternate appropriate non SHU, non-Administrative segregation housing commensurate with his

3  case factors, such as a Sensitive Needs Yard or RCGP, until such time that the inmate can safely

4  be housed in a general population environment.  The Departmental Review Board shall articulate

5  the substantial justification for the need for alternative placement.  If the Institution Classification

6  Committee refers a case to the Departmental Review Board pursuant to this Paragraph, the

7  Departmental Review Board shall prioritize these case reviews and expeditiously conduct the

8  hearing and render its placement decision.  Thereafter, during their regular 180-day reviews, the

9  Institution Classification Committee shall verify whether there continues to be a demonstrated

10  threat to the inmate's personal safety; and if such threat no longer exists the case shall be referred

11  to the Departmental Review Board for review of housing placement as soon as practicable.  For

12  Departmental Review Board hearings held pursuant to this Paragraph, a staff assistant shall be

13  provided to help inmates prepare and present their case due to the fact that the complexity of these

14  types of cases makes assistance necessary.  If Plaintiffs' counsel contends that CDCR has abused

15  its discretion in making housing decisions under this Paragraph, that concern may be raised with

16  Magistrate Judge Nandor J. Vadas in accordance with the dispute resolution and enforcement

17  procedures set forth in Paragraphs 52 and 53 below to determine whether CDCR has articulated

18  substantial justification by a preponderance of the evidence for alternative placement.

19       **D.**     **THE RESTRICTIVE CUSTODY GENERAL POPULATION HOUSING UNIT.**

20       28.     The RCGP is a Level IV 180-design facility commensurate with similarly designed

21  high security general population facilities.  Inmates shall be transferred to the RCGP if they have

22  refused to complete Step Down Program components as described in Paragraph 22; if they have

23  been found guilty of repeated STG violations while in the Step Down Program as described in

24  Paragraph 23; if identified safety concerns prevent their release to General Population and the

25  RCGP is deemed to be appropriate as described in Paragraph 27; or if they meet the eligibility for

26  placement in the RCGP under the pilot program described in Paragraph 26.  Programming for

27  those inmates transferred to or retained in the RCGP will be designed to provide increased

28  opportunities for positive social interaction with other prisoners and staff, including but not

1  limited to:  Alternative Education Program and/or small group education opportunities; yard/out

2  of cell time commensurate with Level IV GP in small group yards, in groups as determined by the

3  Institution Classification Committee; access to religious services; support services job

4  assignments for eligible inmates as they become available; and leisure time activity groups.

5  Contact visiting shall be limited to immediate family and visitors who have been pre-approved in

6  accordance with existing Title 15 visiting regulations, and shall occur on the schedule set forth in

7  Attachment A.  Other privileges provided in the RCGP are also set forth in Attachment A.  CDCR

8  policy is that inmate movement, programming, and contact visits within the RCGP shall not

9  require the application of mechanical restraints; any application of restraints shall be in

10 accordance with existing Title 15, section 3268.2.  CDCR will provide Plaintiffs' counsel with the

11 opportunity to tour the proposed RCGP facility and to meet and confer with Defendants regarding

12 the functioning and conditions of the RCGP, prior to its implementation.

13      **E.    ADMINISTRATIVE SHU STATUS.**

14      29.    An inmate may be retained in the SHU and placed on Administrative SHU status after

15 serving a determinate SHU sentence if it has been determined by the Departmental Review Board

16 that the inmate's case factors are such that overwhelming evidence exists supporting an

17 immediate threat to the security of the institution or the safety of others, and substantial

18 justification has been articulated of the need for SHU placement.  Inmates may also be placed on

19 Administrative SHU status if they have a substantial disciplinary history consisting of no less

20 than three SHU terms within the past five years and the Departmental Review Board articulates a

21 substantial justification for the need for continued SHU placement due to the inmate's ongoing

22 threat to safety and security of the institution and/or others, and that the inmate cannot be housed

23 in a less restrictive environment.  Inmates currently serving an Administrative SHU term may

24 continue to be retained in the SHU based on the criteria set forth in this Paragraph.  The

25 Institution Classification Committee shall conduct classification reviews every 180 days in

26 accordance with Title 15, section 3341.5.  The Departmental Review Board shall annually assess

27 the inmate's case factors and disciplinary behavior and shall articulate the basis for the need to

28 continue to retain the inmate on Administrative SHU status.  The inmate's privilege group shall

11

AGO 001232

Case: 22-16162, 09/19/2023, ID: 12795412, DktEntry: 32-7, Page 174 of 194

Case 3:18-cv-06359-WHA Document 42-2 Filed 01/10/21 Page 173 of 190
Case 4:09-cv-05796-CW Document 42-2 Filed 09/01/15 Page 13 of 190

1   be set in a range similar to S-1 to S-5, which can be modified by the Institution Classification

2   Committee during the inmate's classification review, if deemed appropriate. CDCR shall provide

3   inmates placed on Administrative SHU status with enhanced out of cell recreation and

4   programming of a combined total of 20 hours per week. It is CDCR's expectation that a small

5   number of inmates will be retained in the SHU pursuant to this Paragraph. If Plaintiffs' counsel

6   contends that CDCR has abused its discretion in making a housing decision under this Paragraph,

7   that concern may be raised with Magistrate Judge Vadas in accordance with the dispute resolution

8   and enforcement procedures set forth in Paragraphs 52 and 53 below to determine whether the

9   Defendants' decision meets the evidentiary standards and criteria set forth in this Paragraph.

10      30.     The initial decision to place an inmate on Administrative SHU status, as described in

11  Paragraph 29, can only be made by the Departmental Review Board.

12      31.     At each 180-day review, institutional staff shall identify all efforts made to work with

13  each inmate on Administrative SHU status to move the inmate to a less restrictive environment as

14  soon as case factors would allow.

15      **F.      HOUSING ASSIGNMENT TO PELICAN BAY'S SHU.**

16      32.     Notwithstanding Paragraph 29 above, CDCR shall not house any inmate within the

17  SHU at Pelican Bay State Prison for more than 5 continuous years. Inmates housed in the Pelican

18  Bay SHU requiring continued SHU placement beyond this limitation will be transferred from the

19  Pelican Bay SHU to another SHU facility within CDCR, or to a 180-design facility at Pelican Bay.

20  Inmates who have previously been housed in the Pelican Bay SHU for 5 continuous years can

21  only be returned to the Pelican Bay SHU if that return has been specifically approved by the

22  Departmental Review Board and at least 5 years have passed since the inmate was last transferred

23  out of the Pelican Bay SHU.

24      33.     Notwithstanding Paragraph 32 above, inmates may request in writing that they be

25  housed in the Pelican Bay SHU in lieu of another SHU location, but such a request must be

26  reviewed and approved by the Departmental Review Board. An inmate's request to remain

27  housed in the Pelican Bay SHU shall be reviewed and documented by the Institution

28  Classification Committee at each scheduled Committee hearing.

AGO 001233

**G.    CONFIDENTIAL INFORMATION.**

34.    CDCR shall adhere to the standards for the consideration of and reliance on confidential information set forth in Title 15 of the California Code of Regulations, section 3321. To ensure that the confidential information used against inmates is accurate, CDCR shall develop and implement appropriate training for impacted staff members who make administrative determinations based on confidential information as part of their assigned duties, consistent with the general training provisions set forth in Paragraph 35. The training shall include procedures and requirements regarding the disclosure of information to inmates.

**H.    TRAINING.**

35.    CDCR shall adequately train all staff responsible for implementing and managing the policies and procedures set forth in this Agreement. Plaintiffs' counsel shall be provided an advanced copy of all such training materials with sufficient time to meet and confer with Defendants, prior to the implementation of the trainings. Plaintiffs are entitled to have an attorney attend training sessions on these modifications, no greater than 6 times per year.

**I.    NEW REGULATIONS.**

36.    CDCR shall promulgate regulations, policies and procedures governing the STG management and Step Down Program as set forth in this agreement. The pilot program described in Paragraph 26 will not be required to be promulgated in regulations, unless the pilot program is made permanent.

**J.    DATA AND DOCUMENTS.**

37.    For a period of twenty-four months following the Court's preliminary approval of this Agreement, CDCR will provide Plaintiffs' counsel data and documentation to be agreed upon, under the protective order in place in this matter, to monitor Defendants' compliance with the terms of this Agreement. No later than thirty days after the Court's preliminary approval of this Agreement, and again twelve months after the Court's preliminary approval, the parties shall meet and confer to determine the details of the data and documentation to be produced. That agreement and any disputes regarding data and document production, including modification of the agreement, shall be submitted to Magistrate Judge Vadas in accordance with the dispute

13

AGO 001234

resolution and enforcement procedures set forth in Paragraphs 52 and 53 below. In addition, Magistrate Judge Vadas can request and order the production of any documentation or data he deems material to compliance with this Agreement or the resolution of any dispute contemplated by the terms of the Agreement. The parties agree, nevertheless, that data and documentation will include, but not be limited to, the following:

a.    The number of validated STG I and STG II inmates as of the first of the month following preliminary approval. Subsequently, the number of all new STG I and STG II validations shall be provided on a quarterly basis for a period of nine months following the Court's preliminary approval of this Agreement, and shall be provided on a monthly basis thereafter until the termination of this case;

b.    A list of the names of all inmates serving a SHU term for a SHU-eligible offense with a nexus to an STG as of the first of the month following preliminary approval. Subsequently, the names of all new inmates serving a SHU term for a SHU-eligible offense with a nexus to an STG shall be provided on a monthly basis;

c.    A list of the names of all inmates reviewed pursuant to Paragraph 25 and the outcome of those placement reviews on a quarterly basis;

d.    A list of the names of all inmates in each of the following programs: Step Down Program, RCGP, and placed on Administrative SHU status. This document shall be provided on a quarterly basis;

e.    The total number of Rules Violation Reports issued to inmates in each of the following programs: RCGP, Step Down Program, and Administrative SHU status. This data shall be provided on a semi-annual basis;

f.    The total number of Rules Violation Reports issued for assaults and batteries on staff and other inmates, riots, weapon possession, attempted murder, and murder committed by inmates in each of the following programs: RCGP, Step Down Program, and Administrative SHU status. This data shall be provided on a semi-annual basis;

g.    A list of the names of inmates who have not been progressed to the next successive step in the Step Down Program during their 180-day Institution Classification

AGO 001235

Case: 22-16162, 09/19/2023, ID: 12795412, DktEntry: 32-7, Page 177 of 194

Case 3:18-cv-06859-WHA Document 6242 Filed 09/09/15 Page 176 of 190
Case 4:09-cv-05796-CW Document 424-2 Filed 09/09/15 Page 176 of 190

1   Committee review, and a list of the names of inmates who have been retained in the RCGP during

2   their 180-day Institution Classification Committee review; these lists shall be provided on a semi-

3   annual basis;

4         h.     The following documents shall be produced on a quarterly basis regarding all

5   inmates found guilty of a SHU-eligible offense with a nexus to an STG:  (i) STG Unit

6   Classification Committee validation determinations; and (ii) the decision of the hearing officer to

7   find the inmate guilty of a SHU-eligible offense.  Defendants also shall produce on a quarterly

8   basis a randomly chosen representative sample of the documents relied upon for the validation

9   determinations and RVR decisions for these inmates, including redacted confidential information.

10  The number of representative samples shall be sufficient to demonstrate CDCR's practice and

11  procedure, but shall be reasonable in amount such that compliance with this request is not overly

12  burdensome;

13        i.     Institution Classification Committee chronos documenting the decision to place

14  an inmate into the RCGP, on a quarterly basis;

15        j.     All Departmental Review Board classification chronos in which the decision is

16  made to house an inmate in alternate placement, pursuant to Paragraph 27, due to a substantial

17  threat to their personal safety.  Should Plaintiffs' counsel dispute the determination made, or

18  require more information to determine whether a dispute may exist, Plaintiffs may request and

19  will receive a redacted copy of the documents relied upon by the Departmental Review Board;

20        k.     All Departmental Review Board classification chronos in which an inmate is

21  placed on Administrative SHU status, pursuant to Paragraph 29; all non-confidential documents

22  relied upon for that placement determination; and, on a quarterly basis, a random representative

23  sample of redacted confidential documents relied upon;

24        l.     All Institution Classification Committee chronos reflecting the committee's

25  decision to not progress an inmate to the next successive step in the Step Down Program, or to

26  retain an inmate in the RCGP; this document shall be provided on a quarterly basis;

27

28

15

AGO 001236

Case: 22-16162, 09/19/2023, ID: 12795412, DktEntry: 32-7, Page 178 of 194

Case 3:18-cv-06539-WHA Document 61-2 Filed 11/01/21 Page 177 of 190
Case 4:09-cv-05796-CW Document 42-2 Filed 09/09/15 Page 177 of 190

m.      For all inmates placed on Administrative SHU status, all 180-day Institution Classification Committee review chronos, and all annual Departmental Review Board review classification chronos;

n.      A random, representative sample of Rules Violation Reports relied upon to deny an inmate progression through the Step Down Program, including redacted confidential sections, on a quarterly basis.

38.    Any and all confidential information provided shall be produced in redacted form where necessary, be designated as "Attorneys' Eyes Only" as defined in the protective order in this case, and shall be subject to the protective order.  CDCR shall provide Magistrate Judge Vadas, upon request, unredacted copies for *in camera* review in order to resolve any disputes in accordance with Paragraphs 52 and 53, below.

39.    Representative samples, as discussed in this Paragraph, shall be of sufficient size to allow a determination regarding CDCR's pattern and practice, but shall be reasonable in amount such that compliance with the request is not overly burdensome.  Any disputes regarding data and document production shall be submitted to Magistrate Judge Vadas in accordance with the dispute resolution and enforcement procedures set forth in Paragraphs 52 and 53 below.

**K.      ATTORNEY-CLIENT COMMUNICATIONS.**

40.    Plaintiffs' counsel shall be entitled to meet and speak with all inmates covered by this agreement.  Institutional staff shall facilitate Plaintiffs' counsel's requests for reasonable access to these individuals without undue delay, whether by telephone, mail, or personal visit.  Defendants shall facilitate Plaintiffs' counsel having telephone conference calls with Plaintiff class representatives as a group annually.

**IV.   TERMINATION**

41.    Plaintiffs shall have thirty days after the end of the twenty-four-month period to seek an extension, not to exceed twelve months, of this Agreement and the Court's jurisdiction over this matter by presenting evidence that demonstrates by a preponderance of the evidence that current and ongoing systemic violations of the Eighth Amendment or the Due Process Clause of the Fourteenth Amendment of the United States Constitution exist as alleged in Plaintiffs' Second

16

AGO 001237

1   Amended Complaint or Supplemental Complaint or as a result of CDCR's reforms to its Step

2   Down Program or the SHU policies contemplated by this Agreement. Defendants shall have an

3   opportunity to respond to any such evidence presented to the Court and to present their own

4   evidence. If Plaintiffs do not file a motion to extend court jurisdiction within the period noted

5   above, or if the evidence presented fails to satisfy their burden of proof, this Agreement and the

6   Court's jurisdiction over this matter shall automatically terminate, and the case shall be dismissed.

7       42.     Brief or isolated constitutional violations shall not constitute an ongoing, systemic

8   policy and practice that violate the Constitution, and shall not constitute grounds for continuing

9   this Agreement or the Court's jurisdiction over this matter.

10      43.     If the Court's jurisdiction and this Agreement are extended by Plaintiffs' motion, they

11  shall both automatically terminate at the end of the extension period not to exceed 12 months and

12  the case shall be dismissed unless Plaintiffs make the same showing described in Paragraph 41.

13  Any successive extensions under this Paragraph shall not exceed twelve months in duration, and

14  any extension shall automatically terminate if plaintiffs fail to make the requisite showing

15  described in Paragraph 41.

16      44.     To the extent that this Agreement and the Court's jurisdiction over this matter are

17  extended beyond the initial twenty four-month period, CDCR's obligations and production of any

18  agreed upon data and documentation to Plaintiffs' counsel will be extended for the same period.

19  The role and duties of Magistrate Judge Vadas, as described in Paragraphs 48-50 and 52-53, shall

20  be coextensive with that of the Agreement, and in no event shall those roles and duties extend

21  beyond the termination of the Court's jurisdiction.

22      45.     At any time after the initial twenty-four month period, Defendants and CDCR may

23  seek termination of this case and the Court's jurisdiction under the Prison Litigation Reform Act,

24  18 U.S.C. § 3626(b)(1)(A).

25      46.     If there is a motion contesting Defendants' compliance with the terms of this

26  Agreement pending at the time the case is otherwise to be terminated, the Court will retain limited

27  jurisdiction to resolve the motion.

28

Settlement Agreement (C 09-05796 CW)

**AGO 001238**

**V. RELEASE**

47. It is the intention of the parties in signing this Agreement that upon completion of its terms it shall be effective as a full and final release from all claims for relief asserted in the Second Amended Complaint and the Supplemental Complaint. Nothing in this Agreement will affect the rights of Plaintiffs regarding legal claims that arise after the dismissal of this case.

**VI. DISPUTE RESOLUTION AND ENFORCEMENT**

**A. MAGISTRATE JUDGE NANDOR J. VADAS.**

48. To assist the parties in ensuring compliance with this Agreement, the parties agree that Magistrate Judge Vadas will assume the role and duties as set forth in Paragraphs 48-50 and 52-53. These duties shall commence upon the Court's preliminary approval of this Agreement and shall continue in accordance with Paragraph 43.

49. Following the Court's preliminary approval of this Agreement, Plaintiffs' counsel, CDCR officials, Defendants' counsel, and Magistrate Judge Vadas shall meet on a monthly basis or at other mutually agreed-upon dates to discuss questions and concerns regarding CDCR's compliance with the Agreement. The parties and Magistrate Judge Vadas may determine that such meetings can occur on a less frequent basis, but no less than every three months. No later than one week prior to the meetings contemplated by this Paragraph, Plaintiffs' counsel shall circulate an agenda to Defendants and Magistrate Judge Vadas setting forth the items to be discussed. The meetings described in this Paragraph may be accomplished telephonically or by other means. Defendants shall meet with Plaintiffs' counsel and the four inmate representatives semiannually to discuss progress with implementation of this Agreement. No later than one week prior to these meetings, Defendants shall submit to Magistrate Judge Vadas and Plaintiffs' counsel a compliance report setting forth progress toward implementation.

50. Magistrate Judge Vadas may conduct institutional visits and meet with any inmate subject to or affected by the terms of this Agreement. Magistrate Judge Vadas may submit to the parties and the Court a written compliance and progress review assessing the matters under his purview according to this Agreement after 18 months, irrespective of any other motions or matters under Magistrate Judge Vadas's review. Among the matters addressed shall be a review

18

**AGO 001239**

Case: 22-16162, 09/19/2023, ID: 12795412, DktEntry: 32-7, Page 181 of 194

Case 3:18-cv-06359-WHA Document 60-2 Filed 04/09/21 Page 200 of 190
Case 4:09-cv-05796-CW Document 424-2 Filed 09/09/13 Page 20 of 25

of the conditions and programming in the RCGP and whether they comport with the design and purpose of that unit as provided in this Agreement.

**B. COMPLIANCE.**

51. The parties shall agree on a mechanism by which CDCR shall promptly respond to concerns raised by Plaintiffs' counsel regarding individual class members.

52. If Plaintiffs contend that current and ongoing violations of the Eighth Amendment or the Due Process Clause of the Fourteenth Amendment of the United States Constitution exist on a systemic basis as alleged in the Second Amended Complaint or Supplemental Complaint or as a result of CDCR's reforms to its Step Down Program and SHU policies contemplated by this Agreement, Plaintiffs shall provide Defendants with a brief written description of the basis for that contention and may request that the parties meet and confer to resolve the issue. Defendants shall respond to Plaintiffs' contentions no later than 30 days after receipt of Plaintiffs' written description of the issue. If the parties are unable to resolve the issue informally, Plaintiffs may seek enforcement of the Agreement by seeking an order upon noticed motion before Magistrate Judge Vadas. Plaintiffs must demonstrate by a preponderance of the evidence that CDCR is in material breach of its obligations under this Agreement. Defendants shall have an opportunity to respond to any such evidence presented to Magistrate Judge Vadas and to present their own evidence in opposition to any enforcement motion. If Plaintiffs have demonstrated by a preponderance of the evidence a material noncompliance with these terms, then for the purposes of Plaintiffs' enforcement motion only, the parties agree that Plaintiffs will have also demonstrated a violation of a federal right and that Magistrate Judge Vadas may order enforcement consistent with the requirements of 18 U.S.C. § 3626(a)(1)(A). An order issued by Magistrate Judge Vadas under this Paragraph is subject to review under 28 U.S.C. § 636 (b)(1)(B).

53. If Plaintiffs contend that CDCR has not substantially complied with any other terms of this Agreement that do not amount to current, ongoing, systemic violations as alleged in the Second Amended Complaint or Supplemental Complaint of the Eighth Amendment or the Due Process Clause of the Fourteenth Amendment of the United States Constitution, they may seek enforcement by order of this Court. Plaintiffs shall provide Defendants with a brief written

19

1    description of the basis for that contention and may request that the parties meet and confer to

2    resolve the issue.  Defendants shall respond to Plaintiffs' contentions no later than 30 days after

3    they receive Plaintiffs' written description of the issue.  If the parties are unable to resolve the

4    issue informally, Plaintiffs may seek enforcement of the Agreement by seeking an order upon

5    noticed motion before Magistrate Judge Vadas.  It shall be Plaintiffs' burden in making such a

6    motion to demonstrate by a preponderance of the evidence that Defendants have not substantially

7    complied with the terms of the Agreement.  Defendants shall have an opportunity to respond to

8    any such evidence presented to the Court and to present their own evidence in opposition to

9    Plaintiffs' motion.  If Plaintiffs satisfy their burden of proof by demonstrating substantial

10   noncompliance with the Agreement's terms by a preponderance of the evidence, then Magistrate

11   Judge Vadas may issue an order to achieve substantial compliance with the Agreement's terms.

12   An order issued by Magistrate Judge Vadas under this Paragraph is subject to review under 28

13   U.S.C. § 636(b)(1)(B).

14       **C.    RETALIATION.**

15       54.    Defendants shall not retaliate against any class representative, class member, or other

16   prisoner due to their participation in any aspect of this litigation or the Agreement.  Allegations of

17   retaliation may be made to Magistrate Judge Vadas in accordance with the procedures set forth in

18   Paragraph 53.

19   **VII. ATTORNEYS' FEES AND COSTS**

20       55.    Defendants agree to pay Plaintiffs' counsel attorneys' fees and costs for work

21   reasonably performed on this case, including monitoring CDCR's compliance with this

22   Agreement and enforcing this Agreement, and for work to recover fees and costs, at the hourly

23   rate set forth under the Prison Litigation Reform Act, 42 U.S.C. § 1997e(d).  Plaintiffs preserve

24   all arguments for attorneys' fees and costs without limitation. The Prison Litigation Reform Act

25   applies to all applications for attorneys' fees in this case.  Plaintiffs shall have sixty days from the

26   entry of a final order approving this Agreement to file their motion for attorneys' fees and costs

27   for work reasonably performed before that date.  Subject to the provisions under 42 U.S.C. §§

28   1988 and 1997e, Plaintiffs' motion may request an award that includes their expert fees.  On a

20

AGO 001241

Case: 22-16162, 09/19/2023, ID: 12795412, DktEntry: 32-7, Page 183 of 194
Case 3:18-cv-06525-WHA Document 60-12 Filed 11/00/24 Page 182 of 190
Case 4:09-cv-05796-CW Document 42-2 Filed 09/09/15 Page 23 of 15

1  quarterly basis, Plaintiffs may file motions for reasonable attorneys' fees accrued in monitoring

2  and enforcing CDCR's compliance with this Agreement.

3      56.    The notice to the class members shall explain that Plaintiffs will file a motion for

4  attorneys' fees following entry of a final order approving the Agreement.

5  **VIII.   JOINT MOTION AND STAY OF PROCEEDINGS**

6      57.    The parties will jointly request that the Court preliminarily approve this Agreement,

7  conditionally certify a settlement class, require that notice of the proposed settlement be sent to

8  the classes, provide for an objection period, and schedule a fairness hearing.  Prior to or

9  concurrent with the joint motion for preliminary approval, the parties will jointly request that the

10  Court stay all other proceedings in this case pending resolution of the fairness hearing.  Following

11  the close of the objection period, the parties will jointly request that the Court enter a final order

12  approving this Agreement, retaining jurisdiction to enforce it, and continuing the stay of the case

13  pending the completion of the Agreement's terms.

14      58.    If this Agreement is not approved by the Court, the parties shall be restored to their

15  respective positions in the action as of the date on which this Agreement was executed by the

16  parties, the terms and provisions of this Agreement shall have no force and effect, and shall not be

17  used in this action or in any proceeding for any purpose, and the litigation of this action would

18  resume as if there had been no settlement.

19  **IX.   CONSTRUCTION OF AGREEMENT**

20      59.    This Agreement reflects the entire agreement of the parties and supersedes any prior

21  written or oral agreements between them.  Any modification to the terms of this Agreement must

22  be in writing and signed by a CDCR representative and attorneys for Plaintiffs and Defendants to

23  be effective or enforceable.

24      60.    This Agreement shall be governed and construed according to California law.

25      61.    The parties waive any common-law or statutory rule of construction that ambiguity

26  should be construed against the drafter of this Agreement, and agree that the language in all parts

27  of this Agreement shall in all cases be construed as a whole, according to its fair meaning.

28

Settlement Agreement (C 09-05796 CW)

AGO 001242

Case: 22-16162, 09/19/2023, ID: 12795412, DktEntry: 32-7, Page 184 of 194

Case 3:18-cv-06509-WHA Document 61-2 Filed 09/09/21 Page 183 of 190
Case 4:09-cv-05796-CW Document 424 Filed 09/01/15 Page 183 of 25

62.   This Agreement shall be valid and binding on, and faithfully kept, observed, performed, and be enforceable by and against the parties, their successors and assigns.

63.   The obligations governed by this Agreement are severable.  If for any reason a part of this Agreement is determined to be invalid or unenforceable, the presumption will be that such a determination shall not affect the remainder, subject to a party's right to raise the severability issue in accordance with Paragraph 53.

64.   The waiver by one party of any provision or breach of this Agreement shall not be deemed a waiver of any other provision or breach of this Agreement.

PLAINTIFFS TODD ASHKER, RONNIE DEWBERRY, LUIS ESQUIVEL, GEORGE FRANCO, RICHARD JOHNSON, PAUL REDD, GABRIEL REYES, GEORGE RUIZ, AND DANNY TROXELL

Dated:  August 31, 2015

_____
JULES LOBEL
CENTER FOR CONSTITUTIONAL RIGHTS
*Attorneys for Plaintiffs*

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION

Dated:  August 31, 2015

_____
JEFFREY BEARD, SECRETARY

**APPROVED AS TO FORM:**

Dated:  August 31, 2015

_____
JULES LOBEL (*pro hac vice*)
Email:  jll4@pitt.edu
ALEXIS AGATHOCLEOUS (*pro hac vice*)
Email: aagathocleous@ccrjustice.org
RACHEL MEEROPOL (*pro hac vice*)
Email: rachelm@ccrjustice.org
SAMUEL MILLER
Email: samrmiller@yahoo.com
SOMALIA SAMUELS
Email: ssamuels@ccrjustice.org
AZURE WHEELER
Email: awheeler@ccrjustice.org
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6478
Fax: (212) 614-6499

22

Settlement Agreement (C 09-05796 CW)

ANNE CAPPELLA (Bar No. 181402)
Email: anne.cappella@weil.com
AARON HUANG (Bar No. 261903)
Email: aaron.huang@weil.com
BAMBO OBARO (Bar No. 267683)
Email: bambo.obaro@weil.com
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065-1134
Tel: (650) 802-3000
Fax: (650) 802-3100

CAROL STRICKMAN (SBN 78341)
Email: carol@prisonerswithchilodren.org
LEGAL SERVICES FOR PRISONERS WITH
CHILDREN
1540 Market Street, Suite 490
San Francisco, CA 94102
Tel: (415) 255-7036
Fax: (415) 552-3150

CARMEN E. BREMER
Email: Carmen.bremer@cojk.com
CHRISTENSEN, O'CONNOR,
JOHNSON & KINDNESS PLLC
1201 Third Avenue, Suite 3600
Seattle, WA 98101-3029
Tel: (206) 695-1654
Fax: (206) 224-0779

GREGORY D. HULL (State Bar No. 57367)
E-mail: greg@ellenberghull.com
ELLENBERG & HULL
4 N 2nd Street, Suite 1240
San Jose, CA 95113
Telephone: (408) 998-8500
Fax: (408) 998-8503

CHARLES F.A. CARBONE (Bar No. 206536)
Email: Charles@charlescarbone.com
LAW OFFICES OF CHARLES CARBONE
P. O. Box 2809
San Francisco, CA 94126
Tel: (415) 981-9773
Fax: (415) 981-9774

MARILYN S. MCMAHON (SBN 270059)
Email: Marilyn@prisons.org
CALIFORNIA PRISON FOCUS
1904 Franklin Street, Suite 507
Oakland, CA 94612
Tel: (510) 734-3600
Fax: (510) 836-7222

23

AGO 001244

Case: 22-16162, 09/19/2023, ID: 12795412, DktEntry: 32-7, Page 186 of 194

Case 3:18-cv-06350 WHA Document 61-12 Filed 04/00/21 Page 185 of 190
Case 4:09-cv-05796-CW Document 242 Filed 09/01/15 Page 235 of 25

1

2          ANNE BUTTERFIELD WEILLS (SBN 139845)
           Email: abweills@gmail.com
3          SIEGEL & YEE
           499 14th Street, Suite 300
4          Oakland, CA 94612
           Tel: (510) 839-1200
           Fax: (510) 444-6698
5          *Attorneys for Plaintiffs*

6          KAMALA D. HARRIS
           Attorney General of California
7

8    Dated: August **31**, 2015

9          ADRIANO HRVATIN
           Deputy Attorney General
10         *Attorneys for Defendants*

11   SF2012204868
     20778443.doc

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

24

Settlement Agreement (C 09-05796 CW)

AGO 001245

# EXHIBIT 12

**TO DEFENDANTS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**AGO 001246**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| **TODD ASHKER, et al.,** | C 09-05796 CW |
| Plaintiffs, | **[PROPOSED]** ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT AGREEMENT |
| **v.** | |
| **GOVERNOR OF THE STATE OF CALIFORNIA, et al.,** | |
| Defendants. | |

This civil-rights class-action case concerns the California Department of Corrections and Rehabilitation's (CDCR) policies and practices related to gang validation and management and its use of segregated housing, including the Security Housing Unit (SHU) at Pelican Bay State Prison. Plaintiffs claim that CDCR's gang validation policies did not provide sufficient due process and that confinement in Pelican Bay's SHU for ten or more years violates the United States Constitution.

The parties have entered into a settlement agreement (Settlement Agreement or Agreement) (J. Lobel Decl. Ex. A) that would settle all claims for relief asserted in this case. The Court granted preliminary approval of the Agreement on October 14, 2015. (ECF No. 445.) Subsequently, Court-approved notice was timely disseminated to the classes. (ECF No. 456.) The Court has thoroughly considered all comments and objections filed during the notice period.

AGO 001247

1   On January 12, 2016, the parties filed a Joint Motion for Final Approval of Class Action

2   Settlement Agreement.  The parties' Joint Motion seeks an order providing that the Court:  (1)

3   grant final approval of the Settlement Agreement; (2) retain jurisdiction to enforce the

4   Agreement; and (3) stay all proceedings pending completion of the Agreement's terms.  On

5   January 26, 2016, the Court held a Final Fairness Hearing at which counsel for Plaintiffs and

6   Defendants presented argument, and during which the Court considered whether the parties'

7   Agreement is fair, reasonable, and adequate.

8       The Court has presided over the proceedings in the above-captioned action and has

9   reviewed all the pleadings, records, and papers on file.  The Court has reviewed the Joint Motion

10  for Final Approval, along with the Settlement Agreement and supporting documents, and has

11  considered the parties' arguments concerning the settlement of this class action.

12      Therefore, with good cause appearing, the Court hereby orders as follows:

13      1.   For the reasons stated in the Joint Motion for Final Approval, the Court finds, under

14  Rule 23(e) of the Federal Rules of Civil Procedure, that:  (a) all notice requirements have been

15  fulfilled, and that notice was successfully directed in a reasonable manner to class members; and

16  (b) the Settlement Agreement is fair, adequate, and reasonable.  On that basis, final approval of

17  the Settlement Agreement is hereby GRANTED, and the Agreement is incorporated by reference.

18      2.   The Court finds that, for purposes of settlement only, the Settlement Agreement

19  meets the requirements of 18 U.S.C. § 3626(a)(1).

20      3.   The stay of all proceedings in this case is continued pending the completion of the

21  terms of the Settlement Agreement.

22      4.   The Court retains jurisdiction of this matter to enforce the Agreement's terms.

23      **IT IS SO ORDERED.**

24

25  Dated: January 26  , 2016      _____
                                   The Honorable Claudia Wilken

26                                 United States District Court Judge

27

28

AGO 001248

# EXHIBIT 13

**TO DEFENDANTS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT**

**AGO 001249**

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TODD ASHKER, et al., | Case No. 09-cv-05796-CW |
| Plaintiffs. | |
| v. | **JUDGMENT IN A CIVIL CASE** |
| GOVERNOR OF THE STATE OF CALIFORNIA, et al., | |
| Defendants. | |

This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

**IT IS SO ORDERED AND ADJUDGED** that judgment is entered in accordance with the Order Granting Final Approval of Class Action Settlement Agreement (docket no. 488).

Dated: 5/6/2016

Susan Y. Soong, Clerk

By:_____

Melinda K. Lozenski
Deputy Clerk

AGO 001250

1    Rob Bonta
     Attorney General of California
2    Marisa Kirschenbauer
     Supervising Deputy Attorney General
3    Cassandra J. Shryock
     Deputy Attorney General
4    State Bar No. 300360
       455 Golden Gate Avenue, Suite 11000
5      San Francisco, CA  94102-7004
       Telephone:  (415) 510-3622
6      Facsimile:  (415) 703-5843
       E-mail: Cassandra.Shryock@doj.ca.gov
7    *Attorneys for Defendants*
     *C. Vargas, C. Ducart, D. Rothchild, G. Giurbino,*
8    *J. Robertson, J. Fallis, J. Beard, J. McLaughlin,*
     *K. Harrington, M. Russell, M. Ruff, S. Kernan,*
9    *S. Hubbard, and W. Black*

10

11                IN THE UNITED STATES DISTRICT COURT

12               FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                     SAN FRANCISCO DIVISION

14

15

16   **TODD ASHKER**,                    Case No. 3:18-cv-06350-WHA

17                          Plaintiff,   **DEFENDANTS' *RAND* WARNING TO
                                         PLAINTIFF REGARDING OPPOSING
18          v.                           SUMMARY JUDGMENT**

19   **S. KERNAN, et al.**,              Judge:        The Honorable William Alsup
                                         Action Filed:  October 17, 2018
20                          Defendants.

21

22

23       TO PLAINTIFF TODD ASHKER, PRO SE:

24          Plaintiff is advised to read the following warning, which is a verbatim copy of the model

25   warning from *Rand v. Rowland*, 154 F.3d 952, 962-63 (9th Cir. 1998) (en banc):

26

27

28

                                          1

AGO 001251

### *RAND* WARNING

The defendants have made a motion for summary judgment by which they seek to have your case dismissed.  A motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure will, if granted, end your case.

Rule 56 tells you what you must do in order to oppose a motion for summary judgment. Generally, summary judgment must be granted when there is no genuine issue of material fact— that is, if there is no real dispute about any fact that would affect the result of your case, the party who asked for summary judgment is entitled to judgment as a matter of law, which will end your case.  When a party you are suing makes a motion for summary judgment that is properly supported by declarations (or other sworn testimony), you cannot simply rely on what your complaint says.  Instead, you must set out specific facts in declarations, depositions, answers to interrogatories, or authenticated documents, as provided in Rule [56(c)],[1] that contradict the facts shown in the defendant's declarations and documents and show that there is a genuine issue of material fact for trial.  If you do not submit your own evidence in opposition, summary judgment, if appropriate, may be entered against you.  If summary judgment is granted, your case will be dismissed and there will be no trial.

### NORTHERN DISTRICT OF CALIFORNIA LOCAL RULE REQUIREMENTS

Aside from the *Rand* warning, Plaintiff is advised to review the applicable local rules concerning opposing summary judgment.  In particular, Local Rule 7-3(a) instructs you to assert any evidentiary and procedural objections to Defendants' motion in your opposition brief or memorandum, not to exceed twenty-five pages.  Once Defendants file their reply, no additional memoranda, papers, or letters may be filed without prior court approval.  L.R. 7-3(d)(1).  Where Defendants submitted new evidence in their reply, you may file and serve an Objection to Reply Evidence within ten days from the date Defendants served their reply by mail.  *See id.* (extending the seven-day deadline by three days in certain circumstances).  Your Objection may not exceed five pages of text, nor include further argument on the summary-judgment motion.  *Id.*

---

[1] The substance of Rule 56(e) from the 1998 version, when *Rand* was decided, has been reorganized and renumbered with the current version of Rule 56(c).

**AGO 001252**

1    When opposing summary judgment, Local Rule 7-5(a) requires that factual contentions be

2    supported by an affidavit or declaration and by appropriate references to the record.  Extracts

3    from depositions, interrogatory answers, requests for admissions, and other evidentiary matters

4    must be appropriately authenticated by an affidavit or declaration.  An affidavit or declaration

5    may contain only facts, must conform as much as possible to the requirements of Federal Rule of

6    Civil Procedure 56(c), and must avoid conclusions and argument.  L.R. 7-5(b).  Any statement

7    made upon information or belief must specify the basis for that information or belief.  *Id*.  Local

8    Rule 7-5(b) warns that an affidavit or declaration not in compliance with this rule may be stricken

9    in whole or in part.

10

11   Dated:  November 10, 2021                    Respectfully submitted,

12                                                ROB BONTA
                                                  Attorney General of California
13                                                MARISA KIRSCHENBAUER
                                                  Supervising Deputy Attorney General
14
15                                                */s/ Cassandra J. Shryock*
                                                  CASSANDRA J. SHRYOCK
16                                                Deputy Attorney General
                                                  *Attorneys for Defendants*
17   SF2020400523
     42957865.docx
18

19

20

21

22

23

24

25

26

27

28

---

3

**AGO 001253**